**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| TRINSEO PLC, *et al.*, | ) Case No. 26-90545 (CML) |
| | ) |
| Debtors.[1] | ) (Jointly Administered) |
| | ) |
| THE AD HOC GROUP OF EXCLUDED OPCO TERM LENDERS; | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| -against- | ) Adv. Proc. No. _____ |
| | ) |
| ALTER DOMUS (US) LLC; ANGELO, GORDON & CO., L.P.; APOLLO GLOBAL MANAGEMENT INC.; DEUTSCHE BANK AG NEW YORK BRANCH; OAKTREE CAPITAL MANAGEMENT L.P.; TPG AG PRIVATE CREDIT FINANCING 1 LLC; TRINSEO HOLDING S.À R.L.; TRINSEO LUXCO FINANCE SPV S.À R.L.; TRINSEO LUXCO S.À R.L.; AND TRINSEO MATERIALS FINANCE, INC., | ) |
| Defendants. | ) |
| | ) |

**COMPLAINT FOR (I) DECLARATORY
RELIEF UNDER THE RELEVANT CREDIT AGREEMENT,
(II) RECHARACTERIZATION OF CERTAIN INTERCOMPANY LOANS,
(III) SUBORDINATION OF CLAIMS UNDER CERTAIN INTERCOMPANY LOANS,
AND (IV) SUBORDINATION OF CLAIMS UNDER THE REVOLVING CREDIT FACILITY**

Plaintiff the Ad Hoc Group of Excluded OpCo Term Lenders (the "AHG" or "Excluded

Lenders")[2] files this adversary complaint pursuant to Rule 7001 of the Federal Rules of Bankruptcy

---

[1] A complete list of each of the Debtors in these chapter 11 cases (the "Chapter 11 Cases") and the last four digits of each Debtor's taxpayer identification number (if applicable) may be obtained on the website of the Debtors' proposed claims and noticing agent at https://restructuring.ra.kroll.com/trinseo/.  The Debtors' mailing address is 440 East Swedesford Road, Suite 301, Wayne, PA 19087.

[2] The members of the Ad Hoc Group of Excluded OpCo Term Lenders are: CastleKnight Master Fund LP, Elevation CLO 2013-1, Ltd; Elevation CLO 2016-5, Ltd; Elevation CLO 2020-11, Ltd; Elevation CLO 2021-12, Ltd; Elevation CLO 2021-13, Ltd; Elevation CLO 2021-14, Ltd; Elevation CLO 2021-15, Ltd; Elevation CLO 2022-16, Ltd; Signal

Procedure against Defendants  Alter Domus (US) LLC; Angelo, Gordon & Co., L.P.; Apollo Global Management Inc.; Deutsche Bank AG New York Branch; Oaktree Capital Management L.P.; TPG AG Private Credit Financing 1 LLC; Trinseo Holding S.à r.l.; Trinseo Luxco Finance SPV S.à r.l.; Trinseo Luxco S.à r.l.; and Trinseo Materials Finance, Inc. ("Defendants").  As the basis for this Complaint, the AHG states as follows:

## NATURE OF THE ACTION

1. This adversary proceeding challenges a series of prepetition liability management exercises (the "LMEs") that laid the groundwork for the chapter 11 plan of reorganization now before this Court—a plan that would transfer control of the Debtors to a group of lenders (the "Super HoldCo Lenders"), compensate those lenders for inequitable conduct, and substantially impair recovery on over $700 million in first-lien term loans (the "2028 OpCo Term Loan") under a senior secured credit agreement dated September 6, 2017 (as amended from time to time thereafter, the "OpCo Credit Agreement").[3]

2. The first of these LMEs dates back to 2023.  At that time, the Debtors were in significant financial distress—their operating performance had deteriorated, and they faced mounting cash needs.  The Debtors' capital structure consisted primarily of the 2028 OpCo Term Loan, which was secured by liens on the Debtors' principal operating units.  Faced with these challenges, the Debtors could have sought additional financing from the most logical source—the 2028 OpCo Term Loan lenders with the largest exposure in the capital structure.

3. Instead, the Debtors entered into a transaction with the Super HoldCo Lenders and, in doing so, disregarded fundamental contractual protections belonging to the AHG under the

---

Peak CLO 4, Ltd.; Signal Peak CLO 5, Ltd.; Signal Peak CLO 7, Ltd.; Signal Peak CLO 8, Ltd.; Signal Peak CLO 9, Ltd.; Signal Peak CLO 10, Ltd.; and Signal Peak CLO 12, Ltd.

[3] Capitalized terms used but not defined herein shall have the meaning ascribed in the OpCo Credit Agreement.

OpCo Credit Agreement.  The OpCo Credit Agreement provided limited flexibility to raise new financing.  At the time, the existing basket capacity for new indebtedness stood at around $375 million—a fraction of the $1.077 billion that the Debtors sought to borrow.  The lead borrower ("OpCo Borrower")[4] was the corporate parent of all the operating subsidiaries of the Debtors, and the OpCo Credit Agreement did not permit this corporate parent from guaranteeing new lending. This prevented the Debtors from conducting the "drop down" or "double dip" LME structures sometimes seen in the capital markets.

4.  Undeterred, the Debtors and the Super HoldCo Lenders structured a transaction that, while creative, violated the OpCo Credit Agreement in multiple respects.

5.  *First*, instead of issuing new debt at the level of the OpCo Borrower (which would have required consent from the 2028 OpCo Term Loan lenders), the Debtors created a brand-new shell SPV (Trinseo Luxco Finance SPV S.à r.l., or "Luxco SPV") to act as borrower on the new $1.077 billion of debt lent by the Super HoldCo Lenders (the "Super HoldCo Loan").  That SPV was placed directly below Trinseo PLC, the publicly traded parent holding company of the group.

6.  *Second*, in an attempt to expand the existing basket capacity under the OpCo Credit Agreement, the Debtors used $125 million in proceeds from the new financing to manufacture an "equity contribution" into the OpCo Borrower.

7.  *Third*, using this fictional basket capacity, the Debtors then transferred one of the Debtors' most valuable assets—a joint venture interest in Americas Styrenics ("AmSty")—into an unrestricted subsidiary.

---

[4] Trinseo Materials Operating S.C.A., the initial lead borrower, merged with Trinseo Holding S.à r.l. in December 2024 and the merged entity became the lead borrower.

8. *Fourth*, the Debtors then caused this unrestricted subsidiary (the new owner of AmSty) to guarantee the new Super HoldCo Loan. This was no ordinary guarantee. Luxco SPV sat immediately below the ultimate parent company, and thus, the new guarantee was a distribution in respect of the equity interests of the parent in the OpCo borrowers. This had critical consequences under the OpCo Credit Agreement. As additional credit support, the Debtors then took substantially all of the unrestricted subsidiaries in the OpCo structure and had them also guarantee the new Super HoldCo Loan.

9. *Finally*, Luxco SPV contributed $948 million of the new financing to the OpCo Borrower—not as an equity contribution, but under the guise of an intercompany "loan." The intercompany "loan" was a loan in name only. It had every hallmark of an equity contribution between corporate affiliates. Calling it a "loan" served no legitimate business purpose, was entered into between conflicted fiduciaries of the two borrowers, and was an attempt to manufacture an artificial claim in bankruptcy for the Super HoldCo Lenders. If credited as a "loan," the intercompany transaction would mean the Debtors collectively incurred roughly *$2 billion* in new debt to obtain roughly *$1 billion* of new capital.

10. The 2023 LME laid the groundwork for a series of increasingly aggressive and unlawful transactions that continued to the eve of bankruptcy. In 2025, the Debtors further upsized the intercompany "loans" by nearly $500 million and entered into a $300 million revolving credit facility (the "OpCo RCF"). The Debtors attempted to give the OpCo RCF "super-priority" status through an off-market intercreditor agreement (the "ICA"). As the Debtors' insolvency became apparent, the Super HoldCo Lenders obtained other unusual ICA provisions that purported to allow them to purchase the OpCo RCF, positioning themselves to execute a loan-to-own strategy upon the Debtors' anticipated bankruptcy filing.

11.     In early 2026, as the Debtors engaged in final restructuring negotiations, the Super HoldCo Lenders completed their loan-to-own strategy.  The Super HoldCo Lenders purchased substantially all of the OpCo RCF, by all accounts at its full par value, so that they could exercise their powers under the ICA in these chapter 11 proceedings and control any OpCo plan confirmation.

12.     The net result is the chapter 11 plan now before this Court.  The Super HoldCo Lenders stand to receive substantially all of the takeback debt and equity of the Debtors at emergence, along with substantial backstop fees, DIP financing fees, and other transaction-related compensation.  By contrast, the 2028 OpCo Term Loan lenders—lenders who hold a first-in-time, first-priority lien on substantially all value in the OpCo Debtors—stand to receive virtually nothing on account of their claims.

13.     As detailed below, the 2023 LME violated numerous provisions of the OpCo Credit Agreement.  The financial engineering to manufacture additional basket capacity was non-compliant.  The new guarantee following the AmSty transfer violated clear prohibitions on the distribution of property "with respect to the Equity Interests" in the OpCo Borrower.  And these breaches consequently prevented the issuance of the $948 million intercompany "loan," which is otherwise subject to recharacterization and thus void.

14.     As a result, the remaining transactions premised on the 2023 LME—the 2025 intercompany "loans," the ICA, and the "super-priority" of the OpCo RCF—are equally invalid. Each of these subsequent transactions depended on consents that could be delivered only through votes of the intercompany "loan."  With that loan void *ab initio*, the remaining transactions are void as well.

5

15.     In addition, any claims by the Super HoldCo Lenders under the OpCo RCF should be equitably subordinated.  In the period leading up to these Chapter 11 Cases, the Super HoldCo Lenders acquired the OpCo RCF for the purpose of effectuating their loan-to-own strategy, concealing the prior breaches, and constraining the AHG's rights in these proceedings.  That inequitable conduct warrants subordination of any "super-priority" status that might otherwise accrue to the OpCo RCF.

16.     Accordingly, the AHG brings this Action to protect their rights and seek appropriate relief against Defendants.

## JURISDICTION AND VENUE

17.     The Court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. §§ 1334.  This is a core proceeding under 28 U.S.C. § 157(b).

18.     Venue is proper in this district under 28 U.S.C. §§ 1408 and 1409.

19.     This adversary proceeding is commenced pursuant to Bankruptcy Rule 7001(2), which contemplates that an action "to determine the validity, priority, or extent of a lien or other interest in property" be brought by adversary proceeding, and section 105(a) of title 11 of the United States Code (the "Bankruptcy Code").

20.     Pursuant to Rule 7008-1 of the Bankruptcy Local Rules for the United States Bankruptcy Court for the Southern District of Texas, the AHG consents to the entry of a final judgment or order with respect to this Complaint if it is determined that the Court would lack Article III jurisdiction to enter such final order or judgment absent the consent of the parties.

## THE PARTIES

21.     Plaintiff CastleKnight Master Fund LP is a Cayman Islands limited partnership, managed by CastleKnight Management LP. CastleKnight Master Fund LP is the beneficial owner of $271,809,527 in face value of 2028 OpCo Term Loans.

6

22.     Plaintiff Elevation CLO 2013-1, Ltd; Elevation CLO 2016-5, Ltd; Elevation CLO 2020-11, Ltd; Elevation CLO 2021-12, Ltd; Elevation CLO 2021-13, Ltd; Elevation CLO 2021-14, Ltd; Elevation CLO 2021-15, Ltd; and Elevation CLO 2022-16, Ltd (collectively, the "ArrowMark Funds") are the funds managed by ArrowMark Partners, each with a principal place of business in Denver, Colorado.  The ArrowMark Funds are the beneficial owners of $14,423,155 in face value of 2028 OpCo Term Loans.

23.     Plaintiff Signal Peak CLO 4, Ltd.; Signal Peak CLO 5, Ltd.; Signal Peak CLO 7, Ltd.; Signal Peak CLO 8, Ltd.; Signal Peak CLO 9, Ltd.; Signal Peak CLO 10, Ltd.; and Signal Peak CLO 12, Ltd. (collectively, the "Signal Peak Funds") are funds managed by ORIX Advisers LLC, each with a principal place of business in Dallas, Texas.  The Signal Peak Funds are the beneficial owners of $7,451,387 in face value of 2028 OpCo Term Loans.

24.     Defendant Alter Domus (US) LLC is a Delaware limited liability company with its principal place of business at 225 W. Washington Street, 9th Floor, Chicago, Illinois 60606.

25.     Defendant Angelo, Gordon & Co., L.P. ("Angelo Gordon") is a Delaware limited partnership with its principal place of business at 245 Park Avenue, 26th Floor, New York, New York 10167.

26.     Defendant Apollo Global Management Inc. ("Apollo") is a Delaware corporation with its principal place of business at 9 West 57th Street, New York, New York 10019.

27.     Defendant Deutsche Bank AG New York Branch ("Deutsche Bank") is a licensed branch of Deutsche Bank AG, located at One Columbus Circle, New York, New York 10019. Deutsche Bank AG is incorporated as a German stock corporation with its principal place of business and registered head office located at Taunusanlage 12, 60325 Frankfurt am Main, Germany.

28.      Defendant Oaktree Capital Management L.P. ("Oaktree") is a Delaware limited partnership with its principal place of business at 333 South Grand Avenue, 28th Floor, Los Angeles, California 90071.

29.      Defendant TPG AG Private Credit Financing 1 LLC ("TPG AG") is a Delaware limited liability company managed by Angelo Gordon.

30.      Defendant Trinseo Holding S.à r.l. ("Trinseo Holdings") is a private limited liability company organized under the laws of the Grand Duchy of Luxembourg, with its registered office at 26, Boulevard Royal, L-2449 Luxembourg, Grand Duchy of Luxembourg.  Trinseo Holdings is a wholly owned subsidiary of Trinseo S.A.  Trinseo Materials Operating S.C.A. ("OpCo Borrower") was a partnership limited by shares (société en commandite par actions) organized under the laws of the Grand Duchy of Luxembourg, acting by its general partner, Trinseo Materials S.à r.l.  In December 2024, OpCo Borrower merged with Trinseo Holdings, and the merged entity became the lead borrower under the OpCo Credit Agreement.  After December 2024, "OpCo Borrower" refers to the merged entity.

31.      Defendant Trinseo Luxco Finance SPV S.à r.l. ("Luxco SPV") is a private limited liability company incorporated and existing under the laws of the Grand Duchy of Luxembourg, with registered office at 26, Boulevard Royal, L-2449, Luxembourg, Grand Duchy of Luxembourg.  Luxco SPV is an indirect wholly owned subsidiary of Trinseo PLC.

32.      Defendant Trinseo Luxco S.à r.l. ("Trinseo Luxco") is a private limited liability company incorporated and existing under the laws of the Grand Duchy of Luxembourg, with registered office at 26 Boulevard Royal, L-2449, Luxembourg, Grand Duchy of Luxembourg. Trinseo Luxco is an indirect wholly owned subsidiary of Trinseo PLC.

33.     Defendant Trinseo Materials Finance, Inc. is a Delaware Corporation.  Trinseo Materials Finance, Inc. is a wholly owned subsidiary of Trinseo S.A.

34.     Non-party Trinseo PLC ("Parent") is a public limited company existing under the laws of Ireland.  Parent's global operating center is located in Wayne, Pennsylvania.  Parent has regional operating centers throughout North America, Europe and Asia Pacific.

35.     The Debtors' current corporate structure, as shown in documents accompanying the Petition, is shown in **Exhibit A** attached hereto.

## FACTUAL BACKGROUND

### I.     The Debtors

36.     Trinseo was founded in 2010 as a specialty materials company.  It manufactures plastics and latex binders used in the automotive, appliance, electronics, medical, and packaging industries, among others.

37.     The Debtors operate manufacturing and production facilities around the world.  As of December 2023, these included thirty-four manufacturing plants and one recycling facility across twenty sites in thirteen countries, as well as eleven research and development facilities.

38.     Today, the company operates under four reportable business segments: Engineered Materials, Latex Binders, Polymer Solutions, and Americas Styrenics.  Until recently, Parent traded on the New York Stock Exchange under the ticker symbol "TSE".

### II.    The OpCo Credit Group Enters the OpCo Credit Agreement, With Important Lender Protections

39.     On September 6, 2017, Trinseo Holdings, Trinseo Materials S.à r.l., OpCo Borrower, and Trinseo Materials Finance Inc. (together, the "OpCo Credit Group"), entered into the OpCo Credit Agreement.  Various subsidiaries of Trinseo Holdings guaranteed the OpCo Credit

Group's obligations under the OpCo Credit Agreement (the "Guarantors"). The OpCo Credit Group and Guarantors include the Debtors' main operating entities in the U.S. and internationally.

40. At the time of the 2023 LME (discussed *infra*), the Debtors' debt included: (i) $700 million in term loans maturing in 2024 (the "2024 OpCo Term Loans") under the OpCo Credit Agreement; (ii) $750 million in term loans maturing in 2028 (the "2028 OpCo Term Loans") under the OpCo Credit Agreement; (iii) $500 million in unsecured senior notes maturing in 2025 (the "2025 Unsecured Notes"); (iv) unsecured senior notes maturing in 2029 (the "2029 Unsecured Notes"); and (v) $375 million in a revolving credit facility.

41. The AHG owns approximately 40% of the 2028 OpCo Term Loans.

42. The OpCo Credit Agreement includes a number of provisions that are designed to protect the AHG and other 2028 OpCo Term Loan lenders by maintaining sufficient assets within the OpCo Credit Group to ensure repayment of the 2028 OpCo Term Loans, while prohibiting the OpCo Borrower from refinancing or incurring additional term loans if enumerated requirements and preconditions are not met.

41. Among these provisions, sections 1.01, 2.16 and 2.17 of the OpCo Credit Agreement limit the OpCo Borrower's ability to execute amendments without seeking lender consent to consummate a "Credit Extension," which includes the incurrence of any additional incremental term loans or the refinancing of existing term loans (a "Credit Extension Amendment").[5] Sections 2.16(d) and 2.17(d) provide that "the effectiveness of any [Credit Extension] Amendment . . . shall be subject to the satisfaction" on the applicable date that "the conditions of Section 4.02 shall be satisfied."

---

[5] The OpCo Credit Agreement permits such incremental or refinancing term loans to rank either *pari passu* or junior in right of payment and right of security to existing obligations. OpCo Credit Agreement §§ 2.16(e)(i)(A) and 2.17(e)(i)(G).

42.     Section 4.02 requires that with respect to any Credit Extension "no Default shall exist or would result from such proposed Credit Extension or from the application of the proceeds therefrom." OpCo Credit Agreement § 4.02(b). A "Default" is defined as any event or condition that constitutes an Event of Default or that, with the giving of any notice, the passage of time, or both, would be an Event of Default. OpCo Credit Agreement § 1.01.

43.     Under section 8.01, Events of Default include, among other things, the OpCo Borrower's failure to "perform or observe any term, covenant or agreement contained in" the OpCo Credit Agreement, to make payments of principal or interest, or to pay debts as they become due.

44.     The covenants in the OpCo Credit Agreement that must be observed to avoid a Default or Event of Default—and, thus, permit Credit Extensions—include negative covenants that limit what the OpCo Borrower and its Restricted Subsidiaries can do with their assets and limit the OpCo Borrower's ability to designate Restricted Subsidiaries as Unrestricted Subsidiaries.

45.     Among these covenants, section 7.06 prohibits the OpCo Borrower and its Restricted Subsidiaries from directly or indirectly making a "Restricted Payment" unless such payment falls within defined carve-outs. This provision limits the ability of the OpCo Borrower and its Restricted Subsidiaries to issue dividends or make other distributions of property on account of their equity interests, thus maintaining assets within the OpCo Credit Group.

46.     Specifically, section 1.01 of the OpCo Credit Agreement defines "Restricted Payment" as:

> (i) any dividend or other distribution (whether in cash, securities or other property) with respect to any Equity Interest of the OpCo Borrower or any Restricted Subsidiary, or any payment (whether in cash, securities or other property), including any sinking fund or

11

similar deposit, on account of the purchase, redemption, retirement, defeasance, acquisition, cancellation or termination of any such Equity Interest, or on account of any return of capital to the OpCo Borrower's or a Restricted Subsidiary's stockholders, partners or members (or the equivalent Persons thereof) and (ii) any Restricted Investment.

"Equity Interest" is defined as "with respect to any Person, all of the shares, interests, rights, participations or other equivalents (however designated) of capital stock of (or other ownership or profit interests or units in) such Person."

47.     Other than the Credit Extension Amendments addressed above, the OpCo Credit Agreement cannot be amended absent a writing signed by "Required Lenders" or those Lenders otherwise specified in section 10.01.  Required Lenders are those "Lenders having more than 50% of the sum of" the total outstanding debt and unused commitments.

48.     Collectively, these provisions serve a critical protective function—to ensure that sufficient assets remain available to support the AHG's 2028 OpCo Term Loans either directly as collateral or through residual equity value, thereby preventing the dilution of the AHG's credit support via distributions to entities that are neither obligors or their subsidiaries.  These provisions also ensure that the OpCo Borrower is in strict compliance with its obligations under the OpCo Credit Agreement before it can amend the agreement to incur debt dilutive to existing lenders without their consent.

49.     The aforementioned sections of the OpCo Credit Agreement have never been amended and remain in full force and effect.

### III.     Defendants Consummate the 2023 LME

50.     In the years following the OpCo Credit Agreement, the Debtors faced financial headwinds from geopolitical and macroeconomic events.  By the summer of 2023, the Debtors'

consolidated financial statements showed negative book equity, and their debt was trading well below par.  The company had been cash-flow negative for years.

51.     By year-end 2022, the Debtors still owed $663.4 million on the 2024 OpCo Term Loans and $500 million on the 2025 Unsecured Notes.  Both debts were coming due soon, and the Debtors needed to raise new capital to address those maturities.

52.     Around this time, an ad hoc group of 2028 OpCo Term Loan lenders—which had historically been a constructive partner of the Debtors—began discussions with the Debtors about how to address the looming debt maturities.  The group was hopeful that the Debtors would work with existing lenders and noteholders to find a solution.

53.     Instead of working with these existing lenders, the Debtors chose to raise $1.077 billion in new financing from the Super HoldCo Lenders.

**A.     The Steps of the 2023 LME**

54.     The 2023 LME was carried out in the following steps.  *First*, the Debtors created a new special purpose vehicle, Luxco SPV, to borrow $1.077 billion from the Super HoldCo Lenders.  Luxco SPV was placed in the corporate structure directly below Parent, the publicly traded holding company at the top of the Debtors' corporate structure.  *See* Ex. A.

55.     *Second*, the Debtors funneled $125 million from the new Super HoldCo financing into OpCo Borrower, labeling it an "equity contribution" to artificially inflate the basket capacity under the OpCo Credit Agreement.  Specifically, Luxco SPV made a $125 million intercompany loan (the "Parent Intercompany Loan") to Trinseo Luxco (an entity that shortly thereafter became a party to the OpCo Credit Agreement), which was in turn directed down to Trinseo Holdings, then OpCo Borrower (which shortly thereafter merged with Trinseo Holdings) as an "equity contribution" (the "Basket Capacity Equity Contribution").

56.     *Third*, using this artificially enlarged basket capacity, the Debtors transferred one of their most valuable assets—a 50% joint venture interest in Americas Styrenics LLC (the "AmSty JV")—out of the OpCo Credit Group.  Specifically, a Guarantor of the 2028 OpCo Term Loans contributed the AmSty JV to Trinseo NA Finance SPV LLC and Trinseo NA Finance LLC (the "AmSty Unsubs"), which the Debtors had designated as Unrestricted Subsidiaries under the OpCo Credit Agreement (the "AmSty Dropdown").  The AmSty JV had been one of the Debtors' most reliable cash generators, producing average adjusted EBITDA of approximately $100 million per year and paying average annual dividends of $85 million.

57.     *Fourth*, the Debtors then caused the AmSty Unsubs to guarantee the new Super HoldCo debt borrowed by Luxco SPV, giving the Super HoldCo Lenders a structurally senior secured claim on the AmSty assets.  Because Luxco SPV sat immediately below Parent in the corporate structure, this guarantee could only have been issued in respect of Parent's equity interests in OpCo Borrower.  In addition, certain non-U.S. subsidiaries (the "Foreign Guarantors")[6] that were not obligors on either the 2024 OpCo Term Loans or the 2025 Unsecured Notes being repaid as part of this transaction issued a secured guaranty (the "Foreign Guaranty") of the Super HoldCo Loan, capped at $340 million (the "Guarantee Limit").

58.     *Finally*, Luxco SPV contributed $948 million of the new financing to OpCo Borrower as an intercompany "loan" (the "2023 Intercompany Loan") that was documented as *pari passu* with the 2028 OpCo Term Loans through a Credit Extension Amendment to the OpCo Credit Agreement.[7]  OpCo Borrower used the proceeds of the 2023 Intercompany Loan, together

---

[6] The Foreign Guarantors are Trinseo Belgium B.V., Trinseo Operating Belgium B.V., Trinseo Deutschland Gmbh, Trinseo Deutschland Anlagengesellschaft mbH, Trinseo Deutschland Re GP Gmbh, Trinseo Deutschland Re Gmbh & Co. KG, PT Trinseo Materials Indonesia, PT Trinseo Operating Indonesia, and Taiwan Trinseo Limited.

[7] The 2023 Intercompany Loan technically has two elements (i) $680 million in 2023 Refinancing Term Loans the proceeds of which were used to pay off the 2024 OpCo Term Loans and (ii) $268 million in 2023 Incremental Term Loans the proceeds of which were used to pay off a portion of the 2025 Unsecured Notes.  One of the conditions to

with cash on hand, to repay the full remaining balance of the 2024 Term Loans and $385 million of the $500 million of 2025 Unsecured Notes.

59.     The result of the 2023 LME was a structure that inherently favored the Super HoldCo Lenders at the expense of the AHG.  The Super HoldCo Lenders obtained an indirect first-lien claim (*pari passu* with the 2028 OpCo Term Loans) against OpCo Borrower through the 2023 Intercompany Loan, while also taking exclusive collateral support from the AmSty JV and the Foreign Guaranty—assets and guarantees that had previously supported the AHG's loans.  This structure violated the AHG's bargained-for protections under the OpCo Credit Agreement.

**B.     A Precondition to the 2023 LME Was Not Met, Rendering the 2023 Amendment Ineffective**

60.     The 2023 LME could not take effect unless every part of the transaction was permitted under the OpCo Credit Agreement.  It was not.  The 2023 Intercompany Loan was structured as incremental and refinancing term loans under sections 2.16 and 2.17 of the OpCo Credit Agreement and documented through a September 2023 Credit Extension Amendment (the "2023 Amendment") without the consent of any existing 2028 OpCo Term Loan lender.  But the 2023 LME triggered a Default—specifically, a prohibited Restricted Payment—that blocked the amendment from taking effect.

61.     The OpCo Credit Agreement bars the OpCo Borrower and its Restricted Subsidiaries from directly or indirectly making any "Restricted Payment"—which includes any distribution of cash, securities, or other property "with respect to any Equity Interest of the" OpCo Borrower, and any "Restricted Investment"—unless a specific exception applies.

---

the 2023 Amendment was execution by the Loan Parties of an Acknowledgment and Confirmation that the 2023 Refinancing and Incremental Term Loans form part of the "Secured Obligations" as defined in each Collateral Document.

62.     OpCo Borrower lacked sufficient Restricted Payments capacity to carry out the AmSty Dropdown.  At the time, the Debtors' existing investment capacity for Restricted Payments and Restricted Investments was approximately $375 million.  The Debtors tried to increase capacity by the $125 million Parent Intercompany Loan and Basket Capacity Equity Contribution using a builder basket that allowed the OpCo Borrower to build additional capacity by increasing cash flow in certain ways, such as by receiving cash as an equity contribution.

63.     However, a Disqualified Equity Interest cannot increase capacity.  Under the OpCo Credit Agreement, equity is "disqualified" if, among other things, it "matures or is mandatorily redeemable . . . pursuant to a sinking fund or otherwise . . . ."  The Basket Capacity Equity Contribution had a mandatory redemption date and, thus, was disqualified.  As a result, there was insufficient capacity to dropdown the AmSty JV, which had a value of at least $500 million.

64.     Even if the equity were not disqualified (and it is), it may not constitute equity at all.  On September 8, 2023—the same day as the rest of the 2023 LME—the $125 million was transferred as an intercompany loan to Trinseo Luxco and immediately passed down to OpCo Borrower.[8]  In other words, the Debtors accomplished in two connected steps what the main $948 million intercompany "loan" accomplished in one: lending money from Luxco SPV to the OpCo Borrower.  The Debtors cannot have it both ways:  Either the 2023 Intercompany Loan must be treated as equity, just like the claimed intercompany "equity" contribution; or, the intercompany "equity" contribution must be treated as debt.[9]

65.     A further violation occurred when the AmSty UnSubs issued a secured guaranty for the Super HoldCo Loan in favor of Luxco SPV, thus distributing a property interest outside the

---

[8] The $125 million was contributed first to Trinseo Holdings then to OpCo Borrower.  Shortly thereafter, these entities merged and Trinseo Holdings became OpCo Borrower.

[9] This is consistent with how Trinseo Holdings treated it in its financial statements—as a liability owed to an affiliate.

existing credit group to an entity owned entirely by Parent, which also indirectly owned 100% of the equity interests in OpCo Borrower.  This distribution was made "with respect to" the Equity Interests in OpCo Borrower because it was made on account of—and would not have occurred but for—Parent's equity ownership in OpCo Borrower.  There is no other reason the OpCo Borrower would distribute property to a wholly owned subsidiary of its ultimate parent.

66.     None of the carveouts in section 7.06 applied to this secured guaranty.  Having already exhausted (and in fact, exceeded) any remaining basket capacity through the AmSty Dropdown itself, OpCo Borrower lacked sufficient dollar-based capacity to grant a security interest backing over $1 billion in debt or distribute the value of the AmSty Unsubs through a secured guaranty.

67.     Either way, each of these maneuvers thus gave rise to Events of Default under the OpCo Credit Agreement.  Because a necessary precondition to the 2023 Amendment was not satisfied, the 2023 Intercompany Loan was never validly issued under the OpCo Credit Agreement, Luxco SPV never became a Lender under the OpCo Credit Agreement, and the 2023 Amendment was void *ab initio*.

68.     As a result, the 2023 Intercompany Loan is not secured, at least not on a pari basis with the 2028 OpCo Term Loans.  The 2023 Intercompany Loan was purportedly secured by virtue of being issued under the OpCo Credit Agreement and receiving the attendant grant of security interests provided to the Obligations under that agreement.  Because the 2023 Intercompany Loan was not validly issued and does not qualify as an Obligation, it is not secured by the grant of security interests provided under the OpCo Credit Agreement and other Loan Documents.

17

C. **Conflicted Fiduciaries Executed the 2023 LME for the Improper Purpose of Manufacturing a Bankruptcy Claim for the Super HoldCo Lenders**

69. The 2023 LME was approved by the same individuals who, because of their overlapping management positions, owed fiduciary duties to both Luxco SPV and OpCo Borrower. The Super HoldCo Lenders and Luxco SPV took advantage of this conflict to cause OpCo Borrower's fiduciaries to enter into the 2023 Intercompany Loan—a transaction that was not in OpCo Borrower's best interests or the interests of its creditors. Because Luxco SPV and OpCo Borrower had the same parent and the same fiduciaries, Luxco SPV knew of the fiduciaries' duties and knowingly participated in the breach of those duties.

70. There is no evidence that anyone negotiated, deliberated over, or performed due diligence on the 2023 Intercompany Loan on behalf of either Luxco SPV or OpCo Borrower. On information and belief, none of the usual steps that precede a major loan occurred: there was no exchange of term sheets, no negotiation of terms, no attempt to find alternative financing, and no underwriting or credit analysis. Nor is there any indication that Luxco SPV ever evaluated whether OpCo Borrower could repay the loan.

71. Luxco SPV benefited from this arrangement because it was able to obtain new lending from the Super HoldCo Lenders on more favorable terms than it could have without the intercompany loan. The gains from the 2023 Intercompany Loan went primarily to Luxco SPV and its creditors, while the costs fell on OpCo Borrower and its creditors.

72. The 2023 LME—and in particular the 2023 Intercompany Loan—gave OpCo Borrower no net benefit and served no legitimate business purpose. While the 2023 LME pushed out the maturity dates on some existing debt, it did so at the cost of adding far more expensive debt that increased the Debtors' interest burden and only delayed an inevitable bankruptcy.

18

73. For example, the 2024 Term Loans that were paid off with proceeds of the 2023 Intercompany Loan bore an interest rate of approximately 7.5% and matured in September 2024. The 2025 Unsecured Notes that were partially retired bore a coupon of 5.375% and matured in September 2025. The 2023 Intercompany Loan, by contrast, bore an interest rate of SOFR plus 9.656%—far more expensive than the debt it replaced.

74. The more expensive Super HoldCo debt consumed the Debtors' already strained cash flow. The annual cash interest rate on the Super HoldCo Loan was SOFR plus 8.50% (subject to a 3.00% SOFR floor), compared to a weighted average of about 6.5% on the pre-existing debt. Although the Super HoldCo Credit Agreement allowed the Debtors to elect to pay part of the interest in kind for up to 24 months, even under that scenario, the Debtors' annual cash interest burden was expected to rise by more than $30 million—enough to wipe out all of the modest positive cash flow the Debtors expected to generate in 2024.

75. Obviously, none of these things were in the best interest of the OpCo Borrower. The real purpose of the 2023 Intercompany Loan was to create an artificial claim in bankruptcy for the Super HoldCo Lenders.

76. Although the 2023 Intercompany Loan was structured to look like a loan on paper, it was in economic substance an equity contribution. No independent third-party lender would have extended nearly $1 billion in credit to OpCo Borrower on these terms. The loan was made at a time when the Debtors' existing debt was trading far below par value, and when substantial value—including the AmSty JV and the Foreign Guaranty—was being stripped from the OpCo Borrower's collateral pool.

77. The fact that the 2023 Intercompany Loan was issued at the very same time that collateral support was being stripped from the OpCo Credit Group—through the transfer of AmSty

19

and the issuance of the Foreign Guaranty—further demonstrates that this was equity, not debt.  A genuine lender would expect an absolute right to repayment regardless of the success of borrower's operations and would protect that right by ensuring adequate credit support, but here the collateral securing any such repayment was being simultaneously diminished.

78.     The terms of the 2023 Intercompany Loan are also inconsistent with a standard commercial loan.  For example, the loan requires only quarterly interest payments, rather than the monthly payments typical of a commercial term loan.

79.     Further, Luxco SPV was not in the business of making loans.  On information and belief, Luxco SPV had never lent money to any related entity or third party other than through the Intercompany Loans.  It did so here not for any business purpose, but to manufacture an artificial claim in bankruptcy.

**IV.     Using the Invalid Votes of Luxco SPV as Intercompany Lender, Defendants Consummate the 2025 LME**

80.     After the 2023 LME, the Debtors' capital structure at the OpCo level consisted of: (i) $115 million in remaining 2025 Unsecured Notes, (ii) $447 million in 2029 Unsecured Notes, (iii) approximately $728.9 million in 2028 OpCo Term Loans, (iv) $1.077 billion in loans from the 2023 LME, and (v) $375 million in OpCo RCF.

81.     By the end of 2024, the Debtors' financial condition had worsened further.  Their FY2024 financial statements showed negative book equity and negative $77.5 million in free cash flow.  The Debtors' debt continued to trade well below par.

82.     Looking to capture a discount on the 2029 Unsecured Notes, which were trading at depressed prices, and to retire the remaining 2025 Unsecured Notes, the Debtors carried out a second liability management transaction (the "2025 LME") with the Super HoldCo Lenders.  The

2025 LME was a continuation of the 2023 LME and the next step in the Super HoldCo Lenders' loan-to-own strategy.

### A.      The Steps of the 2025 LME

83.      Even though the 2023 Amendment was invalid due to preexisting defaults, the Debtors proceeded with the 2025 LME anyway, documented through yet another amendment to the OpCo Credit Agreement (the "2025 Amendment").

84.      The 2025 LME had five parts, most of which shifted value from the OpCo Credit Group to the Super HoldCo Lenders at the AHG's expense, while providing only minimal new capital.

85.      *First*, OpCo Borrower designated Aristech Surfaces LLC and Altuglas LLC (the "Additional UnSubs") as "unrestricted subsidiaries" under the OpCo Credit Agreement and added them as guarantors of the Super HoldCo debt—effectively removing them from the OpCo Credit Group.  This shifted value from the OpCo Credit Group to the Super HoldCo Group.

86.      *Second*, the Debtors exchanged $447 million of 2029 Unsecured Notes (at 85% of par value) for new second-lien notes (the "2L Notes") issued by the Super HoldCo Debtors.  The 2L Notes are secured by the same collateral as the Super HoldCo Loans, on a junior basis, and carry a coupon of 7.625%, maturing in May 2029.  The resulting principal amount of the 2L Notes was approximately $379.5 million.

87.      *Third*, the Debtors upsized the intercompany loan by another $494.5 million (the "2025 Intercompany Loan" and, together with the 2023 Intercompany Loan, the "Intercompany Loans").  The 2025 Intercompany Loan bore an interest rate between 7.5% and 9.66%.  The 2025 Intercompany Loan proceeds were contributed to OpCo Borrower and used to

21

retire the remaining $115 million of 2025 Unsecured Notes.  This upsizing further diluted the 2028 OpCo Term Loans for the Super HoldCo Lenders' benefit.[10]

88.      *Fourth*, the Debtors terminated the existing revolving credit facility and replaced it with a new $300 million revolving credit facility (the "2025 OpCo RCF") that claimed "super-priority" status over the 2028 OpCo Term Loans and the Intercompany Loans, even though it was secured by the same collateral.  The agent for the new 2025 OpCo RCF was the same entity that served as agent under the OpCo Credit Agreement, despite an ad hoc group of creditors having sent multiple letters to that agent before the 2023 LME warning that the proposed transactions could breach the OpCo Credit Agreement.

89.      *Fifth*, the $340 million Guarantee Limit on the Foreign Guaranty was eliminated, increasing the Foreign Guarantors' potential exposure from $340 million to approximately $1.7 billion.

90.      Absent the 2025 Amendment, the 2025 LME could not have been consummated because the OpCo Borrower lacked sufficient capacity under the OpCo Credit Agreement to effectuate any of the elements of the 2025 LME.

91.      Similar to the 2023 LME, the 2025 LME purportedly allowed the Super HoldCo Lenders to seek recoveries against the remaining collateral in the OpCo Credit Group, and to have those claims positioned on a *pari passu* basis with those of the AHG.

**B.      The Off-Market ICA**

92.      Through the 2025 LME, the Super HoldCo Lenders—using their control over Luxco SPV as the purported "Intercompany Lender" and the overlapping fiduciaries at OpCo

---

[10] Notably the entire upsizing of the 2023 Intercompany Loan was documented as a *pari passu* claim under the OpCo Credit Agreement.  This conferred a distinct benefit upon the Super HoldCo Lenders as they benefited from an inflated claim.

Borrower—tightened their grip on the OpCo Credit Group, captured more of its value for themselves at the expense of the OpCo lenders, and set the stage to take over the Debtors in bankruptcy.

93. As part of the 2025 LME, the Super HoldCo Lenders—using Luxco SPV's invalid votes—forced Deutsche Bank to enter into a highly unusual Intercreditor Agreement (the "ICA"). The ICA governs the relationship between the new "superpriority" RCF and the "junior" 2028 OpCo Term Loans.

94. In a typical intercreditor agreement, junior creditors get the right to buy out senior debt if the borrower defaults. This allows junior creditors to protect their position rather than let senior creditors foreclose on shared collateral.

95. Here, however, the purchase right was given not to the 2028 OpCo Term Loan lenders (the junior creditors of OpCo Borrower), but instead to the Super HoldCo Lenders—who were creditors of a completely different borrower. This unusual provision ensured that, in a bankruptcy, the Super HoldCo Lenders could buy up the RCF debt, step into the shoes of the RCF lenders, and control the OpCo and Super HoldCo restructuring.

96. The ICA contains several other unusual provisions designed to limit the AHG's ability to protect their interests. For example, the ICA bars the AHG from proposing or participating in any DIP financing—even on a junior basis—unless the superpriority lenders have first turned down the opportunity to provide such financing. This ensures the RCF holders can dictate the DIP financing terms.

**C.     The 2025 Amendment and ICA are Void**

97. The 2025 Amendment and the ICA are void *ab initio* because the OpCo Borrower could not obtain the votes needed to approve them. Unlike the 2023 LME—which was structured

as a Credit Extension Amendment that did not require any existing Lender consent—the 2025 LME required approval by a majority of lenders (the "Required Lenders").

98.    To reach the Required Lenders threshold, the OpCo Borrower had to count votes of Luxco SPV. But Luxco SPV only qualified as a "Lender" through the 2023 Intercompany Loan issued under the 2023 Amendment. Because the 2023 Amendment was itself invalid (due to the Default caused by the 2023 LME), Luxco SPV was never a valid Lender under the OpCo Credit Agreement and its votes should not have counted.

99.    Without Luxco SPV's invalid votes, the 2025 Amendment lacked the required lender support. As a result, each component of the 2025 LME that depended on that amendment is invalid, including: (a) the designation of the Additional UnSubs; (b) the upsizing of the Intercompany Loan; (c) Deutsche Bank's entry into the ICA; and (d) the removal of the Guarantee Limit.

100.   *Separately*, the 2023 Intercompany Loan was not a true loan at all—in economic reality, it was equity. Because Luxco SPV provided equity, not debt, to OpCo Borrower, it did not qualify as a "Lender" under the OpCo Credit Agreement. Without Luxco SPV's consent, the 2025 Amendment is void *ab initio*.

### D.    The Conflicted Fiduciaries Enter and Approve the 2025 LME—Including the 2025 Intercompany Loan

101.   Like the 2023 Intercompany Loan, the 2025 Intercompany Loan was an equity contribution disguised as a loan. Among other things, the 2025 Intercompany Loan: (i) was made between sister entities with the same conflicted managers; (ii) was not negotiated at arm's length; (iii) was not subject to due diligence, term sheet exchange, or any of the usual processes for incurring major debt; (iv) was not modeled based on OpCo Borrower's ability to repay; and (v) was made on terms that no independent lender would have accepted, given that the loan coincided

24

with further value being stripped from the OpCo Borrower through the designation of Aristech and Altuglas as unrestricted subsidiaries.

102. And like the 2023 LME, the 2025 LME was approved by the same individuals who, because of their overlapping management positions, owed fiduciary duties to both Luxco SPV and OpCo Borrower. As with the 2023 Intercompany Loan, the Super HoldCo Lenders and Luxco SPV took advantage of this conflict of interest. It caused, and knowingly participated in, the OpCo Borrower managers' breach of their fiduciary duties by entering into the 2025 Intercompany Loan, which was not in OpCo Borrower's or its creditors' best interests. There is no indication that the 2025 Intercompany Loan was subject to any negotiation, deliberation, or due diligence by either board.

103. The benefits of the 2025 Intercompany Loan went primarily to Luxco SPV, while the costs fell on OpCo Borrower and its creditors.

## V. Defendants Continue to Prejudice the AHG

104. Right after the 2025 LME closed, S&P downgraded the company's credit rating, calling the exchange a "selective default" and noting:

> The exchange was offered at 85 cents on the dollar. As a result, we believe the transaction offered noteholders less value than originally promised on the securities and thus view it as a selective default. Specifically, we do not believe the increased position in the capital stack at a second-lien position and the higher offered coupon is adequate, offsetting compensation for the below-par redemption.

105. As expected, since the 2025 LME, the Debtors' financial position continued to deteriorate, with the company reporting a net loss of $546 million and negative free cash flow of $153.4 million for the full year 2025.

106. In December 2025, the New York Stock Exchange notified Trinseo that it would suspend trading of Trinseo's shares because the share price had stayed below $1 for 30 consecutive

trading days and Trinseo's market capitalization had fallen below $50 million, unless Trinseo submitted a compliance plan. Around the same time, S&P Global Ratings further downgraded Trinseo due to unsustainable debt levels and continued deterioration in the Debtors' operating performance.

107. In January 2026, it was announced that the Debtors and Super HoldCo Lenders had hired advisors and were engaging in discussions around a potential debt restructuring.

108. Since that time, the Super HoldCo Lenders have taken steps to cement their control over the Debtors and these bankruptcy proceedings, and have firmly entrenched themselves as company insiders.

109. The Super HoldCo Lenders purchased all or substantially all of the "superpriority" RCF loans—a move that gave them control over the senior-most debt at the OpCo level, in addition to the control they already exercised over the senior-most debt at the Super HoldCo level.

110. The Super HoldCo Lenders then caused the Debtors to draw down the RCF and transfer those funds to the Super HoldCo entities. The OpCo Credit Group received nothing in return for this transfer. The effect was twofold: it shifted cash to the Super HoldCo Lenders' benefit and increased the amount of RCF debt owed by OpCo.

111. The Debtors' books and records further show that they failed to maintain clear and consistent accounting practices to distinguish between the OpCo and Super HoldCo credit silos— even though the supposed separation between those silos was the entire basis for the priority structure imposed on the AHG. On information and belief, the Debtors routinely shifted cash, expenses, and liabilities between silos without clear documentation or consistent accounting, demonstrating that the Debtors did not in practice operate their business as if the two structures were genuinely separate.

26

112.     The Debtors also forced the OpCo Credit Group to absorb costs that belonged to the enterprise as a whole or exclusively to the Super HoldCo entities—such as taxes attributable to the entire enterprise and management retention payments benefiting the entire enterprise—further draining value from the AHG and the 2028 OpCo Term Loan lenders.

113.     Upon information and belief, the Super HoldCo Lenders, using their insider status, drove the above decisions of the Debtors and have otherwise exercised their control over the Debtors to drive these bankruptcy proceedings, resulting in a RSA and chapter 11 plan of reorganization that were not negotiated at arms' length.

## COUNT I

**Declaratory Judgment of an Event of Default Under the OpCo Credit Agreement, and Invalidating the Intercompany Loans, 2023 and 2025 Amendments, and ICA**
**(Against the Luxco SPV, Trinseo Holdings, Trinseo Luxco, and Trinseo Materials Finance, Inc., Alter Domus (US) LLC, and Deutsche Bank AG New York Branch)**

114.     The allegations set forth above are incorporated herein by reference.

115.     Pursuant to the Declaratory Judgment Act, "[i]n a case of actual controversy within its jurisdiction . . . any court of the United States . . . may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought." 28 U.S.C. §2201(a).  Bankruptcy Courts, as units of the district court, have the authority to issue declaratory judgments.

116.     The OpCo Credit Agreement is a valid and binding contract between the parties.

117.     The OpCo Credit Agreement's investment and restricted payment covenants prohibit OpCo Borrower from making any investments or restricted payments other than those specifically enumerated in, among other places, sections 1.01 and 7.06 of the OpCo Credit Agreement.  The 2023 LME violated those covenants because the OpCo Credit Group had

insufficient investment capacity for the AmSty Dropdown and AmSty Unsubs guaranty of the Super HoldCo Loan.

118.    OpCo Borrower's failure to abide by the OpCo Credit Agreement's terms and covenants constitutes a Default under Sections 1.01 and 8.01(b) of the OpCo Credit Agreement. As a result, under Sections 2.16, 2.17 and 4.02 of the OpCo Credit Agreement, a precondition to the effectiveness of the 2023 Amendment was not met.  Therefore, the 2023 Intercompany Loan and 2023 Amendment are invalid and void *ab initio*, or in the alternative are voidable and should be rescinded (or the AHG should be awarded rescissory damages).

119.    The 2025 Intercompany Loan, 2025 Amendment, and ICA were consummated based on the votes of Luxco SPV as lender of the 2023 Intercompany Loan.  Because that loan is invalid (because the 2023 Amendment was not effective and independently because the loan is equity in economic substance) and Luxco SPV could not vote, the 2025 Intercompany Loan, 2025 Amendment, and ICA are also invalid, void *ab initio*, or in the alternative are voidable and should be rescinded (or the AHG should be awarded rescissory damages).

120.    A real and justiciable controversy exists regarding the proper interpretation and application of the OpCo Credit Agreement.  The AHG seek a declaratory judgment that: (1) the 2023 LME (including the AmSty Dropdown and/or AmSty UnSubs' guarantee of the Super Holdco Loan) breached OpCo Credit Agreement's Restricted Payment covenants and caused a Default; (2) the 2023 Amendment and 2023 Intercompany Loan are void *ab initio*, or in the alternative are voidable and should be rescinded (or the AHG should be awarded rescissory damages); and (3) the 2025 Amendment, 2025 Intercompany Loan, and ICA  are void *ab initio*, or in the alternative are voidable and should be rescinded (or the AHG should be awarded rescissory damages).

## COUNT II

### RECHARACTERIZATION OF INTERCOMPANY LOANS
### (Against Defendant Luxco SPV)

121.    The allegations set forth above are incorporated herein by reference.

122.    The Intercompany Loans were in substance equity investments rather than true loans.  Among other things:

a.    Each of the Intercompany Loans was made between company entities and approved by conflicted fiduciaries of Luxco SPV and the OpCo Borrower;

b.    Luxco SPV was not in the business of lending money, and there was no legitimate commercial basis for the Intercompany Loans;

c.    Luxco SPV understood that the purpose of the Intercompany Loans was to manufacture bankruptcy claims for the Super HoldCo Lenders at the expense of Plaintiff;

d.    There was no arm's length commercial negotiation of the Intercompany Loans, including no due diligence or other underwriting activity characteristic of complex loans of the size of the Intercompany Loans;

e.    The Intercompany Loans were issued on off-market terms that a true third-party lender never would have agreed to, particularly given the financial state of OpCo Borrower at the time of the Intercompany Loans;

f.    Luxco SPV had no real expectation of repayment; and

g.    Neither Luxco SPV nor the OpCo Borrower conducted the usual processes that post-date incurrence of a typical debt, such as periodic reporting to Luxco SPV.

123.    In approving the Intercompany Loans, LuxCo SPV and OpCo Borrower acted in a manner that was contrary to the best interests of the creditors as a whole.

124.    Any purported claims against the Debtors that rely, directly or indirectly, on the Intercompany Loans should be recharacterized as equity claims pursuant to Bankruptcy Code Sections 105(a) and 502(a).

## COUNT III

### EQUITABLE SUBORDINATION OF INTERCOMPANY LOANS
**(Against Defendant Luxco SPV )**

125.    The allegations set forth above are incorporated herein by reference.

126.    Section 510(c) of the Bankruptcy Code allows parties to seek to equitably subordinate allowed claims for the purposes of entitlement to distributions.

127.    The conduct of Luxco SPV described above was wrongful, inequitable, and not in good faith.  The decision to enter into the Intercompany Loans was made by the same conflicted fiduciaries who served at both Luxco SPV and OpCo Borrower.

128.    Luxco SPV knowingly participated in and exploited this conflict of interest by causing the OpCo Borrower fiduciaries, in breach of their fiduciary duties, to enter into the Intercompany Loans, which were not in the best interests of OpCo Borrower or its creditors.

129.    There is no indication that the Intercompany Loans were subject to any negotiation, deliberation, or due diligence by either board.

130.    As related entities with a common parent and identical fiduciaries, Luxco SPV had knowledge of the OpCo Borrower fiduciaries' duties and knowingly participated in the breach.

131.    Luxco SPV benefitted from this misconduct by obtaining the benefit of the Intercompany Loans, including allowing Luxco SPV to obtain more favorable lending terms on the Super HoldCo Loan that would not have been available without the Intercompany Loans.

132.    The benefits of the Intercompany Loans went primarily to Luxco SPV, while OpCo Borrower bore the costs: additional debt at higher interest rates, loss of collateral support through the transfer of AmSty, the designation of Aristech and Altuglas as unrestricted subsidiaries, reduction of revolver capacity, and removal of the Foreign Guaranty limits.  This misconduct gave Luxco SPV an unfair advantage over other creditors.

30

133.     Equitable subordination of Luxco SPV's claims is therefore consistent with the provisions of the Bankruptcy Code, including Bankruptcy Code § 510(c).

## COUNT IV

**EQUITABLE SUBORDINATION OF RCF**
**(Against Defendants Angelo Gordon, Apollo, Oaktree, and TPG AG)**

134.     The allegations set forth above are incorporated herein by reference.

135.     Section 510(c) of the Bankruptcy Code allows parties to seek to equitably subordinate allowed claims for the purposes of entitlement to distributions.

136.     The conduct of the Super HoldCo Lenders described above and herein was wrongful, inequitable, and not in good faith, including that, among other things:

     a.     The Super HoldCo Lenders used invalid votes to force entry into the off-market ICA, which strips the AHG of core bankruptcy rights; and

     b.     The Super HoldCo Lenders began buying up the OpCo RCF loans when the Debtors' insolvency was apparent, and then used OpCo RCF draws—which reduce the recovery available to Plaintiff—to funnel money to themselves via the Super HoldCo entities;

137.     The Super HoldCo Lenders knowingly participated in and benefitted from this misconduct, including by being able to control the bankruptcy process and gain control of the Debtors.

138.     The benefits of this misconduct largely inured to the benefit of the Super HoldCo Lenders and came to the detriment of the Debtors and their creditors, including the AHG.  The misconduct therefore allowed the Super HoldCo Lenders to obtain an unfair advantage over the Debtors' other creditors.

139. Equitable subordination of the Super HoldCo Lenders' claims under the RCF is therefore consistent with the provisions of the Bankruptcy Code, including Bankruptcy Code § 510(c).

## **PRAYER FOR RELIEF**

**WHEREFORE**, the AHG respectfully request that this Court enter judgment in the AHG's favor against Defendants for each claim for relief and grant:

(a) A declaratory judgment declaring that the 2023 LME (including the AmSty Dropdown and/or AmSty UnSubs' guarantee of the Super Holdco Loan) breached OpCo Credit Agreement's Restricted Payment covenants and caused a Default;

(b) A declaratory judgment declaring that the 2023 Amendment and 2023 Intercompany Loan are void *ab initio*, or in the alternative are voidable and should be rescinded (or the AHG should be awarded rescissory damages);

(c) A declaratory judgment declaring that t the 2025 Amendment, 2025 Intercompany Loan, and ICA are void *ab initio*, or in the alternative are voidable and should be rescinded (or the AHG should be awarded rescissory damages);

(d) A judgment recharacterizing the Intercompany Loans as equity;

(e) Subordination of Luxco SPV's claims under the Intercompany Loans below the AHG's secured claims;

(f) Subordination of the Super HoldCo Lenders' claims under the RCF below the AHG's secured claims;

(g) Costs in bringing this action under Bankruptcy Rule 7054; and

(h) Such other and further relief as the Court may deem just and proper.

Respectfully submitted this 26th day of May 2026.

**GRAY REED**

By:     */s/ Jason S. Brookner*
          Jason S. Brookner
          Texas Bar No. 24033684
          Lydia R. Webb
          Texas Bar No. 24083758
1300 Post Oak Blvd., Suite 2000
Houston, Texas 77056
Telephone:    (713) 986-7000
Facsimile:     (713) 986-7100
Email:          jbrookner@grayreed.com
                   lwebb@grayreed.com

-and-

**PALLAS PARTNERS (US) LLP**

Duane L. Loft (*pro hac vice* pending)
Jill L. Forster (*pro hac vice* pending)
Brianna S. Simopoulos (*pro hac vice* pending)
75 Rockefeller Plaza
New York, NY 10019
Telephone:    (212) 970-2300
Email:          duane.loft@pallasllp.com
                   jill.forster@pallasllp.com
                   brianna.simopoulos@pallasllp.com

*Counsel to the Ad Hoc Group of Excluded OpCo Term Lenders*

33

**EXHIBIT A**

Debtors' Organizational Chart

# Debtors' Organizational Chart

*As of the Petition Date*



**1** Share pledge under the Super-Priority Revolver and OpCo Facility

**2** Pledge of certain IP under the Super HoldCo Facility and Super HoldCo 2L Notes

**3** Trinseo Netherlands B.V. holds a minority interest in the following: (i) 1% of Trinseo Kimya Ticaret Limited Sirketi; (ii) 1 share of Trinseo Belgium; (iii) 1 % of Trinseo de Mexico, S. de R.l. de C.V.; and (iv) 1 share of Altuglas Mexico

**4** Trinseo PLC holds 11% of Trinseo Deutschland GmbH