**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

|  |  |
|---|---|
| In re:<br><br>TRINSEO PLC., *et al*.,<br><br>                Debtors.[1] | Chapter 11<br><br>Case No. 26-90545 (CML)<br><br>(Jointly Administered) |
| CASTLEKNIGHT MASTER FUND LP; ELEVATION CLO 2013-1, LTD; ELEVATION CLO 2016-5, LTD; ELEVATION CLO 2020-11, LTD; ELEVATION CLO 2021-12, LTD; ELEVATION CLO 2021-13, LTD; ELEVATION CLO 2021-14, LTD; ELEVATION CLO 2021-15, LTD; ELEVATION CLO 2022-16, LTD; SIGNAL PEAK CLO 4, LTD.; SIGNAL PEAK CLO 5, LTD.; SIGNAL PEAK CLO 7, LTD.; SIGNAL PEAK CLO 8, LTD.; SIGNAL PEAK CLO 9, LTD.; SIGNAL PEAK CLO 10, LTD.; AND SIGNAL PEAK CLO 12, LTD.,<br><br>                Plaintiffs,<br><br>– against –<br><br>APOLLO ACCORD+ II AGGREGATOR A, L.P.; APOLLO CALLIOPE FUND LP; APOLLO CENTRE STREET PARTNERSHIP, L.P.; APOLLO EXCELSIOR CO-INVEST, L.P.; APOLLO LINCOLN FIXED INCOME FUND, L.P.; APOLLO MOULTRIE CREDIT FUND, L.P.; AG CREDIT SOLUTIONS MASTER FUND II A, L.P.; TPG AG CORPORATE CREDIT OPPORTUNITIES FUND, L.P.; TPG AG CREDIT SOLUTIONS AVANTI CO-INVEST, L.P.; AG CATALOOCHEE, L.P.; AG CSF 2023 OVERFLOW FUND (G) LP; AG POTOMAC FUND, L.P.; TPG AG CENTRE STREET PARTNERSHIP, L.P.; TPG DYNAMIC CREDIT INCOME MASTER FUND, L.P.; AG CREDIT SOLUTIONS FUND II CO-INVESTMENT, L.P.; OAKTREE OPPORTUNITIES FUND XI HOLDINGS (DELAWARE), L.P.; OAKTREE OPPORTUNITIES FUND XII HOLDINGS (DELAWARE), L.P.; TRINSEO HOLDING S.À.R.L.; TRINSEO LUXCO FINANCE SPV S.À.R.L.; TRINSEO LUXCO S.À.R.L.; AND TRINSEO MATERIALS FINANCE, INC.,<br><br>                Defendants. | Adv. Proc. No. 26-03208 |

---

[1] A complete list of each of the Debtors in these chapter 11 cases and the last four digits of each Debtor's taxpayer identification number (if applicable) may be obtained on the website of the Debtors' proposed claims and noticing agent at https://restructuring.ra.kroll.com/trinseo/.  The Debtors' mailing address is 440 East Swedesford Road, Suite 301, Wayne, PA 19087.

4929-3060-7031

**FIRST AMENDED COMPLAINT**

Plaintiffs CastleKnight Master Fund LP, Elevation CLO 2013-1, Ltd; Elevation CLO 2016-5, Ltd; Elevation CLO 2020-11, Ltd; Elevation CLO 2021-12, Ltd; Elevation CLO 2021-13, Ltd; Elevation CLO 2021-14, Ltd; Elevation CLO 2021-15, Ltd; Elevation CLO 2022-16, Ltd; Signal Peak CLO 4, Ltd.; Signal Peak CLO 5, Ltd.; Signal Peak CLO 7, Ltd.; Signal Peak CLO 8, Ltd.; Signal Peak CLO 9, Ltd.; Signal Peak CLO 10, Ltd.; and Signal Peak CLO 12, Ltd. (the "Plaintiffs") file this amended adversary complaint pursuant to Rule 7001 of the Federal Rules of Bankruptcy Procedure.  As the basis for this Amended Complaint, Plaintiffs state as follows:

**NATURE OF THE ACTION**

1. This adversary proceeding challenges a series of prepetition liability management exercises (the "LMEs") that laid the groundwork for the chapter 11 plan of reorganization now before this Court—a plan that would transfer control of the Debtors to a group of lenders (the "Super HoldCo Lenders"), compensate those lenders for inequitable conduct, and substantially impair recovery on over $700 million in first-lien term loans (the "2028 OpCo Term Loans") under a senior secured credit agreement dated September 6, 2017 (as amended from time to time thereafter, the "OpCo Credit Agreement").[2]

2. The first of these LMEs occurred in 2023.  At that time, the Debtors were in significant financial distress—their operating performance had deteriorated, and they faced mounting cash needs.  The Debtors' capital structure consisted primarily of the 2028 OpCo Term Loans, which were secured by liens on the Debtors' principal operating units.  Faced with these challenges, the Debtors could have sought additional financing from the existing 2028 OpCo Term Loans lenders with the largest exposure in the capital structure.

---

[2] Capitalized terms used but not defined herein shall have the meaning ascribed in the OpCo Credit Agreement.

3.      Instead, the Debtors entered into a transaction with the Super HoldCo Lenders and, in doing so, disregarded fundamental contractual protections belonging to Plaintiffs under the OpCo Credit Agreement.  The OpCo Credit Agreement provided limited flexibility to raise new financing in a manner that would prime the 2028 OpCo Term Loans.  The Debtors had very limited "basket capacity" to transfer assets away from the OpCo Borrower or its Restricted Subsidiaries. The lead borrower ("OpCo Borrower")[3] was the corporate parent of all the operating subsidiaries of the Debtors, and the OpCo Credit Agreement did not permit this corporate parent to guarantee new lending.  These restrictions prevented the Debtors from conducting the "drop down" or "double dip" LME structures sometimes seen in the capital markets.

4.      Undeterred, the Debtors and the Super HoldCo Lenders structured a transaction that, while creative, violated the OpCo Credit Agreement in multiple respects.

5.      *First*, instead of issuing new debt at the level of the OpCo Borrower (which would have required consent from Plaintiffs), the Debtors created a brand-new shell SPV (Trinseo Luxco Finance SPV S.à r.l., or "Luxco SPV") to act as borrower on the new $1.077 billion of debt lent by the Super HoldCo Lenders (the "Super HoldCo Loan").  That SPV was placed directly below Trinseo PLC, the publicly traded parent holding company of the group that is outside of the credit group that secures the OpCo Term Loans.

6.      *Second*, in an attempt to expand the existing basket capacity under the OpCo Credit Agreement, the Debtors used $125 million in proceeds from the new financing to manufacture an "equity contribution" into the OpCo Borrower.

---

[3] Trinseo Materials Operating S.C.A., the initial lead borrower, merged with Trinseo Holding S.à r.l. in December 2024 and the merged entity became the lead borrower.

7.      *Third*, using this fictional basket capacity, the Debtors then transferred one of the Debtors' most valuable assets—a joint venture interest in Americas Styrenics ("AmSty")—into an unrestricted subsidiary.

8.      *Fourth*, the Debtors then caused this unrestricted subsidiary (the new owner of AmSty) to guarantee the new Super HoldCo Loan.  This was no ordinary guarantee.  Luxco SPV sat immediately below the ultimate parent company and outside the OpCo credit group, and thus, the new guarantee was a distribution in respect of the equity interests of the parent in the OpCo Borrower.  This had critical consequences under the OpCo Credit Agreement.  As additional credit support, the Debtors then took substantially all of the unrestricted subsidiaries in the OpCo structure and had them also guarantee the new Super HoldCo Loan.

9.      *Finally*, Luxco SPV contributed $948 million of the new financing to the OpCo Borrower—not as an equity contribution, but under the guise of an intercompany "loan."  The intercompany "loan" was a loan in name only.  It had every hallmark of an equity contribution between corporate affiliates.  Calling it a "loan" served no legitimate business purpose, was entered into between conflicted fiduciaries of the two borrowers, and was an attempt to manufacture an artificial claim in bankruptcy for the Super HoldCo Lenders.  If credited as a "loan," the intercompany transaction would mean the Debtors collectively incurred roughly *$2 billion* in new debt to obtain roughly *$1 billion* of new capital.

10.     The 2023 LME laid the groundwork for a series of increasingly aggressive and unlawful transactions that continued to the eve of bankruptcy.  In 2025, the Debtors further upsized the intercompany "loans" by nearly $500 million and entered into a $300 million revolving credit facility (the "OpCo RCF").  The Debtors attempted to give the OpCo RCF "super-priority" status through an off-market intercreditor agreement (the "OpCo ICA").  As the Debtors' insolvency became apparent, the Super HoldCo Lenders obtained other unusual OpCo ICA provisions that

4

purported to allow them to purchase the OpCo RCF, positioning themselves to execute a loan-to-own strategy upon the Debtors' anticipated bankruptcy filing.

11.     In early 2026, as the Debtors engaged in final restructuring negotiations, the Super HoldCo Lenders completed their loan-to-own strategy.  The Super HoldCo Lenders purchased substantially all of the OpCo RCF, by all accounts at its full par value, so that they could exercise their powers under the OpCo ICA in these chapter 11 proceedings and control any OpCo plan confirmation.  The Super HoldCo Lenders knew that ██████████████████████████ ██████████████████████ and that buying the RCF was effectively a risk-free investment: ███████████████████████████████████████████████████████ ███████████████████████████████████████████████████████ Recognizing that they ██████████████████████████████ the Super HoldCo Lenders knew that acquiring the RCF at OpCo would then ██████████████████████████ At the same time, the Super HoldCo Lenders and the Debtors used the RCF as a vehicle to layer additional debt on the OpCo collateral pool and funnel the proceeds of the new RCF lending to the Super HoldCo collateral pool and to the Super HoldCo Lenders.

12.     The net result is the chapter 11 plan now before this Court.  The Super HoldCo Lenders stand to receive substantially all of the takeback debt and equity of the Debtors at emergence, along with substantial backstop fees, DIP financing fees, and other transaction-related compensation.  By contrast, the 2028 OpCo Term Loans lenders—lenders who hold a first-in-time, first-priority lien on substantially all value in the OpCo Debtors—stand to receive virtually nothing on account of their claims.

13.     As detailed below, the 2023 LME violated numerous provisions of the OpCo Credit Agreement.  The financial engineering to manufacture additional basket capacity was non-compliant.  The new guarantee following the AmSty transfer violated clear prohibitions on the

5

distribution of property "with respect to the Equity Interests" in the OpCo Borrower.  And these breaches consequently prevented the issuance of the $948 million intercompany "loan," which is otherwise subject to recharacterization and thus void.

14.     As a result, the remaining transactions premised on the 2023 LME—the 2025 intercompany "loans," the OpCo ICA, and the "super-priority" of the OpCo RCF—are equally invalid.  Each of these subsequent transactions depended on consents that could be delivered only through votes of the intercompany "loan."  With that loan void *ab initio*, the remaining transactions are void as well.

15.     In addition, any claims by the Super HoldCo Lenders under the OpCo RCF should be equitably subordinated.  In the period leading up to these chapter 11 cases, the Super HoldCo Lenders acquired the OpCo RCF for the purpose of effectuating their loan-to-own strategy, concealing the prior breaches, and constraining Plaintiffs' rights in these proceedings.  That inequitable conduct warrants subordination of any "super-priority" status that might otherwise accrue to the OpCo RCF.

16.     Accordingly, Plaintiffs bring this action to protect their rights and seek appropriate relief against Defendants.

## JURISDICTION AND VENUE

17.     The Court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. § 1334.  This is a core proceeding under 28 U.S.C. § 157(b).

18.     Venue is proper in this district under 28 U.S.C. §§ 1408 and 1409.

19.     This adversary proceeding is commenced pursuant to 11 U.S.C. §§ 502(b), 510(c), and 105(a), and Bankruptcy Rule 7001(8), to the extent it seeks "to subordinate an allowed claim or interest."

20.     Pursuant to Rule 7008-1 of the Bankruptcy Local Rules for the United States Bankruptcy Court for the Southern District of Texas, Plaintiffs consent to the entry of a final judgment or order with respect to this Complaint if it is determined that the Court would lack Article III jurisdiction to enter such final order or judgment absent the consent of the parties.

## THE PARTIES

21.     Plaintiff CastleKnight Master Fund LP is a Cayman Islands limited partnership, managed by CastleKnight Management LP. CastleKnight Master Fund LP is the beneficial owner of $271,809,527 in face value of 2028 OpCo Term Loans.

22.     Plaintiff Elevation CLO 2013-1, Ltd; Elevation CLO 2016-5, Ltd; Elevation CLO 2020-11, Ltd; Elevation CLO 2021-12, Ltd; Elevation CLO 2021-13, Ltd; Elevation CLO 2021-14, Ltd; Elevation CLO 2021-15, Ltd; and Elevation CLO 2022-16, Ltd (collectively, the "ArrowMark Funds") are the funds managed by ArrowMark Partners, each with a principal place of business in Denver, Colorado.  The ArrowMark Funds are the beneficial owners of $14,423,155 in face value of 2028 OpCo Term Loans.

23.     Plaintiff Signal Peak CLO 4, Ltd.; Signal Peak CLO 5, Ltd.; Signal Peak CLO 7, Ltd.; Signal Peak CLO 8, Ltd.; Signal Peak CLO 9, Ltd.; Signal Peak CLO 10, Ltd.; and Signal Peak CLO 12, Ltd. (collectively, the "Signal Peak Funds") are funds managed by ORIX Advisers LLC, each with a principal place of business in Dallas, Texas.  The Signal Peak Funds are the beneficial owners of $7,451,387 in face value of 2028 OpCo Term Loans.

24.     Defendant Apollo Accord+ II Aggregator A, L.P. is an exempted limited partnership formed under the laws of the Cayman Islands, with its principal place of business in New York, New York.

25.     Defendant Apollo Calliope Fund LP is a limited partnership formed under the laws of the Cayman Islands, with its principal place of business in New York, New York.

7

26.     Defendant Apollo Centre Street Partnership, L.P. is a limited partnership organized under the laws of the State of Delaware, with its principal place of business in New York, New York.

27.     Defendant Apollo Excelsior Co-Invest, L.P. is a limited partnership organized under the laws of the State of Delaware, with its principal place of business in New York, New York.

28.     Defendant Apollo Lincoln Fixed Income Fund, L.P. is a limited partnership organized under the laws of the State of Delaware, with its principal place of business in New York, New York.

29.     Defendant Apollo Moultrie Credit Fund, L.P. is a limited partnership organized under the laws of the State of Delaware, with its principal place of business in New York, New York.

30.     Defendant AG Credit Solutions Master Fund II A, L.P. is a limited partnership organized under the laws of the State of Delaware, with its principal place of business in New York, New York.

31.     Defendant TPG AG Corporate Credit Opportunities Fund, L.P. is a limited partnership organized under the laws of the State of Delaware, with its principal place of business in New York, New York.

32.     Defendant TPG AG Credit Solutions Avanti Co-Invest, L.P. is a limited partnership organized under the laws of the State of Delaware, with its principal place of business in New York, New York.

33.     Defendant AG Cataloochee, L.P. is a limited partnership organized under the laws of the State of Delaware, with its principal place of business in New York, New York.

34.     Defendant AG CSF 2023 Overflow Fund (G) LP is an exempted limited partnership formed under the laws of the Cayman Islands, with its principal place of business in New York, New York.

35.     Defendant AG Potomac Fund, L.P. is a limited partnership organized under the laws of the State of Delaware, with its principal place of business in New York, New York.

36.     Defendant TPG AG Centre Street Partnership, L.P. is a limited partnership organized under the laws of the State of Delaware, with its principal place of business in New York, New York.

37.     Defendant TPG Dynamic Credit Income Master Fund, L.P. is a limited partnership formed under the laws of the Cayman Islands, with its principal place of business in New York, New York.

38.     Defendant AG Credit Solutions Fund II Co-Investment, L.P. is a limited partnership organized under the laws of the State of Delaware, with its principal place of business in New York, New York.

39.     Defendant Oaktree Opportunities Fund XI Holdings (Delaware), L.P. is a limited partnership organized under the laws of the State of Delaware, with its principal place of business in Los Angeles, California.

40.     Defendant Oaktree Opportunities Fund XII Holdings (Delaware), L.P. is a limited partnership organized under the laws of the State of Delaware, with its principal place of business in Los Angeles, California.

41.     Defendant Trinseo Holding S.à r.l. ("Trinseo Holdings") is a private limited liability company organized under the laws of the Grand Duchy of Luxembourg, with its registered office at 26, Boulevard Royal, L-2449 Luxembourg, Grand Duchy of Luxembourg.  Trinseo Holdings is a wholly owned subsidiary of Trinseo S.A.  Trinseo Materials Operating S.C.A. ("OpCo

9

Borrower") was a partnership limited by shares (société en commandite par actions) organized under the laws of the Grand Duchy of Luxembourg, acting by its general partner, Trinseo Materials S.à r.l.  In December 2024, OpCo Borrower merged with Trinseo Holdings, and the merged entity became the lead borrower under the OpCo Credit Agreement.  After December 2024, "OpCo Borrower" refers to the merged entity.

42.     Defendant Trinseo Luxco Finance SPV S.à r.l. ("Luxco SPV") is a private limited liability company incorporated and existing under the laws of the Grand Duchy of Luxembourg, with registered office at 26, Boulevard Royal, L-2449, Luxembourg, Grand Duchy of Luxembourg.  Luxco SPV is an indirect wholly owned subsidiary of Trinseo PLC.

43.     Defendant Trinseo Luxco S.à r.l. ("Trinseo Luxco") is a private limited liability company incorporated and existing under the laws of the Grand Duchy of Luxembourg, with registered office at 26 Boulevard Royal, L-2449, Luxembourg, Grand Duchy of Luxembourg.  Trinseo Luxco is an indirect wholly owned subsidiary of Trinseo PLC.

44.     Defendant Trinseo Materials Finance, Inc. is a Delaware corporation.  Trinseo Materials Finance, Inc. is a wholly owned subsidiary of Trinseo S.A.

45.     Non-party Trinseo PLC ("Parent") is a public limited company existing under the laws of Ireland.  Parent's global operating center is located in Wayne, Pennsylvania.  Parent has regional operating centers throughout North America, Europe and Asia Pacific.

46.     The Debtors' current corporate structure, as shown in documents accompanying the Petition, is shown in **Exhibit A** attached hereto.

**FACTUAL BACKGROUND**

I.      **The Debtors**

47.     Trinseo was founded in 2010 as a specialty materials company.  It manufactures plastics and latex binders used in the automotive, appliance, electronics, medical, and packaging industries, among others.

48.     The Debtors operate manufacturing and production facilities around the world.  As of December 2023, these included thirty-four manufacturing plants and one recycling facility across twenty sites in thirteen countries, as well as eleven research and development facilities.

49.     Today, the company operates under four reportable business segments: Engineered Materials, Latex Binders, Polymer Solutions, and Americas Styrenics.  Until recently, Parent traded on the New York Stock Exchange under the ticker symbol "TSE."

II.     **The OpCo Credit Group Enters the OpCo Credit Agreement, With Important Lender Protections**

50.     On September 6, 2017, Trinseo Holdings, Trinseo Materials S.à r.l., OpCo Borrower, and Trinseo Materials Finance Inc. (together, the "OpCo Credit Group"), entered into the OpCo Credit Agreement.  Various subsidiaries of Trinseo Holdings guaranteed the OpCo Credit Group's obligations under the OpCo Credit Agreement (the "Guarantors").  The OpCo Credit Group and Guarantors include the Debtors' main operating entities in the U.S. and internationally.

51.     At the time of the 2023 LME (discussed *infra*), the Debtors' debt included: (i) $700 million in term loans maturing in 2024 (the "2024 OpCo Term Loans") under the OpCo Credit Agreement; (ii) $750 million in term loans maturing in 2028 (the "2028 OpCo Term Loans") under the OpCo Credit Agreement; (iii) $500 million in unsecured senior notes maturing in 2025 (the "2025 Unsecured Notes"); (iv) unsecured senior notes maturing in 2029 (the "2029 Unsecured Notes"); and (v) $375 million in a revolving credit facility.

52.     Plaintiffs own approximately 40% of the 2028 OpCo Term Loans.

11

53.     The OpCo Credit Agreement includes a number of provisions designed to protect Plaintiffs and other 2028 OpCo Term Loans lenders by maintaining sufficient assets within the OpCo Credit Group to ensure repayment of the 2028 OpCo Term Loans, while prohibiting the OpCo Borrower from refinancing or incurring additional term loans if enumerated requirements and preconditions are not met.

54.     Among these provisions, sections 1.01, 2.16, and 2.17 of the OpCo Credit Agreement limit the OpCo Borrower's ability to execute amendments without seeking lender consent to consummate a "Credit Extension," which includes the incurrence of any additional incremental term loans or the refinancing of existing term loans (a "Credit Extension Amendment").[4]  Specifically, section 1.01 of the OpCo Credit Agreement defines "Restricted Payment" as:

> (i) any dividend or other distribution (whether in cash, securities or other property) with respect to any Equity Interest of the OpCo Borrower or any Restricted Subsidiary, or any payment (whether in cash, securities or other property), including any sinking fund or similar deposit, on account of the purchase, redemption, retirement, defeasance, acquisition, cancellation or termination of any such Equity Interest, or on account of any return of capital to the OpCo Borrower's or a Restricted Subsidiary's stockholders, partners or members (or the equivalent Persons thereof) and (ii) any Restricted Investment.

"Equity Interest" is defined as "with respect to any Person, all of the shares, interests, rights, participations or other equivalents (however designated) of capital stock of (or other ownership or profit interests or units in) such Person."   Sections 2.16(d) and 2.17(d) provide that "the effectiveness of any [Credit Extension] Amendment . . . shall be subject to the satisfaction" on the applicable date that "the conditions of Section 4.02 shall be satisfied."

---

[4] The OpCo Credit Agreement permits such incremental or refinancing term loans to rank either *pari passu* or junior in right of payment and right of security to existing obligations.  OpCo Credit Agreement §§ 2.16(e)(i)(A) and 2.17(e)(i)(G).

55.     Section 4.02 requires that, with respect to any Credit Extension, "no Default shall exist or would result from such proposed Credit Extension or from the application of the proceeds therefrom."  OpCo Credit Agreement § 4.02(b).  A "Default" is defined as any event or condition that constitutes an Event of Default or that, with the giving of any notice, the passage of time, or both, would be an Event of Default.  OpCo Credit Agreement § 1.01.

56.     Under section 8.01, Events of Default include, among other things, the OpCo Borrower's failure to "perform or observe any term, covenant or agreement contained in" the OpCo Credit Agreement, to make payments of principal or interest, or to pay debts as they become due.

57.     The covenants in the OpCo Credit Agreement that must be observed to avoid a Default or Event of Default—and, thus, permit Credit Extensions—include negative covenants that limit what the OpCo Borrower and its Restricted Subsidiaries can do with their assets and limit the OpCo Borrower's ability to designate Restricted Subsidiaries as Unrestricted Subsidiaries.

58.     Among these covenants, section 6.15 prohibits the designation of Unrestricted Subsidiaries if doing so would deteriorate the OpCo Borrower's ability to service its existing debt, as measured by a Fixed Charge Coverage Ratio ("FCCR"), below certain thresholds.

59.     Beyond those conditions, section 7.06 prohibits the OpCo Borrower and its Restricted Subsidiaries from directly or indirectly making a "Restricted Payment" or "Restricted Investment" unless such payment or investment falls within defined carve-outs, often known as "baskets."  This provision limits the ability of the OpCo Borrower and its Restricted Subsidiaries to transfer assets, issue dividends, or make distributions of property on account of their equity interests, thus maintaining assets within the OpCo Credit Group.

60.     Other than the Credit Extension Amendments addressed above, the OpCo Credit Agreement cannot be amended absent a writing signed by "Required Lenders" or those Lenders otherwise specified in section 10.01.  Required Lenders are those "Lenders having more than 50% of the sum of" the total outstanding debt and unused commitments.

61.     Collectively, these provisions serve a critical protective function—to ensure that sufficient assets remain available to support the Plaintiffs' OpCo Term Loans either directly as collateral or through residual equity value, thereby preventing the dilution of Plaintiffs' credit support via distributions to entities that are neither obligors nor their subsidiaries.  These provisions also ensure that the OpCo Borrower is in strict compliance with its obligations under the OpCo Credit Agreement before it can amend the agreement to incur debt dilutive to existing lenders without their consent.

62.     The aforementioned sections of the OpCo Credit Agreement have never been amended and remain in full force and effect.

## III.     Defendants Consummate the 2023 LME

63.     In the years following the OpCo Credit Agreement, the Debtors faced financial headwinds from geopolitical and macroeconomic events.  By the summer of 2023, the Debtors' consolidated financial statements showed negative book equity, and their debt was trading well below par.  The company had been cash-flow negative for years.

64.     By year-end 2022, the Debtors still owed $663.4 million on the 2024 OpCo Term Loans and $500 million on the 2025 Unsecured Notes.  Both debts were coming due soon, and the Debtors needed to raise new capital to address those maturities.

65.     Around this time, an ad hoc group of 2028 OpCo Term Loan lenders—which had historically been a constructive partner of the Debtors—began discussions with the Debtors about

how to address the looming debt maturities.  The group was hopeful that the Debtors would work with existing lenders and noteholders to find a solution.

66.      Instead of working with these existing lenders, the Debtors chose to raise $1.077 billion in new financing from the Super HoldCo Lenders.

A.      **The Steps of the 2023 LME**

67.      The 2023 LME was carried out in the following steps.  *First*, the Parent created a new special purpose vehicle, Luxco SPV, to borrow $1.077 billion from the Super HoldCo Lenders.  Luxco SPV was placed in the corporate structure directly below Parent, the publicly traded holding company at the top of the Debtors' corporate structure, which was not a party to the OpCo Credit Agreement and outside the credit group.  *See* Ex. A.

68.      *Second*, the Debtors funneled $125 million from the new Super HoldCo financing into OpCo Borrower, labeling it an "equity contribution" to artificially inflate the basket capacity under the OpCo Credit Agreement.  Specifically, Luxco SPV made a $125 million intercompany loan (the "Parent Intercompany Loan") to Trinseo Luxco (an entity that shortly thereafter became a party to the OpCo Credit Agreement), which was in turn directed down to Trinseo Holdings, then OpCo Borrower (which shortly thereafter merged with Trinseo Holdings) as an "equity contribution" (the "Basket Capacity Equity Contribution").

69.      *Third*, using this artificially enlarged basket capacity, the Debtors transferred one of their most valuable assets—a 50% joint venture interest in Americas Styrenics LLC (the "AmSty JV")—out of the OpCo Credit Group.  Specifically, a Restricted Subsidiary contributed the AmSty JV to Trinseo NA Finance SPV LLC and Trinseo NA Finance LLC (the "AmSty Unsubs"), which the Debtors had designated as Unrestricted Subsidiaries under the OpCo Credit Agreement (the "AmSty Dropdown").  The AmSty JV had been one of the Debtors' most reliable

15

cash generators, producing average adjusted EBITDA of approximately $100 million per year and paying average annual dividends of $85 million.

70.    *Fourth*, the Debtors then caused the AmSty Unsubs to guarantee the new Super HoldCo debt borrowed by Luxco SPV, giving the Super HoldCo Lenders a structurally senior secured claim on the AmSty assets.  Because Luxco SPV sat immediately below Parent in the corporate structure, this guarantee could only have been issued in respect of Parent's equity interests in OpCo Borrower.  In addition, certain non-U.S. subsidiaries (the "Foreign Guarantors")[5] that were not obligors on either the 2024 OpCo Term Loans or the 2025 Unsecured Notes being repaid as part of this transaction issued a secured guaranty (the "Foreign Guaranty") of the Super HoldCo Loan, capped at $340 million (the "Guarantee Limit").

71.    *Finally*, Luxco SPV contributed $948 million of the new financing to OpCo Borrower as an intercompany "loan" (the "2023 Intercompany Loan") that was documented as *pari passu* with the 2028 OpCo Term Loans through a Credit Extension Amendment to the OpCo Credit Agreement.[6]  OpCo Borrower used the proceeds of the 2023 Intercompany Loan, together with cash on hand, to repay the full remaining balance of the 2024 Term Loans and $385 million of the $500 million of 2025 Unsecured Notes.

72.    The result of the 2023 LME was a structure that inherently favored the Super HoldCo Lenders at the expense of Plaintiffs.  The Super HoldCo Lenders obtained an indirect first-lien claim (*pari passu* with the 2028 OpCo Term Loans) against OpCo Borrower through the 2023

---

[5] The Foreign Guarantors are Trinseo Belgium B.V., Trinseo Operating Belgium B.V., Trinseo Deutschland GmbH, Trinseo Deutschland Anlagengesellschaft mbH, Trinseo Deutschland Re GP GmbH, Trinseo Deutschland Re GmbH& Co. KG, PT Trinseo Materials Indonesia, PT Trinseo Operating Indonesia, and Taiwan Trinseo Limited.

[6] The 2023 Intercompany Loan technically has two elements (i) $680 million in 2023 Refinancing Term Loans the proceeds of which were used to pay off the 2024 OpCo Term Loans and (ii) $268 million in 2023 Incremental Term Loans the proceeds of which were used to pay off a portion of the 2025 Unsecured Notes.  One of the conditions to the 2023 Amendment was execution by the Loan Parties of an Acknowledgment and Confirmation that the 2023 Refinancing and Incremental Term Loans form part of the "Secured Obligations" as defined in each Collateral Document.

16

Intercompany Loan, while also taking exclusive collateral support from the AmSty JV and the Foreign Guaranty—assets and guarantees that had previously supported Plaintiffs' OpCo Term Loans. As an Oaktree managing director stated in a July 2023 email on the ███████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ██████████████████████ This structure violated Plaintiffs' bargained-for protections under the OpCo Credit Agreement.

**B.    A Precondition to the 2023 LME Was Not Met, Rendering the 2023 Amendment Ineffective**

73.    The 2023 LME could not take effect unless every part of the transaction was permitted under the OpCo Credit Agreement. It was not. The 2023 Intercompany Loan was structured as incremental and refinancing term loans under sections 2.16 and 2.17 of the OpCo Credit Agreement and documented through a September 2023 Credit Extension Amendment (the "2023 Amendment") without the consent of any existing 2028 OpCo Term Loan lender. But the 2023 LME triggered at least three Defaults that blocked the amendment from taking effect.

1.    The Designation of the AmSty Unsubs as Unrestricted Subsidiaries Was Barred by Section 6.15.

74.    The first Default arose from the Debtors' attempt to structure the AmSty Dropdown as a two-step transaction designed to circumvent section 6.15 of the OpCo Credit Agreement. Under that provision, the OpCo Borrower is permitted to designate a Restricted Subsidiary as an Unrestricted Subsidiary only if "immediately after giving effect to such designation, (i) the Lead Borrower could incur $1.00 of Permitted Ratio Debt or (ii) the Fixed Charge Coverage Ratio would be no less than the Fixed Charge Coverage Ratio immediately prior to giving effect to such designation." The FCCR is effectively the ratio of Consolidated EBITDA to Fixed Charges such as interest and dividends for the period. It is a common feature of credit agreements, meant to

17

prevent a borrower from transferring valuable assets out of the credit group when its earnings are, or would become, insufficient to comfortably service its debt obligations to existing lenders.

75.     The Debtors knew that they had no hope of satisfying these conditions if the creation of the AmSty Unsubs and the transfer of AmSty into those subsidiaries were treated as a single transaction.  So the Debtors attempted to circumvent the restrictions by making the one, integrated AmSty Dropdown appear as two independent steps.  In the first step, the Debtors designated the AmSty Unsubs—newly created, empty shell holding companies—as Unrestricted Subsidiaries at a time when those entities held no material assets.  This was done so that the Debtors could claim that the designation had no change on the OpCo Borrower's FCCR.  In the second step, the Debtors transferred the AmSty JV interest to the AmSty Unsubs.

76.     This artifice fails.  Section 1.10 of the OpCo Credit Agreement specifically guards against such maneuvers by requiring that the calculation of any FCCR condition occur *after* giving "pro forma" effect to *all* "Specified Transactions" that occur "*simultaneously* with the event for which the calculation of any such ratio is made."

77.     The term "Specified Transactions" is defined to include both the designation of an Unrestricted Subsidiary and Restricted Payments—in other words, both components of the AmSty Dropdown.  Because those were pre-planned components of a single integrated transaction—the 2023 LME—consummated over a period of weeks and documented as a unified refinancing, they must be treated as occurring "simultaneously" under section 1.10, or otherwise collapsed and treated as a single integrated transaction.  Absent designation of the AmSty Unsubs, the Debtors could not have completed the AmSty Dropdown, and each step was executed by the same fiduciary, David Stasse, with knowledge of each step.  As a consequence, the FCCR test in section 6.15 must be calculated by giving pro forma effect to the transfer of AmSty, not merely to the designation of an empty shell.

78.     After giving pro forma effect to the transfer of AmSty, the OpCo Borrower's FCCR was necessarily lower than immediately prior to the transaction.  The FCCR is defined as the ratio of Consolidated EBITDA to Fixed Charges, with Consolidated EBITDA, in turn, defined as including Consolidated Net Income.  Consolidated Net Income is expressly defined to include "dividends or distributions or other payments that are actually paid in cash or Cash Equivalents . . . to the Lead Borrower or a Restricted Subsidiary thereof."  AmSty paid average annual cash dividends of approximately $85 million to the restricted group.  Those dividends were included in Consolidated Net Income—and therefore in Consolidated EBITDA.  After giving pro forma effect to the AmSty transfer, those dividends were no longer going to be paid "to the Lead Borrower or a Restricted Subsidiary thereof."  Instead, under the new Super HoldCo Credit Agreement, the AmSty dividends would be used to pay down that new borrowing.  This meant that, pro forma, Consolidated EBITDA would be reduced by an amount approximating the historical AmSty dividends. This reduction caused the pro forma FCCR to be materially lower than immediately prior to the transaction.

79.     Nor could the OpCo Borrower satisfy the alternative condition in section 6.15—the ability to "incur $1.00 of Permitted Ratio Debt."  This condition requires a FCCR greater than 2.00:1.00.   At the time of the 2023 LME, the OpCo Borrower's FCCR had deteriorated to approximately 0.95x—far below the 2.00:1.00 threshold required to incur Permitted Ratio Debt.

2.     <u>OpCo Borrower lacked sufficient capacity to carry out the AmSty Dropdown.</u>

80.     Even if section 6.15 were satisfied, there was a second independent Default arising from the absence of adequate basket capacity to conduct the AmSty Dropdown.  The OpCo Credit Agreement bars the OpCo Borrower and its Restricted Subsidiaries from directly or indirectly

making any "Restricted Investment" unless there is sufficient "capacity" in the OpCo Credit Agreement for the amount of the Restricted Investment.

81. At the time, the Lead Borrower's existing "fixed dollar" baskets for Restricted Investments totaled, at most, approximately $143 million. This consisted of capacity available under section 7.06(g)(x), which permits Restricted Payments in an amount equal to 4.25% of Total Assets. With Total Assets at the time of $3,355,000,000, this equaled $143 million. The other fixed dollar baskets, including under the Permitted Investment (u) (general basket) and (b)(i) (Similar Business) appear already to have been consumed by prior transactions.

82. Under section 7.06(y), the Lead Borrower's Restricted Payment capacity is also increased by amounts available under the definition of "Cumulative Credit." However, at the time of the 2023 LME, the only objectively verifiable quantum of Cumulative Credit consists of the $170 million in proceeds from the 2014 IPO of Trinseo PLC.

83. Any additional Cumulative Credit on account of increases in Consolidated Net Income ("CNI") is not verifiable based on current information. Clause (a) of the Cumulative Credit definition builds basket capacity equal to 50% of CNI for the period from January 1, 2013, through the most recently ended fiscal quarter. The resulting amount is then reduced by all amounts previously used ("Prior Usage") to make Restricted Payments in reliance on Clause (a). As a threshold matter, CNI means CNI of the *Lead Borrower*. Because the Lead Borrower did not publish its own financial statements, this amount is impossible to verify. In any event, even using the consolidated GAAP net income for Trinseo PLC, the publicly-traded parent company, CNI for the relevant period would total only approximately $348 million.[7] Reduced by an admitted $592

---

[7] The definition of CNI allows for certain adjustments, but discovery is required to determine what adjustments the Debtors actually made and whether those adjustments are valid under the OpCo Credit Agreement. Notably, one of the Super HoldCo Lenders' own models, dated two days before the transaction closed, calculated $522 million of "Builder Basket CNI" – again an amount that would be fully absorbed by Prior Usage.

million of Prior Usage, the available Cumulative Credit capacity was negative – i.e., there would be no Cumulative Credit capacity.

84.     *Finally*, the OpCo Borrower did not have basket capacity under the Fixed Charge Coverage Basket, found at Clause (t) of the definition of the "Permitted Investments." Clause (t) permits unlimited Investments in Unrestricted Subsidiaries only if, *"after giving effect to such Investment,"* the FCCR is not lower than immediately prior to such transaction, *and* the OpCo Borrower or its Restricted Subsidiary "receives consideration . . . at least equal to the fair market value of the assets" contributed. Here, because AmSty income was such a substantial portion of Consolidated EBITDA, "after giving effect" to the AmSty transfer, the FCCR was necessarily "lower" by a substantial degree. And in any event, neither the Lead Borrower nor its Restricted Subsidiary received *any* value from the AmSty transfer, let alone "the fair market value of the assets" as required to generate capacity under the Fixed Charge Coverage Basket. The OpCo Credit Group gave up a cash-generating asset worth at least $500 million and received in return a structurally subordinated equity interest in an Unrestricted Subsidiary over which it had no practical economic claim.

> 3.     <u>The Basket Capacity Equity Contribution did not validly increase available Restricted Payments capacity.</u>

85.     Contemporaneous documents confirm this deficiency in basket capacity. As observed by the Debtors' own advisors, ███████████████████████████████████

████████████████████████████████████████

86.     Contemporaneous documents also confirm that bridging this gap in basket capacity, so that the Debtors could complete the AmSty Dropdown, was the express purpose of the $125 million Basket Capacity Equity Contribution:

a.    As described by one of the Super HoldCo Lenders, ██████████

████████████████████████████████████████████████████████

████████████████████████

b.    Likewise, counsel representing one of the parties in later refinancing discussions commented: ████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████

c.    A ████████████████████████████████████████

████████████████████████████████████████████████████████

████████

d.    One of the Super HoldCo Lenders noted that ████████████

████████████████████████████████████████████████████████

██████████████████████████████

87.    However, the Basket Capacity Equity Contribution was not permitted to serve its evident purpose of allowing the AmSty Dropdown.

88.    On September 8, 2023, the $125 million was transferred as an intercompany *loan* to Trinseo Luxco and immediately passed down to OpCo Borrower in the form of so-called Mandatory Redeemable Equity Shares ("MRES").[8]

89.    The Debtors took pains to paper over the MRES so that it would avoid the definition of a "Disqualified Equity Interest." Apart from revealing the true economic substance of the MRES (*i.e.*, not equity), these maneuvers violated the implied covenant of good faith and fair dealing. The "Disqualified Equity Interests" definition protects the benefit of the lenders' bargain

---

[8] The $125 million was contributed first to Trinseo Holdings then to OpCo Borrower. Shortly thereafter, these entities merged and Trinseo Holdings became OpCo Borrower.

by distinguishing equity that expands Cumulative Credit from instruments that, because they function as debt, do not. The MRES were deliberately engineered to satisfy the letter of each disqualifying criterion while replicating, in economic substance, the very debt those criteria are meant to exclude — depriving the 2028 OpCo Term Loan lenders of the protection the definition was bargained to provide:

      a.     *Maturity.* The Disqualified Equity Interests definition disqualifies equity that matures or is mandatorily redeemable prior to the date 91 days after the 2028 maturity of the OpCo Term Loans. The MRES were given a Final Mandatory Redemption Date of May 3, 2031. The only apparent purpose of that date was to clear the 91-day window, even though the instrument remained, by its terms, mandatorily redeemable for cash.

      b.     *Redemption right.* The definition disqualifies equity redeemable at the holder's option before that date. The MRES were made redeemable only at the option of the issuer, an asymmetry that serves no legitimate business purpose and simply attempts to track the carve-out in the definition of Disqualified Equity Interest.

      c.     *Dividends*. The definition disqualifies equity providing for scheduled cash dividend payments before that date. The MRES dividend was instead structured to accrue daily and cumulate, payable only upon redemption in 2031. However, reflecting its economic reality as debt, the dividend accrued at a debt rate: a rate equal to Adjusted Term SOFR (defined by reference to the OpCo Credit Agreement's own benchmark for the 2023 Term Loans) plus an 8.764% margin plus a transfer-pricing "Remuneration" producing an all-in yield of approximately 14% per annum.

90.     This stratagem was laid bare in contemporaneous correspondence. When asked by an analyst, the Debtors made clear that ████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

91.     Stripped of these engineered features, the MRES were debt.  They were funded with the proceeds of the Super HoldCo financing, routed down the corporate structure, and contributed to the Lead Borrower on the same day as the rest of the 2023 LME.  In the issuers' own audited statutory accounts, both the contribution and its mirror at the Lead Borrower were classified as subordinated liabilities, and the return on the contribution was booked as "interest income."  The Debtors further commissioned a transfer-pricing study analyzing the MRES as part of the group's financing structure.  That is the type of analysis that companies conduct for intercompany debt, not permanent equity capital.

92.     In other words, the Debtors accomplished in two connected steps what the main $948 million intercompany "loan" accomplished in one: lending money from Luxco SPV to the OpCo Borrower.  The Debtors cannot have it both ways:  Either the 2023 Intercompany Loan must be treated as equity, just like the claimed intercompany "equity" contribution; or, the intercompany "equity" contribution must be treated as debt.[9]

           4.     <u>The AmSty UnSubs' Grant of Security Interests and Diversion of AmSty Dividends Were a Further Restricted Payment Lacking Any Conceivable Basket Capacity.</u>

93.     A further violation occurred when the AmSty Unsubs issued liens on substantially all of their property to secure the Super HoldCo Loan in favor of Luxco SPV, thus distributing a property interest outside the existing credit group to an entity owned entirely by Parent, which also indirectly owned 100% of the equity interests in OpCo Borrower.  This distribution was made "with respect to" the Equity Interests in OpCo Borrower because it was made on account of—and would not have occurred but for—Parent's equity ownership in OpCo Borrower.  There is no other reason the OpCo Borrower would distribute property to a wholly owned subsidiary of its ultimate

---

[9] This is consistent with how Trinseo Holdings treated it in its financial statements—as a liability owed to an affiliate.

24

parent.  In addition to granting security interests, under the agreement governing the Super HoldCo debt, the AmSty Unsubs agreed that "any cash dividend" from the AmSty JV over $5 million in any fiscal year would be used to prepay the Super HoldCo debt.  This agreement resulted in tens of millions of dollars being diverted to the Super HoldCo Lenders—in 2023 and 2024, $65 million and $45 million of dividends were received by the AmSty JV—that otherwise would have been available for distribution to Trinseo LLC—an OpCo Restricted Subsidiary and guarantor of the 2028 OpCo Term Loans—as sole member of Trinseo NA Finance LLC.  These actions were directed by Trinseo LLC, as the sole member of Trinseo NA Finance LLC which, in turn, is the sole member of Trinseo NA Finance SPV LLC.  For example, to help effectuate the 2023 Transaction, ██████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ██████████████████

94.     None of the carveouts in section 7.06 applied to this grant of security interests or the diversion of AmSty dividends.  Having already exhausted (and in fact exceeded) any remaining basket capacity through the AmSty Dropdown itself, OpCo Borrower lacked sufficient dollar-based capacity to grant security interests securing over $1 billion in debt or distribute the value of the AmSty Unsubs.  In addition, Section 7.04 of the OpCo Credit Agreement restricts any Restricted Subsidiary, including Trinseo LLC, from "Dispos[ing] of (whether in one transaction or in a series of transactions) all or substantially all of its assets" to any person unless an enumerated exception is met.  Here, Trinseo LLC contributed the AmSty JV to the AmSty Unsubs, agreed to the AmSty Unsubs securing the Super HoldCo debt with substantially all of their assets, and diverted the majority of any cash dividends from the AmSty JV to prepay the Super HoldCo debt instead of being distributed to Trinseo LLC.  Through these steps, Trinseo LLC not only engaged

in a Restricted Payment, but also disposed of substantially all of its assets in violation of Section 7.04.

95.   Accordingly, each of these maneuvers gave rise to Events of Default under the OpCo Credit Agreement.  Because a necessary precondition to the 2023 Amendment was not satisfied, the 2023 Intercompany Loan was never validly issued under the OpCo Credit Agreement, Luxco SPV never became a Lender under the OpCo Credit Agreement, and the 2023 Amendment was void *ab initio*.

96.   As a result, the 2023 Intercompany Loan is not secured, at least not on a pari basis with the 2028 OpCo Term Loans.  The 2023 Intercompany Loan was purportedly secured by virtue of being issued under the OpCo Credit Agreement and receiving the attendant grant of security interests provided to the Obligations under that agreement.  Because the 2023 Intercompany Loan was not validly issued and does not qualify as an Obligation, it is not secured by the grant of security interests provided under the OpCo Credit Agreement and other Loan Documents.

**C.   Conflicted Fiduciaries Executed the 2023 LME for the Improper Purpose of Manufacturing a Bankruptcy Claim for the Super HoldCo Lenders**

97.   The Officer Certificates for Luxco SPV, OpCo Borrower, and Trinseo Holdings show that ███████████████████████████████████████████████████████████████ ███████████████████████████████████████████████████ The Super HoldCo Lenders and Luxco SPV took advantage of this conflict to cause OpCo Borrower's fiduciaries to enter into the 2023 Intercompany Loan—a transaction that was not in OpCo Borrower's best interests or the interests of its creditors, including Plaintiffs.  Because Luxco SPV and OpCo Borrower had the same parent and the same fiduciaries, Luxco SPV knew of the fiduciaries' duties and knowingly participated in the breach of those duties.

26

98.     There is no evidence that anyone negotiated, deliberated over, or performed due diligence on the 2023 Intercompany Loan on behalf of either Luxco SPV or OpCo Borrower.  On information and belief, none of the usual steps that precede a major loan occurred: there was no exchange of term sheets, no negotiation of terms, no attempt to find alternative financing, and no underwriting or credit analysis.  Nor is there any indication that Luxco SPV ever evaluated whether OpCo Borrower could repay the loan.

99.     Luxco SPV benefited from this arrangement because it was able to obtain new lending from the Super HoldCo Lenders on more favorable terms than it could have without the intercompany loan.  The gains from the 2023 Intercompany Loan went primarily to Luxco SPV and its creditors, while the costs fell on OpCo Borrower and its creditors, including Plaintiffs.

100.    The 2023 LME—and in particular the 2023 Intercompany Loan—gave OpCo Borrower no net benefit and served no legitimate business purpose.  While the 2023 LME pushed out the maturity dates on some existing debt, it did so at the cost of adding far more expensive debt that increased the Debtors' interest burden and only delayed an inevitable bankruptcy.

101.    For example, the 2024 Term Loans that were paid off with proceeds of the 2023 Intercompany Loan bore an interest rate of approximately 7.5% and matured in September 2024. The 2025 Unsecured Notes that were partially retired bore a coupon of 5.375% and matured in September 2025.  The 2023 Intercompany Loan, by contrast, bore an interest rate of SOFR plus 9.656%—far more expensive than the debt it replaced.

102.    The more expensive Super HoldCo debt consumed the Debtors' already strained cash flow.  The annual cash interest rate on the Super HoldCo Loan was SOFR plus 8.50% (subject to a 3.00% SOFR floor), compared to a weighted average of about 6.5% on the pre-existing debt. Although the Super HoldCo Credit Agreement allowed the Debtors to elect to pay part of the interest in kind for up to 24 months, even under that scenario, the Debtors' annual cash interest

burden was expected to rise by more than $30 million—enough to wipe out all of the modest positive cash flow the Debtors expected to generate in 2024.

103.    None of these facts supports a conclusion that the 2023 Intercompany Loan was in the best interests of the OpCo Borrower.  The real purpose of the 2023 Intercompany Loan was to create an artificial claim in bankruptcy for the Super HoldCo Lenders.

104.    Although the 2023 Intercompany Loan was structured to look like a loan on paper, it was in economic substance an equity contribution.  No independent third-party lender would have extended nearly $1 billion in credit to OpCo Borrower on these terms.  The loan was made at a time when the Debtors' existing debt was trading far below par value, and when substantial value—including the AmSty JV and the Foreign Guaranty—was being stripped from the OpCo Borrower's collateral pool.

105.    The fact that the 2023 Intercompany Loan was issued at the very same time that collateral support was being stripped from the OpCo Credit Group—through the transfer of AmSty and the issuance of the Foreign Guaranty—further demonstrates that this was equity, not debt.  A genuine lender would expect an absolute right to repayment regardless of the success of borrower's operations and would protect that right by ensuring adequate credit support, but here the collateral securing any such repayment was being simultaneously diminished.

106.    The terms of the 2023 Intercompany Loan are also inconsistent with a standard commercial loan.  For example, the loan requires only quarterly interest payments, rather than the monthly payments typical of a commercial term loan.

107.    Further, Luxco SPV was not in the business of making loans.  On information and belief, Luxco SPV had never lent money to any related entity or third party other than through the Intercompany Loans.  It did so here not for any business purpose, but to manufacture an artificial claim in bankruptcy.

IV.    **Using the Invalid Votes of Luxco SPV as Intercompany Lender, Defendants Consummate the 2025 LME**

108.    After the 2023 LME, the Debtors' capital structure at the OpCo level consisted of: (i) $115 million in remaining 2025 Unsecured Notes, (ii) $447 million in 2029 Unsecured Notes, (iii) approximately $728.9 million in 2028 OpCo Term Loans, (iv) $1.077 billion in loans from the 2023 LME, and (v) $375 million in OpCo RCF.

109.    By the end of 2024, the Debtors' financial condition had worsened further. Their FY2024 financial statements showed negative book equity and negative $77.5 million in free cash flow. The Debtors' debt continued to trade well below par.

110.    Looking to capture a discount on the 2029 Unsecured Notes, which were trading at depressed prices, and to retire the remaining 2025 Unsecured Notes, the Debtors carried out a second liability management transaction (the "2025 LME") with the Super HoldCo Lenders. The 2025 LME was a continuation of the 2023 LME and the next step in the Super HoldCo Lenders' loan-to-own strategy.

A.    **The Steps of the 2025 LME**

111.    Even though the 2023 Amendment was invalid due to preexisting defaults, the Debtors proceeded with the 2025 LME anyway, documented through yet another amendment to the OpCo Credit Agreement (the "2025 Amendment").

112.    The 2025 LME had five parts, most of which shifted value from the OpCo Credit Group to the Super HoldCo Lenders at Plaintiffs' expense, while providing only minimal new capital.

113.    *First*, OpCo Borrower designated Aristech Surfaces LLC and Altuglas LLC (the "Additional Unsubs") as "unrestricted subsidiaries" under the OpCo Credit Agreement and added them as guarantors of the Super HoldCo debt—effectively removing them from the OpCo Credit Group. This distributed value from the OpCo Credit Group to the Super HoldCo Group.

29

114.    *Second*, the Debtors exchanged $447 million of 2029 Unsecured Notes (at 85% of par value) for new second-lien notes (the "2L Notes") issued by the Super HoldCo Debtors.  The 2L Notes are secured by the same collateral as the Super HoldCo Loans, on a junior basis, and carry a coupon of 7.625%, maturing in May 2029.  The resulting principal amount of the 2L Notes was approximately $379.5 million.

115.    *Third*, the Debtors upsized the intercompany loan by another $494.5 million (the "2025 Intercompany Loan" and, together with the 2023 Intercompany Loan, the "Intercompany Loans").  The 2025 Intercompany Loan bore an interest rate between 7.5% and 9.66%.  The cash component of the 2025 Intercompany Loan was contributed to OpCo Borrower and used to retire the remaining $115 million of 2025 Unsecured Notes, while the balance corresponded to the exchange of the 2029 Unsecured Notes for 2L Notes.  This upsizing further diluted the 2028 OpCo Term Loans for the Super HoldCo Lenders' benefit.[10]

116.    *Fourth*, the Debtors terminated the existing revolving credit facility and replaced it with a new $300 million revolving credit facility (the "OpCo RCF") that claimed "super-priority" status over the 2028 OpCo Term Loans and the Intercompany Loans, even though it was secured by the same collateral.  The agent for the new OpCo RCF was the same entity that served as agent under the OpCo Credit Agreement, despite an ad hoc group of creditors having sent multiple letters to that agent before the 2023 LME warning that the proposed transactions could breach the OpCo Credit Agreement.

117.    *Fifth*, the $340 million Guarantee Limit on the Foreign Guaranty was eliminated, increasing the Foreign Guarantors' potential exposure from $340 million to approximately $1.7 billion.

---

[10] Notably the entire upsizing of the 2023 Intercompany Loan was documented as a *pari passu* claim under the OpCo Credit Agreement.  This conferred a distinct benefit upon the Super HoldCo Lenders as they benefited from an inflated claim.

30

118.    Absent the 2025 Amendment, the 2025 LME could not have been consummated because the OpCo Borrower lacked sufficient capacity under the OpCo Credit Agreement to effectuate any of the elements of the 2025 LME.

119.    Similar to the 2023 LME, the 2025 LME purportedly allowed the Super HoldCo Lenders to seek recoveries against the remaining collateral in the OpCo Credit Group, and to have those claims positioned on a *pari passu* basis with those of Plaintiffs.

**B.      The Off-Market OpCo ICA**

120.    Through the 2025 LME, the Super HoldCo Lenders—using their control over Luxco SPV as the purported "Intercompany Lender" and the overlapping fiduciaries at OpCo Borrower—tightened their grip on the OpCo Credit Group, captured more of its value for themselves at the expense of the OpCo lenders, and set the stage to take over the Debtors in bankruptcy.

121.    As part of the 2025 LME, the Super HoldCo Lenders—using Luxco SPV's invalid votes—forced Deutsche Bank to enter into a highly unusual Intercreditor Agreement (the "OpCo ICA").  The OpCo ICA governs the relationship between the new "superpriority" RCF and the "junior" 2028 OpCo Term Loans.

122.    In a typical intercreditor agreement, junior creditors get the right to buy out senior debt if the borrower defaults.  This allows junior creditors to protect their position rather than let senior creditors foreclose on shared collateral.

123.    Here, however, the purchase right was given not to the 2028 OpCo Term Loan lenders (the "junior" creditors of OpCo Borrower), but instead to the Super HoldCo Lenders— who were creditors of a completely different borrower.  This unusual provision ensured that, in a bankruptcy, the Super HoldCo Lenders could buy up the RCF debt, step into the shoes of the RCF lenders, and control the OpCo and Super HoldCo restructuring.

124.    The OpCo ICA contains several other unusual provisions designed to limit Plaintiffs' ability to protect their interests.  For example, the OpCo ICA bars Plaintiffs from proposing or participating in any DIP financing—even on a junior basis—unless the superpriority lenders have first turned down the opportunity to provide such financing.  This ensures the RCF holders can dictate the DIP financing terms.

C.    **The 2025 Amendment and OpCo ICA Are Void**

125.    The 2025 Amendment and the OpCo ICA are void *ab initio* because the OpCo Borrower could not obtain the votes needed to approve them.  Unlike the 2023 LME—which was structured as a Credit Extension Amendment that did not require any existing Lender consent— the 2025 LME required approval by a majority of lenders (the "Required Lenders").

126.    To reach the Required Lenders threshold, the OpCo Borrower had to count votes of Luxco SPV.  But Luxco SPV only qualified as a "Lender" through the 2023 Intercompany Loan issued under the 2023 Amendment.  Because the 2023 Amendment was itself invalid (due to the Default caused by the 2023 LME), Luxco SPV was never a valid Lender under the OpCo Credit Agreement, and its votes should not have counted.

127.    Without Luxco SPV's invalid votes, the 2025 Amendment lacked the required lender support.  As a result, each component of the 2025 LME that depended on that amendment is invalid, including: (a) the designation of the Additional Unsubs; (b) the upsizing of the Intercompany Loan; (c) Deutsche Bank's entry into the OpCo ICA; and (d) the removal of the Guarantee Limit.

128.    *Separately*, the 2023 Intercompany Loan was not a true loan at all—in economic reality, it was equity.  Because Luxco SPV provided equity, not debt, to OpCo Borrower, it did not qualify as a "Lender" under the OpCo Credit Agreement.  Without Luxco SPV's consent votes, the 2025 Amendment lacked Required Lender consent and is void *ab initio*.

32

**D.      The Conflicted Fiduciaries Enter and Approve the 2025 LME—Including the 2025 Intercompany Loan**

129.      Like the 2023 Intercompany Loan, the 2025 Intercompany Loan was an equity contribution disguised as a loan.  Among other things, the 2025 Intercompany Loan: (i) was made between sister entities with the same conflicted managers; (ii) was not negotiated at arm's length; (iii) was not subject to due diligence, term sheet exchange, or any of the usual processes for incurring major debt; (iv) was not modeled based on OpCo Borrower's ability to repay; and (v) was made on terms that no independent lender would have accepted, given that the loan coincided with further value being stripped from the OpCo Borrower through the designation of Aristech and Altuglas as unrestricted subsidiaries.

130.      And like the 2023 LME, Officer Certificates for Luxco SPV and OpCo Borrower show that ███████████████████████████████████████████████████████ ██████████████████████████████████████████████████████████ As with the 2023 Intercompany Loan, the Super HoldCo Lenders and Luxco SPV took advantage of this conflict of interest.  They caused, and knowingly participated in, the OpCo Borrower managers' breach of their fiduciary duties by entering into the 2025 Intercompany Loan, which was not in OpCo Borrower's or its creditors' (including Plaintiffs') best interests.  There is no indication that the 2025 Intercompany Loan was subject to any negotiation, deliberation, or due diligence by either board.

131.      The benefits of the 2025 Intercompany Loan went primarily to Luxco SPV, while the costs fell on OpCo Borrower and its creditors, including Plaintiffs.

**V.      Defendants Continue to Prejudice Plaintiffs**

132.      Shortly after the 2025 LME closed, S&P downgraded the company's credit rating, calling the exchange a "selective default" and noting:

The exchange was offered at 85 cents on the dollar. As a result, we believe the transaction offered noteholders less value than originally promised on the securities and thus view it as a selective default. Specifically, we do not believe the increased position in the capital stack at a second-lien position and the higher offered coupon is adequate, offsetting compensation for the below-par redemption.

133.    As expected, since the 2025 LME, the Debtors' financial position continued to deteriorate, with the company reporting a net loss of $546 million and negative free cash flow of $153.4 million for the full year 2025.

134.    In December 2025, the New York Stock Exchange notified Trinseo that it would suspend trading of Trinseo's shares because the share price had stayed below $1 for 30 consecutive trading days and Trinseo's market capitalization had fallen below $50 million, unless Trinseo submitted a compliance plan. Around the same time, S&P Global Ratings further downgraded Trinseo due to unsustainable debt levels and continued deterioration in the Debtors' operating performance.

135.    In January 2026, it was announced that the Debtors and Super HoldCo Lenders had hired advisors and were engaging in discussions around a potential debt restructuring.

136.    Since that time, the Super HoldCo Lenders, aware that Trinseo planned to file for bankruptcy, have taken steps to cement their control over the Debtors and these bankruptcy proceedings, and have firmly entrenched themselves as company insiders.

137.    After ███████████████████████████████ the Super HoldCo Lenders purchased all or substantially all of the "superpriority" RCF loans—a move that gave them control over the purported senior-most debt at the OpCo level, in addition to the control they already exercised over the senior-most debt at the Super HoldCo level. The result of purchasing the RCF loans, as a managing director for the Apollo Funds stated in a February 2026 email, would

34

██████████████████████████████████████████████████████

████████████████████████████████████ A senior counsel for the Angelo

Gordon funds also described ████████████████████████████████████

██████████████████████████████████████████████████████

████████████████████████████████

138.    The Super HoldCo Lenders then caused the Debtors to draw down the RCF and transfer those funds to the Super HoldCo Entities.  In a January 2026 forecast, t████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

████████████    Later forecasts ████████████████████████████

██████████████████████████████████████████████████████

█████████████████████████████████████████

139.    The Debtors eventually acknowledged that OpCo was funneling cash to Super HoldCo, saying in a March 2026 presentation that ██████████████████████████████

██████████████████████████████████████████████████████

████████████████████████████████████████ That analysis was based

on ██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

███████████████████████

140.    In addition, OpCo continued to make debt servicing payments, including interest payments on the Intercompany Loans, to the Super HoldCo Entities.  From 2025 to April 2026, █

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

35

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████

141.    The OpCo Credit Group received nothing in return for these transfers.  The effect was twofold: it shifted cash to the Super HoldCo Lenders' benefit and increased the amount of RCF debt owed by OpCo.

142.    The Debtors also forced the OpCo Credit Group to absorb costs that belonged to the enterprise as a whole or exclusively to the Super HoldCo Entities—such as taxes attributable to the entire enterprise and management retention payments benefiting the entire enterprise—further draining value from Plaintiffs as OpCo Term Loan lenders.  For example, ████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

This treatment was particularly improper because, with respect to other categories of shared enterprise expenses, the Company allocated costs proportionally between OpCo Entities and the Super HoldCo Entities, demonstrating that the Company selectively abandoned proportional allocation principles when doing so benefited the Super HoldCo structure.

143.    The Debtors' books and records further show that they failed to maintain clear and consistent accounting practices to distinguish between the OpCo and Super HoldCo credit silos—even though the supposed separation between those silos was the entire basis for the priority structure imposed on Plaintiffs.  On information and belief, the Debtors routinely shifted cash, expenses, and liabilities between silos without clear documentation or consistent accounting,

36

demonstrating that the Debtors did not in practice operate their business as if the two structures were genuinely separate.

144. Additionally, the Super HoldCo Lenders insulated themselves from any consequences of their control over the Debtors. In an April 10, 2026, amendment to the 2025 Credit Agreement, the Super HoldCo Lenders conditioned new lending on an agreement that the Debtors would conclude the investigation by the independent managers of the OpCo and Super HoldCo borrowers (the "Independent Investigation") into the Intercompany Loans by April 25, 2026, thereby protecting their claim to the Intercompany Loans and further solidifying the Super HoldCo Lenders' control over the bankruptcy by preventing any meaningful investigation into the Super HoldCo Lenders' and the Debtors' actions.

145. Upon information and belief, the Super HoldCo Lenders, using their insider status, drove the above decisions of the Debtors and have otherwise exercised their control over the Debtors to drive these bankruptcy proceedings, resulting in an RSA and chapter 11 plan of reorganization that were not negotiated at arm's length.

## <u>COUNT I</u>

### DISALLOWANCE OF CLAIMS UNDER 11 U.S.C. § 502
(Against All Defendants)

146. The allegations set forth above are incorporated herein by reference.

147. Bankruptcy Code § 502(b)(1) provides that a claim shall be disallowed if "such claim is unenforceable against the debtor and property of the debtor, under any agreement or applicable law for a reason other than because such claim is contingent or unmatured."

148. The OpCo Credit Agreement is a valid and binding contract between the parties.

149. The OpCo Credit Agreement's investment and restricted payment covenants prohibit OpCo Borrower from making any investments or restricted payments other than those specifically enumerated in, among other places, sections 1.01 and 7.06 of the OpCo Credit

Agreement.  The 2023 LME violated those covenants because the OpCo Credit Group had insufficient investment capacity for the AmSty Dropdown and AmSty Unsubs guaranty of the Super HoldCo Loan.

150.    OpCo Borrower's failure to abide by the OpCo Credit Agreement's terms and covenants constitutes a Default under sections 1.01 and 8.01(b) of the OpCo Credit Agreement. As a result, under sections 2.16, 2.17 and 4.02 of the OpCo Credit Agreement, a precondition to the effectiveness of the 2023 Amendment was not met.  Therefore, the 2023 Intercompany Loan and 2023 Amendment are invalid and void *ab initio*.

151.    The 2025 Intercompany Loan, 2025 Amendment, and OpCo ICA were consummated based on the votes of Luxco SPV as lender of the 2023 Intercompany Loan.  Because that loan is invalid (because the 2023 Amendment was not effective and independently because the loan is equity in economic substance) and Luxco SPV could not vote, the 2025 Intercompany Loan, 2025 Amendment, and OpCo ICA are also invalid and void *ab initio*.

152.    As a result, any claims based on the 2023 Intercompany Loan, the 2025 Intercompany Loan, the 2025 Amendment, or the OpCo ICA must be disallowed pursuant to Bankruptcy Code § 502(b)(1).

### <u>COUNT II</u>

**RECHARACTERIZATION OF INTERCOMPANY LOANS UNDER 11 U.S.C. § 502**
**(Against Defendant Luxco SPV)**

153.    The allegations set forth above are incorporated herein by reference.

154.    The Intercompany Loans were in substance equity investments rather than true loans.  Among other things:

    a.    Each of the Intercompany Loans was made between company entities and approved by conflicted fiduciaries of Luxco SPV and the OpCo Borrower;

    b.    Luxco SPV was not in the business of lending money, and there was no legitimate commercial basis for the Intercompany Loans;

c.  Luxco SPV understood that the purpose of the Intercompany Loans was to manufacture bankruptcy claims for the Super HoldCo Lenders at the expense of Plaintiffs;

d.  There was no arm's length commercial negotiation of the Intercompany Loans, including no due diligence or other underwriting activity characteristic of complex loans of the size of the Intercompany Loans;

e.  The Intercompany Loans were issued on off-market terms that a true third-party lender never would have agreed to, particularly given the financial state of OpCo Borrower at the time of the Intercompany Loans;

f.  Luxco SPV had no real expectation of repayment; and

g.  Neither Luxco SPV nor the OpCo Borrower conducted the usual processes that postdate the incurrence of a typical debt, such as periodic reporting to Luxco SPV.

155.  In approving the Intercompany Loans, Luxco SPV and OpCo Borrower acted in a manner that was contrary to the best interests of their creditors, harming Plaintiffs.

156.  Any purported claims against the Debtors that rely, directly or indirectly, on the Intercompany Loans should be recharacterized pursuant to Bankruptcy Code sections 105(a) and disallowed under 502(b)(1).

## COUNT III

### EQUITABLE SUBORDINATION OF INTERCOMPANY LOAN CLAIMS
### (Against Defendant Luxco SPV)

157.  The allegations set forth above are incorporated herein by reference.

158.  Section 510(c) of the Bankruptcy Code allows parties to seek to equitably subordinate allowed claims for the purposes of entitlement to distributions.

159.  The conduct of Luxco SPV described above was wrongful, inequitable, and not in good faith.  The decision to enter into the Intercompany Loans was made by the same conflicted fiduciaries who served at both Luxco SPV and OpCo Borrower.

39

160.     Luxco SPV knowingly participated in and exploited this conflict of interest by causing the OpCo Borrower fiduciaries, in breach of their fiduciary duties, to enter into the Intercompany Loans, which were not in the best interests of OpCo Borrower or Plaintiffs.

161.     There is no indication that the Intercompany Loans were subject to any negotiation, deliberation, or due diligence by either board.

162.     As related entities with a common parent and identical fiduciaries, Luxco SPV had knowledge of the OpCo Borrower fiduciaries' duties and knowingly participated in the breach.

163.     Luxco SPV benefited from this misconduct by obtaining the benefit of the Intercompany Loans, including allowing Luxco SPV to obtain more favorable lending terms on the Super HoldCo Loan that would not have been available without the Intercompany Loans.

164.     The benefits of the Intercompany Loans went primarily to Luxco SPV, while OpCo Borrower bore the costs: additional debt at higher interest rates, loss of collateral support through the transfer of AmSty, the designation of Aristech and Altuglas as unrestricted subsidiaries, reduction of revolver capacity, and elimination of the Foreign Guaranty limit.  This misconduct gave Luxco SPV an unfair advantage over Plaintiffs.

165.     Equitable subordination of Luxco SPV's claims is therefore consistent with the provisions of the Bankruptcy Code, including Bankruptcy Code § 510(c).

## COUNT IV

### EQUITABLE SUBORDINATION OF RCF  CLAIMS
**(Against the Super HoldCo Lenders)**

166.     The allegations set forth above are incorporated herein by reference.

167.     Section 510(c) of the Bankruptcy Code allows parties to seek to equitably subordinate allowed claims for the purposes of entitlement to distributions.

168.     The conduct of the Super HoldCo Lenders described above was wrongful, inequitable, and not in good faith, including that, among other things:

40

a.      The Super HoldCo Lenders used invalid votes to force entry into the off-market OpCo ICA, which strips Plaintiffs of core bankruptcy rights; and

b.      The Super HoldCo Lenders began buying up the OpCo RCF loans when the Debtors' insolvency was apparent, and then used OpCo RCF draws—which reduced recoveries available to Plaintiffs—to funnel money to themselves via the Super HoldCo Entities;

169.    The Super HoldCo Lenders knowingly participated in and benefited from this misconduct, including by being able to control the bankruptcy process and gain control of the Debtors.

170.    The benefits of this misconduct largely inured to the Super HoldCo Lenders and came at the expense of creditors of the OpCo Borrower, including Plaintiffs.  The misconduct therefore allowed the Super HoldCo Lenders to obtain an unfair advantage over Plaintiffs.

171.    Equitable subordination of the Super HoldCo Lenders' claims under the RCF is therefore consistent with the provisions of the Bankruptcy Code, including Bankruptcy Code § 510(c).

### PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs respectfully request that this Court enter judgment in their favor against Defendants for each claim for relief and grant:

(a)      A judgment disallowing claims based on the 2023 Intercompany Loan, 2025 Intercompany Loan, 2025 Amendment, or the OpCo ICA;

(b)      A judgment recharacterizing the Intercompany Loans as equity;

(c)      Subordination of Luxco SPV's claims under the Intercompany Loans to Plaintiffs' secured claims;

(d)      Subordination of the Super HoldCo Lenders' claims under the RCF to Plaintiffs' secured claims;

(e)      Costs in bringing this action under Bankruptcy Rule 7054; and

(f)      Such other and further relief as the Court may deem just and proper.

Respectfully submitted this 23rd day of June 2026.

**GRAY REED**

By:      */s/ Jason S. Brookner*
         Jason S. Brookner
         Texas Bar No. 24033684
         Lydia R. Webb
         Texas Bar No. 24083758
1300 Post Oak Blvd., Suite 2000
Houston, Texas 77056
Telephone:    (713) 986-7000
Facsimile:    (713) 986-7100
Email:          jbrookner@grayreed.com
                    lwebb@grayreed.com

-and-

**PALLAS PARTNERS (US) LLP**

Duane L. Loft (admitted *pro hac vice*)
Jill L. Forster (admitted *pro hac vice*)
Brianna S. Simopoulos (admitted *pro hac vice*)
75 Rockefeller Plaza
New York, NY 10019
Telephone:    (212) 970-2300
Email:          duane.loft@pallasllp.com
                    jill.forster@pallasllp.com
                    brianna.simopoulos@pallasllp.com

*Counsel to the Ad Hoc Group of Excluded OpCo Term Lenders*

## CERTIFICATE OF SERVICE

I certify that on June 23, 2026, I caused a copy of the foregoing document to be served by the Electronic Case Filing System for the United States Bankruptcy Court for the Southern District of Texas on those parties registered to receive electronic notices in this adversary proceeding.

By:      */s/ Jason S. Brookner*
         Jason S. Brookner