**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | |
|---|---|
| In re:<br><br>TRINSEO PLC., *et al.*,<br><br>　　　　　　　　Debtors.[1] | Chapter 11<br><br>Case No. 26-90545 (CML)<br><br>(Jointly Administered) |
| CASTLEKNIGHT MASTER FUND LP; ELEVATION CLO 2013-1, LTD; ELEVATION CLO 2016-5, LTD; ELEVATION CLO 2020-11, LTD; ELEVATION CLO 2021-12, LTD; ELEVATION CLO 2021-13, LTD; ELEVATION CLO 2021-14, LTD; ELEVATION CLO 2021-15, LTD; ELEVATION CLO 2022-16, LTD; SIGNAL PEAK CLO 4, LTD.; SIGNAL PEAK CLO 5, LTD.; SIGNAL PEAK CLO 7, LTD.; SIGNAL PEAK CLO 8, LTD.; SIGNAL PEAK CLO 9, LTD.; SIGNAL PEAK CLO 10, LTD.; AND SIGNAL PEAK CLO 12, LTD.,<br><br>　　　　　　　　Plaintiffs,<br><br>– against –<br><br>APOLLO ACCORD+ II AGGREGATOR A, L.P.; APOLLO CALLIOPE FUND LP; APOLLO CENTRE STREET PARTNERSHIP, L.P.; APOLLO EXCELSIOR CO-INVEST, L.P.; APOLLO LINCOLN FIXED INCOME FUND, L.P.; APOLLO MOULTRIE CREDIT FUND, L.P.; AG CREDIT SOLUTIONS MASTER FUND II A, L.P.; TPG AG CORPORATE CREDIT OPPORTUNITIES FUND, L.P.; TPG AG CREDIT SOLUTIONS AVANTI CO-INVEST, L.P.; AG CATALOOCHEE, L.P.; AG CSF 2023 OVERFLOW FUND (G) LP; AG POTOMAC FUND, L.P.; TPG AG CENTRE STREET PARTNERSHIP, L.P.; TPG DYNAMIC CREDIT INCOME MASTER FUND, L.P.; AG CREDIT SOLUTIONS FUND II CO-INVESTMENT, L.P.; OAKTREE OPPORTUNITIES FUND XI HOLDINGS (DELAWARE), L.P.; OAKTREE OPPORTUNITIES FUND XII HOLDINGS (DELAWARE), L.P.; TRINSEO HOLDING S.À.R.L.; TRINSEO LUXCO FINANCE SPV S.À.R.L.; TRINSEO LUXCO S.À.R.L.; AND TRINSEO MATERIALS FINANCE, INC.,<br><br>　　　　　　　　Defendants. | Adv. Proc. No. 26-03208 |

**PLAINTIFFS' OMNIBUS OPPOSITION TO THE DEBTORS' AND SUPER HOLDCO**
**LENDER DEFENDANTS' MOTIONS FOR JUDGMENT ON THE PLEADINGS**

---

[1] A complete list of each of the Debtors in these chapter 11 cases and the last four digits of each Debtor's taxpayer identification number (if applicable) may be obtained on the website of the Debtors' proposed claims and noticing agent at https://restructuring.ra.kroll.com/trinseo/.  The Debtors' mailing address is 440 East Swedesford Road, Suite 301, Wayne, PA 19087.

**TABLE OF CONTENTS**

PRELIMINARY STATEMENT ................................................................................ 1

FACTUAL BACKGROUND/STATEMENT OF FACTS .......................................... 7

    A.    The OpCo Credit Agreement ...................................................... 7

    B.    The 2023 LME ........................................................................ 8

    C.    The 2025 LME ........................................................................11

    D.    Defendants Continue to Prejudice Plaintiffs ............................ 12

    E.    Procedural History ................................................................ 14

ARGUMENT .................................................................................................... 14

I.    PLAINTIFFS HAVE STANDING TO BRING THIS ACTION. .................................... 15

    A.    The Amended Complaint Brings Individual, Not Estate, Claims. ........................ 15

        1.    Plaintiffs Have Individual Standing to Assert the Equitable Subordination Claims. ................................................................................ 16

        2.    Plaintiffs Have Individual Standing to Assert the Recharacterization Claims. ................................................................................ 19

        3.    Allegations of Fiduciary Misconduct Do Not Transform the Claims Into Estate Claims. ........................................................................ 20

        4.    The Amended Complaint Does Not Repackage Previously Asserted Estate Claims. ........................................................................ 21

        5.    If The Court Concludes That Any of the Amended Complaint's Claims Are Estate Claims, Plaintiffs Request Derivative Standing. ........................... 23

    B.    Standing Under the OpCo Credit Agreement Is Not Required. ........................... 25

    C.    Plaintiffs Did Not Waive Their Claims or Ratify Defendants' Conduct. .............. 29

    D.    The Mutual Release Agreement Does Not Bar the Amended Complaint. ............ 32

    E.    The Intercreditor Agreements Do Not Bar the Amended Complaint. .................. 33

        1.    The OpCo ICA Does Not Bar this Action ................................................. 33

        2.    The SHC ICA Does Not Prohibit "Any Action Adverse to the Intercompany Loans" ................................................................ 36

II.    DEFENDANTS ARE NOT ENTITLED TO JUDGMENT ON THE AMENDED COMPLAINT'S CLAIM OBJECTION. .......................................................... 37

    A.    The Amended Complaint States Numerous Violations of the Credit Agreement. 37

    B.    The Absence of a Default Is a Precondition to the Effectiveness of the 2023 Amendment. ........................................................................ 43

    C.    The Debtors' Remedies Argument is Irrelevant. ........................................ 44

III.    THE AMENDED COMPLAINT STATES CLAIMS FOR EQUITABLE SUBORDINATION. ........................................................................ 46

|      | A.   | The Amended Complaint States a Claim for Equitable Subordination with Respect to the Intercompany Loans...................................................................................... 47 |
|      | B.   | The Amended Complaint States a Claim for Equitable Subordination of the RCF. .................................................................................................................................... 48 |
| IV.  |      | DEFENDANTS ARE NOT ENTITLED TO JUDGMENT ON THE AMENDED COMPLAINT'S RECHARACTERIZATION CLAIMS. ............................................... 51 |
|      | A.   | The Debtors Apply the Wrong Test to the Recharacterization Claim................... 51 |
|      | B.   | The Amended Complaint States a Claim for Recharacterization. ........................ 52 |
| CONCLUSION................................................................................................................................... 56 | | |

# TABLE OF AUTHORITIES

**Cases**

*111 W. 57th Inv. LLC v. 111 W57 Mezz Inv. LLC*,
No. 41, 2026 WL 1502410 (N.Y. May 28, 2026) ..................................................... 39

*Abir v. Malky, Inc.*,
873 N.Y.S.2d 350 (N.Y. App. Div. 2009) .................................................................. 52

*Adar Bays, LLC v. GeneSYS ID, Inc.*,
37 N.Y.3d 320 (2021) ........................................................................................ 52, 55

*AIG Financial Prods. Corp. v. Arthurs (In re AIG Financial Prods. Corp.)*,
660 B.R. 603 (Bankr. D. Del. 2024) .................................................................. 34, 35

*Audax Credit Opportunities Offshore Ltd. v. TMK Hawk Parent, Corp.*,
72 Misc. 3d 1218(A) (N.Y. Sup. Ct. 2021) ............................................................. 41

*Autoconnect Holdings LLC v. Toyota Motor Corp.*,
Case No. 2:24-cv-00802-JRG-RSP, 2026 WL 873225 (E.D. Tex. Mar. 11, 2026) ................. 14

*Axos Fin., Inc. v. Reception Purchaser, LLC*,
88 Misc. 3d 1203(A), 246 N.Y.S.3d 915 (N.Y. Sup. 2026) ..................................... 41

*Bayer Corp. v. MasoTech, Inc. (In re AutoStyle Plastics, Inc.)*,
269 F.3d 726 (6th Cir. 2001) ................................................................................... 56

*Beal Sav. Bank v. Sommer*,
865 N.E.2d 1210 (N.Y. 2007) .................................................................................. 28

*Bennett, Trustee for MTE Litig. Trust v. Siffin*,
No. 21-CV-00214-DC-RCG, 2022 WL 2762224 (W.D. Tex. May 24, 2022) ......................... 47

*Bridas S.A.P.I.C. v. Gov't of Turkmenistan*,
345 F.3d 347 (5th Cir. 2003) ................................................................................... 33

*Bunch v. J.M. Capital Fin., Ltd. (In re Hoffinger Indus., Inc.),*
327 B.R. 389 (Bankr. E.D. Ark. 2005) ...................................................... 16, 18, 55

*Butner v. United States*,
440 U.S. 48 (1979) ................................................................................................... 19

*Cheyne European Strategic Value Credit RAIF v. Hunkemoller Intern. BV*,
No. 659297/2024 (N.Y. Sup. Ct. June 17, 2025) .................................................... 42

*Cisneros v. Alpine Ridge Grp.*,
508 U.S. 10 (1993) ................................................................................................... 35

*Citibank, N.A. v. Vebeliunas (In re Vebeliunas)*,
    332 F.3d 85 (2d Cir. 2003) ....................................................................................... 32

*Deutsche Bank AG v. JPMorgan Chase Bank*,
    No. 04 Civ. 7192(SHS), 2007 WL 2823129 (S.D.N.Y. Sept. 27, 2007) ................................. 45

*Dudley v. Smith*,
    504 F.2d 979 (5th Cir. 1974) .................................................................................... 21

*E. Ramapo Cent. Schs. Dist. v. N.Y. Sch. Ins. Reciprocal*,
    158 N.Y.S.3d 173 (2d Dep't 2021) ............................................................................. 38

*German Roman Cath. Orphan Home of Buffalo v. Liberty Nat'l Bank & Tr. Co. (In re Schaefer)*,
    18 N.Y.2d 314 (N.Y. 1966) ...................................................................................... 31

*Haymount Urgent Care PC v. GoFund Advance, LLC*,
    609 F. Supp. 3d 237 (S.D.N.Y. 2022) .................................................................... 52, 55

*Herbert Abstract Co., Inc. v. Touchstone Props., Ltd.*,
    914 F.2d 74 (5th Cir. 1990) ...................................................................................... 14

*Hoang v. Microsemi Corp.*,
    No. 4:19-CV-01971, 2025 WL 933720 (S.D. Tex. Mar. 26, 2025)......................................... 15

*Horowitz v. Nat'l Gas & Elec., LLC*,
    17-cv-7742 (JPO), 2021 WL 4478622 (S.D.N.Y. Sept. 30, 2021)................................... 29, 46

*Hughes v. Tobacco Inst.*,
    278 F.3d 417 (5th Cir. 2001) .................................................................................... 15

*I80 Grp. Lending Opp. Funding Tr. 2018 v. Meritize Fin., Inc.*,
    No. 653670/2023, 2026 WL 1022670 (N.Y. Sup. Ct. Apr. 9, 2026)................................. 29, 30

*In re Andrews*,
    No. 94-21308, 2009 WL 1076831 (Bankr. S.D. Tex. Apr. 2, 2009). ........................ 16, 17, 19

*In re AppliedTheory Corp.*,
    493 F.3d 82 (2d Cir. 2007) ...................................................................................... 19

*In re ATP Oil & Gas Corp.*,
    540 B.R. 294 (Bankr. S.D. Tex. 2015) ....................................................................... 19

*In re BH S & B Holdings LLC*,
    420 B.R. 112 (Bankr. S.D.N.Y. 2009)......................................................................... 53

*In re Blockbuster Inc.*,
    No. 10-14997 BRL, 2011 WL 1042767 (Bankr. S.D.N.Y. Mar. 17, 2011)............................ 22

iv

*In re Broadstripe, LLC*,
 444 B.R. 51 (Bankr. D. Del. 2010) ................................................................. 50

*In re Charter Co.*,
 68 B.R. 225 (Bankr. M.D. Fla. 1986) ............................................................. 26

*In re Ciena Cap. LLC*,
 440 B.R. 49 (S.D.N.Y. 2010) ......................................................................... 27

*In re DePugh*,
 409 B.R. 84 (Bankr. S.D. Tex. 2009) ............................................................. 27

*In re Elrod Holdings Corp.*,
 392 B.R. 110 (Bankr. D. Del. 2008) ................................................... 16, 17, 18

*In re Evergreen Energy, Inc.*,
 546 B.R. 549 (D. Del. 2016)........................................................................... 49

*In re Flying Star Cafes, Inc.*,
 568 B.R. 129 (Bankr. D.N.M. 2017)............................................................... 17

*In re Gilbreath*,
 395 B.R. 356 (Bankr. S.D. Tex. 2008) ........................................................... 27

*In re GMI Grp., Inc.*,
 606 B.R. 467 (Bankr. N.D. Ga. 2019).............................................................. 27

*In re GWG Holdings, Inc.*,
 Adv. Proc. No. 23-3088, 2023 WL 6449208 (Bankr. S.D. Tex. Oct. 2, 2023) ..... 43, 51, 52, 53

*In re JNS Aviation, LLC*,
 334 B.R. 202 (Bankr. N.D. Tex. 2005) ........................................................... 26

*In re LightSquared Inc.*,
 511 B.R. 253 (Bankr. S.D.N.Y. 2014).............................................................. 27

*In re Live Primary, LLC*,
 626 B.R. 171 (Bankr. S.D.N.Y. 2021).................................................. 54, 55, 56

*In re Lothian Oil Inc.*,
 650 F.3d 539 (5th Cir. 2011) ................................................................... 19, 51

*In re Louisiana World Exposition, Inc.*,
 832 F.2d 1391 (5th Cir. 1987)........................................................................ 23

*In re Magnolia Gas Co., L.L.C.*,
 255 B.R. 900 (Bankr. W.D. Okla. 2000).......................................................... 17

*In re Mallett, Inc.*,
No. 21-11619 (JLG), 2024 WL 150628 (Bankr. S.D.N.Y. Jan. 12, 2024) ........................ 54, 56

*In re MPM Silicones, LLC*,
518 B.R. 740 (Bankr. S.D.N.Y. 2014) .................................................................................. 37

*In re Northbelt, LLC*,
630 B.R. 228 (Bankr. S.D. Tex. 2020) ................................................................................. 27

*In re Sackman Mortg. Corp.*,
158 B.R. 926 (Bankr. S.D.N.Y. 1993) .................................................................................. 52

*In re Seven Seas Petroleum, Inc.*,
522 F.3d 575 (5th Cir. 2008) ........................................................................................ passim

*In re Smith*,
415 B.R. 222 (Bankr. N.D. Tex. 2009) ................................................................................ 49

*In re Stone*,
671 B.R. 752 (Bankr. D. Colo. 2025) .................................................................................. 27

*In re SubMicron Sys. Corp.*,
432 F.3d 448 (3d Cir. 2006) ................................................................................................. 56

*In re TPC Grp. Inc.,*
No. 22-10493 (CTG), 2022 WL 2498751 (Bankr. D. Del. July 6, 2022) .............................. 30

*In re Tribune Co.*,
972 F.3d 228 (3d Cir. 2020) ................................................................................................. 34

*In re Tronox Inc.*,
855 F.3d 84 (2d Cir. 2017) ................................................................................................... 19

*In re TS Emp., Inc.*,
597 B.R. 494 (Bankr. S.D.N.Y. 2019) .................................................................................. 41

*In re Verestar, Inc.*,
343 B.R. 444 (Bankr. S.D.N.Y. 2006) ............................................................................ 46, 48

*In re Vitreous Steel Prods. Co.*,
911 F.2d 1223 (7th Cir. 1990) .............................................................................................. 17

*In re Waggoner Cattle, LLC*,
No. 18-20126-RLJ-11, 2019 WL 469367 (Bankr. N.D. Tex. Feb. 6, 2019) .................... 16, 20

*In re Weinstein Co. Holdings, LLC*,
595 B.R. 455 (Bankr. D. Del. 2018) ..................................................................................... 26

*K9 Bytes, Inc. v. Arch Cap. Funding, LLC*,
57 N.Y.S.3d 625 (Sup. Ct. 2017) ....................................................................... 51

*Kortright Capital Partners v. Investcorp Inv. Advisers Ltd.*,
327 F. Supp. 3d 673 (S.D.N.Y. 2018) ................................................................ 45

*Kucel v. Walter E. Heller & Co.*,
813 F.2d 67 (5th Cir. 1987)................................................................................ 47

*LaMonica v. CEVA Grp. PLC (In re CIL Ltd.)*,
Adv. Proc. No. 14-02442-JLG, 2024 WL 1693626 (Bankr. S.D.N.Y. Apr. 18, 2024)............ 34

*Lateral Recovery LLC v. Queen Funding, LLC*,
No. 21 Civ. 9607(LGS), 2022 WL 2829913 (S.D.N.Y. July 20, 2022) ................................ 52

*Lateral Recovery, LLV v. Cap. Merchant Servs, LLC*,
632 F. Supp. 3d 402 (S.D.N.Y. 2022) ................................................................ 53

*LCM XXII Ltd. v. Serta Simmons Bedding, LLC*,
No. 21-cv-3987, 2022 WL 953109 (S.D.N.Y. Mar. 29, 2022)................................ 39

*LG Funding, LLC v. United Senior Props. Of Olathe, LLC*,
122 N.Y.S.3d 309 (N.Y. App. Div. 2020)......................................................... 51, 52

*Liberto v. D.F. Stauffer Biscuit Co.*,
441 F.3d 318 (5th Cir. 2006)............................................................................ 29, 34

*Louisiana World Exposition v. Fed. Ins. Co.*,
858 F.2d 233 (5th Cir. 1988)............................................................................ 25

*Matter of Mobile Steel Co.*,
563 F.2d 692 (5th Cir. 1977)............................................................................ 47

*Matter of S.I. Acquisition, Inc.*,
817 F.2d 1142 (5th Cir. 1987) .......................................................................... 19

*Matter of U.S. Abatement Corp.*,
39 F.3d 556 (5th Cir. 1994)............................................................................... 46

*Merhav Ampal Grp., Ltd. v. Merhav (M.N.F.) Ltd. (In re Ampal-AM. Israel Corp.)*,
545 B.R. 802 (Bankr. S.D.N.Y. 2016)................................................................ 31

*Meridian Cap. CIS Fund v. Burton (In re Buccaneer Res., L.L.C.)*,
912 F.3d 291 (5th Cir. 2019) ............................................................................ 19, 20

*Nat'l Oilwell Varco, L.P. v. Auto-Dril, Inc.*,
68 F.4th 206 (5th Cir. 2023).............................................................................. 32

*Oakshire Props., LLC v. Argus Cap. Funding, LLC,*
  229 A.D.3d 1199 (N.Y. App. Div. 2024)..............................................................51

*Official Comm. Unsecured Creditors v. Clark (In re Nat'l Forge Co.),*
  326 B.R. 532 (Bankr. W.D. Penn. 2005)..............................................................25

*Orius Corp. v. Qwest Corp.,*
  373 B.R. 555 (N.D. Ill. 2007) .............................................................................26

*Pavone v. Aetna Cas. & Sur. Co.,*
  91 Misc.2d 658 (N.Y. Sup. Ct. 1977)..................................................................31

*Poth v. Russey,*
  99 Fed. App'x 446 (4th Cir. 2004) ......................................................................19

*Rudman v Cowles Commc'ns, Inc.,*
  30 N.Y.2d 1 (1972)..............................................................................................41

*Samson MCA LLC v. Joseph A. Russo M.D. P.C./IV Therapeutics PLLC,*
  196 N.Y.S.3d 256 (N.Y. App. Div. 2023).............................................................51

*Sea-Land Servs., Inc. v. D.I.C., Inc.,*
  102 F.R.D. 252 (S.D. Tex. 1984) ...................................................................14, 15

*Sec. Inv. Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC,*
  429 B.R. 423 (Bankr. S.D.N.Y. 2010)..................................................................23

*Students for Fair Admissions, Inc. v. Univ. of Texas at Austin,*
  37 F.4th 1078 (5th Cir. 2022)...............................................................................21

*Texas v. Am. Tobacco Co.,*
  441 F. Supp. 3d 397 (E.D. Tex. 2020)..................................................................33

*U.S. Bank Nat'l Ass'n v. Windstream Servs., LLC,*
  17-CV-7857(JMF), 2019 WL 948120 (S.D.N.Y. Feb. 15, 2019)..........................45

*Wesco Aircraft Holdings, Inc v. SSD Invs. Ltd,*
  Ad. No. 23-3091 (S.D. Tex. Bankr. Jan. 14, 2024)...............................................22

*Wesco Aircraft Holdings, Inc v. SSD Invs. Ltd,*
  No. 4:25-CV-202, 2025 WL 3514358 (S.D. Tex. Dec. 8, 2025).....................19, 21

**Statutes**

11 U.S.C. § 502..................................................................................... passim

11 U.S.C. § 502(a) ........................................................................................26

11 U.S.C. § 502(b) ..........................................................................19, 25, 45, 51

11 U.S.C. § 547 .................................................................................................................. 19

11 U.S.C. § 1109(b) ...................................................................................................... 20, 26

11 U.S.C. § 502(b)(1).................................................................................................. 26, 27, 28

11 U.S.C. § 510(a) ............................................................................................................... 34

11 U.S.C. § 510(c) ...................................................................................... 16, 19, 34, 46

**Rules**

Fed. R. Civ. P. 12(c) ....................................................................................................... 14, 32

Plaintiffs CastleKnight Master Fund LP ("CastleKnight"), Elevation CLO 2013-1, Ltd; Elevation CLO 2016-5, Ltd; Elevation CLO 2020-11, Ltd; Elevation CLO 2021-12, Ltd; Elevation CLO 2021-13, Ltd; Elevation CLO 2021-14, Ltd; Elevation CLO 2021-15, Ltd; Elevation CLO 2022-16, Ltd; Signal Peak CLO 4, Ltd.; Signal Peak CLO 5, Ltd.; Signal Peak CLO 7, Ltd.; Signal Peak CLO 8, Ltd.; Signal Peak CLO 9, Ltd.; Signal Peak CLO 10, Ltd.; and Signal Peak CLO 12, Ltd. (the "Plaintiffs") respectfully submit this Opposition to the Motions for Judgment on the Pleadings (the "Motions") filed by (i) Defendants Apollo Accord+ II Aggregator A, L.P.; Apollo Calliope Fund LP; Apollo Centre Street Partnership, L.P.; Apollo Excelsior Co-Invest, L.P.; Apollo Lincoln Fixed Income Fund, L.P.; Apollo Moultrie Credit Fund, L.P.; AG Credit Solutions Master Fund II A, L.P.; TPG AG Corporate Credit Opportunities Fund, L.P.; TPG AG Credit Solutions Avanti Co-Invest, L.P.; AG Cataloochee, L.P.; AG CSF 2023 Overflow Fund (G) LP; AG Potomac Fund, L.P.; TPG AG Centre Street Partnership, L.P.; TPG Dynamic Credit Income Master Fund, L.P.; AG Credit Solutions Fund II Co-Investment, L.P.; Oaktree Opportunities Fund XI Holdings (Delaware), L.P.; and Oaktree Opportunities Fund XII Holdings (Delaware), L.P. (collectively, the "Super HoldCo Lenders") [Adv. Docket No. 10] (the "SHC Lenders' MJP") and (ii) Defendants Trinseo Holding S.à r.l. ("Trinseo Holdings" or "OpCo Borrower"), Trinseo Luxco Finance SPV S.à r.l. ("Luxco SPV" or "Super HoldCo"), Trinseo Luxco S.à r.l., and Trinseo Materials Finance, Inc., as debtors and debtors in possession (collectively, the "Debtors" and together with their affiliates, the "Company") [Adv. Docket No. 9] (the "Debtors' MJP") in the above-captioned adversary proceeding.

## PRELIMINARY STATEMENT

1.     This adversary proceeding challenges a series of prepetition liability management exercises (the "LMEs") that laid the groundwork for the chapter 11 plan of reorganization now before this Court—a plan that would transfer control of the Debtors to the Super HoldCo Lenders,

compensate those lenders for inequitable conduct, and substantially impair recovery on the 2028 OpCo Term Loans.

2.      In the first of these LMEs in 2023, rather than seeking additional financing from the most logical source—the 2028 OpCo Term Loan lenders with the largest exposure in the capital structure—the Debtors entered into a transaction with the Super HoldCo Lenders that disregarded fundamental contractual protections under the OpCo Credit Agreement.  As part of this transaction, one of the Debtors' most valuable assets—a joint venture in America Styrenics ("AmSty")—was removed from the OpCo collateral when it was dropped down into a newly created unrestricted subsidiary and used to secure the new Super HoldCo debt.

3.      Then, for no purpose other than to create an artificial "double dip" claim for the Super HoldCo Lenders, the Debtors papered an intercompany "loan" from the Super HoldCo Borrower back into OpCo.  Applauding ███████████████ the Super HoldCo lenders recognized its intended purpose and effect ████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████

4.      In 2025, as part of a second LME, the intercompany loan was upsized, the OpCo Borrower issued a new "super-priority" RCF facility priming the 2028 OpCo Term Loans, and the Super HoldCo Lenders forced through an off-market intercreditor agreement (the "OpCo ICA"). As a condition of the new money lending from the Super HoldCo Lenders, the Super HoldCo Lenders insisted on the uptiering of the RCF and a purchase right on the RCF, which was secured by OpCo collateral over which the Super HoldCo Lenders had no direct claim, positioning themselves to execute a loan-to-own strategy upon the Debtors' anticipated bankruptcy filing.

5.      As the Debtors' performance continued to deteriorate after the LMEs, CastleKnight participated with an ad hoc group of 2028 OpCo Term Lenders in an effort to engage constructively with the Debtors—presenting no less than four proposals to provide significant capital to the Debtors, analyzing and responding to a restructuring proposal by the Debtors, and answering every request from the Debtors for incremental financing in the affirmative.  These proposals were largely met with silence.  Rather, in a continuation of the dynamic from the LMEs, the Debtors engaged with, and acted at the direction of, the Super HoldCo Lenders.

6.      As the Debtors began restructuring negotiations in January 2026, the Super HoldCo Lenders—who already held the priority debt at the Super HoldCo silo of the Debtors—were encouraged by the Debtors to acquire all of the "super-priority" RCF Obligations at the OpCo silo, completing their playbook to consolidate control over the Debtors and dictate the terms of these Chapter 11 Cases.  The Super HoldCo Lenders knew ███████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

Recognizing that they ███████████████████████████        the Super HoldCo Lenders knew that acquiring the RCF at OpCo would ████████████████

7.      Once they solidified their position in the RCF, the Super HoldCo Lenders then used their control over the Debtors to maximize their recoveries at the expense of OpCo Term Lenders, while working to insulate themselves from liability and the LMEs from judicial review.  Among other things, the Debtors pushed out the timeline of filing these Chapter 11 Cases for months, ensuring more new capital would be funded from the RCF—increasing the Super HoldCo Lenders' "super-priority" claim against the OpCo at the expense of the 2028 OpCo Term Loan Lenders.  A

substantial portion of these funds were funneled to Super HoldCo, providing additional value to the Super HoldCo Lenders' claims at Super HoldCo, to the further detriment of 2028 OpCo Term Loan lenders. This delay also served to increase the cash burn on professional fees borne by the estate.

8. The Super HoldCo Lenders then dictated a purportedly "consensual" plan of reorganization dependent on sticking the intercompany loans from the LMEs in the same class as the OpCo Term Loans and treating the RCF as "impaired." To insulate the LMEs, the Debtors set up a purportedly "independent" investigation into intercompany claims on an expedited timeline dictated by the Super HoldCo Lenders to button up a settlement that essentially allows the intercompany loans in full (other than a token agreement not to allow an invalid make-whole claim). To further insulate the LMEs, the Super HoldCo Lenders then provided DIP financing at both Super HoldCo and OpCo conditioned on expansive stipulations by the Debtors agreeing to the validity and priority of claims and on aggressive case milestones. Finally, the Super HoldCo Lenders structured a "settlement" with certain supporting 2028 OpCo Term Loan Lenders as a "death trap" for the Plaintiffs, with only supporting lenders receiving "outsize backstop economics."

9. The Plaintiffs declined to exchange Plan support for differential treatment. Far from a "bad faith . . . strategy of pursuing baseless claims" and "disrupt an otherwise fully consensual restructuring" (SHC Lenders' MJP ¶¶ 2–3), the Plaintiffs bring this adversary proceeding—and intend to file a plan confirmation objection at the appropriate time—to shine a light on the Super HoldCo Lenders' and the Debtors' misconduct and ensure equitable treatment of the 2028 OpCo Term Loan lenders in these Chapter 11 Cases. That may be an inconvenient

truth for the Debtors and the Super HoldCo Lenders.  But it is a completely legitimate exercise of rights in this proceeding.

10.     The Amended Complaint seeks to (i) disallow claims that are based on the 2023 and 2025 Amendments to the OpCo Credit Agreement and the OpCo ICA issued in the LMEs, as those agreements are void; (ii) equitably subordinate the intercompany loans or recharacterize those loans; and (iii) equitably subordinate the RCF Obligations.

11.     In an attempt to avoid judicial review of their alleged misconduct, the Super HoldCo Lenders and the Debtors filed premature motions for judgment on the pleadings, asking the Court to dismiss the Amended Complaint without considering the allegations therein based on five meritless legal arguments.

12.     *First*, Defendants contend the equitable subordination and recharacterization claims are estate causes of action—for an estate controlled by the Super HoldCo Lenders that has already chosen to release such claims—requiring derivative standing and leave from the Court.  To the contrary, these are direct claims seeking redress for the particularized injury suffered by the 2028 OpCo Term Lenders based on the relative priority of their own secured claims relative to other secured claims.  Those are quintessentially direct, not derivative, claims.

13.     *Second*, the Debtors contend only the Administrative Agent has standing to assert a claim for breach of the OpCo Credit Agreement and, thus, the Plaintiffs cannot assert Count I for claim disallowance.  However, section 502 expressly grants any "party in interest"—including the Plaintiffs—the right to object to claims, and nothing in the OpCo Credit Agreement prevents Plaintiffs from exercising their statutory rights under the Bankruptcy Code.

14.     *Third*, the Debtors contend that the Plaintiffs "ratified" the 2023 and 2025 Transactions by purchasing notes issued by Super HoldCo and 2028 OpCo Term Loans post-

5

LMEs.  These are factual allegations outside of the pleadings.  Regardless, one cannot ratify a void contract.  Moreover, the continued investment in Trinseo demonstrates nothing more than a belief in recovering on the investment, not any "confidence in the validity" of the LMEs.

15.     *Fourth*, Defendants contend the Plaintiffs are bound by a Mutual Release Agreement that they never signed, based on allegations raised in the motions "upon information and belief."  These false factual allegations are no basis to dismiss the Amended Complaint.

16.     *Fifth*, Defendants contend that the OpCo ICA (and a Super HoldCo intercreditor agreement) bars the Plaintiffs' claims—ignoring the Plaintiffs' contentions that these agreements are void and, thus, cannot bind the Plaintiffs.  In any event, even if valid, no breach of these agreements has occurred.  The Bankruptcy Code is clear that the Court must decide claims for equitable subordination notwithstanding any intercreditor agreement.  And the claim for recharacterization challenges the nature of the intercompany loans—not the priority or perfection of liens—and, thus, is not precluded by the OpCo ICA.

17.     Defendants fare no better on their challenges to the merits of the Plaintiffs' claims, which rest on unproven factual allegations outside of the pleadings and incorrect statements of the relevant legal standards.  On a motion for judgment on the pleadings the Court is confined to the pleadings and must accept all allegations contained therein as true; these fact-intensive claims cannot be resolved at the pleading stage.

18.     For example, on Count I, the Debtors offer their own factual account, without evidence, to claim that they had sufficient investment capacity to conduct the 2023 LME, regardless of the challenged $125 million "equity contribution" (the "Basket Capacity Equity Contribution").  On Count IV to equitably subordinate the RCF Obligations, Defendants contend the Super HoldCo Lenders were non-insiders engaged in nothing more than the exercise of contract

rights—ignoring the fact-intensive allegations regarding the Super HoldCo Lenders' intent when purchasing the RCF to control these chapter 11 cases and use RCF draws to improve their position at the expense of the 2028 OpCo Term Lenders.

19.     On Count III to equitably subordinate the Intercompany Loans, the Debtors contend the Intercompany Loans were validly issued—ignoring the allegations of the Amended Complaint to the contrary—and arose from a "competitive, market-based process" and "vigorous[]" negotiations—facts that appear nowhere in the pleadings.  On Count II for recharacterization, the Debtors apply the incorrect standard and selectively identify factors that suggest the Intercompany Loans are debt.  Under New York law, courts evaluate the totality of the circumstances, beyond the labels the parties attach to a transaction, to examine the economic reality.  When the circumstances of the transaction as a whole are considered, it is clear the Amended Complaint sufficiently states a claim for recharacterization.

20.     Because the motions for judgment on the pleadings are based on fact-intensive issues outside of the pleadings, the motions are premature and must be denied.  Challenges raised in this adversary proceeding must be resolved on a full factual record, with *evidence*, not based upon Defendants' say-so that they acted properly.

**FACTUAL BACKGROUND/STATEMENT OF FACTS**

**A.      The OpCo Credit Agreement**

21.     In September 2017, the OpCo Credit Group entered into the OpCo Credit Agreement, which provided for term loans secured by liens on the Debtors' principal operating units. Am. Compl. ¶ 50.  The Plaintiffs own approximately 40% of the 2028 OpCo Term Loans issued under the OpCo Credit Agreement. Am. Compl. ¶ 52.

22.     The OpCo Credit Agreement contains a number of provisions designed to maintain sufficient assets within the OpCo Credit Group and prevent the OpCo Borrower from incurring

7

dilutive debt. Am. Compl. ¶ 53. Relevant here, Credit Extension Amendments under sections 2.16 and 2.17 are effective only if the conditions of section 4.02 are satisfied—requiring that "no Default shall exist or would result from such proposed Credit Extension." Am. Compl. ¶¶ 54–55. Section 6.15 prohibits the designation of Unrestricted Subsidiaries if doing so would cause the Fixed Charge Coverage Ratio ("FCCR") (a test for whether earnings are sufficient to comfortably service debt obligations) to deteriorate below specified thresholds. Am. Compl. ¶ 58. Section 7.06 prohibits Restricted Payments and Restricted Investments—including distributions "with respect to any Equity Interest" of the OpCo Borrower—absent sufficient "basket" capacity. Am. Compl. ¶¶ 59. And non-Credit Extension amendments require consent of Required Lenders (holding more than 50% of outstanding debt). Am. Compl. ¶ 60.

**B.    The 2023 LME**

23.    By the summer of 2023, the Debtors were in significant financial distress, with debt trading well below par, and years of negative cash flow, and were facing impeding maturity dates on certain debt instruments. Am. Compl. ¶¶ 63–64. Rather than work with existing lenders, the Debtors raised $1.077 billion in new financing from the Super HoldCo Lenders through a series of transactions (the "2023 LME"). Am. Compl. ¶ 66.

24.    The 2023 LME proceeded as follows. *First*, the Parent created Luxco SPV, a shell entity placed below the publicly traded parent that was not a loan party to the OpCo Credit Agreement, to borrow the $1.077 billion. Am. Compl. ¶ 67. *Second*, the Debtors funneled $125 million into OpCo Borrower as a purported "equity contribution" to artificially inflate basket capacity—as one Super HoldCo Lender described it, to "build[] their unsub basket capacity up to the $500 million they are looking for." Am. Compl. ¶¶ 68, 86(a). *Third*, using this manufactured capacity, the Debtors transferred the AmSty JV—generating approximately $100 million in annual EBITDA and $85 million in annual dividends—into newly created Unrestricted Subsidiaries. Am.

8

Compl. ¶ 69. *Fourth*, the Debtors caused those Unrestricted Subsidiaries to secure the Super HoldCo debt with liens on substantially all of their assets and obtained a $340 million Foreign Guaranty from non-U.S. subsidiaries, giving the Super HoldCo Lenders structurally senior claims on assets that had previously supported the Plaintiffs' loans. Am. Compl. ¶ 70. *Finally*, Luxco SPV contributed $948 million to OpCo Borrower as an intercompany "loan" (the "2023 Intercompany Loan"), documented as pari passu with the 2028 OpCo Term Loans through the "2023 Amendment." Am. Compl. ¶ 71.

25.     The result of the 2023 was an LME that inherently favored the Super HoldCo Lenders at the expense of the Plaintiffs. As an Oaktree managing director stated in a July 2023 email on the ██████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████      Am. Compl. ¶ 72.[2]

26.     The 2023 LME triggered multiple defaults that prevented the 2023 Amendment from taking effect. Am. Compl. ¶ 73. The designation of the AmSty Unsubs as unrestricted subsidiaries violated section 6.15 because, after giving pro forma effect to the transfer of AmSty (removing approximately $85 million in annual dividends from Consolidated EBITDA), the FCCR was necessarily lower than before the transaction—and the OpCo Borrower's FCCR had already deteriorated to approximately 0.95x, far below the 2.00:1.00 threshold for the alternative incurrence test. Am. Compl. ¶¶ 74–79. The OpCo Borrower also lacked sufficient basked capacity to make Restricted Payments or Restricted Investments: according to contemporaneous documents from the parties to the transaction, existing basket capacity was at most approximately $375

---

[2] While the Debtors assert that the transaction was not a "double dip," Debtors' MJP ¶ 25, that is certainly how the participants characterize it.

million, while the AmSty JV was worth at least $500 million. Am. Compl. ¶¶ 80–84.[3] The Debtors' only hope of bridging this gap was to rely on the $125 million Basket Capacity Equity Contribution that was not real "equity" and was deliberately structured to avoid the definition of "Disqualified Equity Interests" in a manner that violated the implied covenant of good faith and fair dealing. Thus, the AmSty transfer alone, as well as the AmSty Unsub's grant of liens, were Restricted Payment violations. Am. Compl. ¶¶ 74–96.

27.     Because these violations triggered Defaults, the no-Default condition precedent in section 4.02 was not satisfied, and the 2023 Amendment was void *ab initio*. Am. Compl. ¶¶ 95–96.

28.     The 2023 Intercompany Loan was approved by the same conflicted fiduciaries who served at both Luxco SPV and OpCo Borrower. Am. Compl. ¶ 97. There was no negotiation, no due diligence, no exchange of term sheets, no underwriting, and no evaluation of whether OpCo Borrower could repay. Am. Compl. ¶ 98. The benefits went primarily to Luxco SPV and the Super HoldCo Lenders; the costs fell on OpCo Borrower—additional debt at far higher interest rates and loss of collateral support—and the 2028 OpCo Term Loan lenders. Am. Compl. ¶ 100–02.

29.     The 2023 Intercompany Loan gave OpCo Borrower no net benefit and served no legitimate business purpose. Am. Compl. ¶ 100. It bore an interest rate of SOFR plus 9.656%—far more expensive than the approximately 7.5% and 5.375% debt it replaced—and the Debtors' annual cash interest burden was expected to rise by more than $30 million, wiping out all projected positive cash flow. Am. Compl. ¶¶ 101–02. The real purpose of the 2023 Intercompany Loan was

---

[3] Any Cumulative Credit that could have expanded basked capacity was more than consumed by $592 million of admitted Prior Usage. Am. Compl. ¶¶ 80–84. And the Basket Capacity Equity Contribution did not increase capacity because it was, in substance, debt—the $125 million was structured as Mandatory Redeemable Equity Shares with an all-in yield of approximately 14%, classified in the issuers' own statutory accounts as a subordinated liability with the return booked as "interest income." Am. Compl. ¶¶ 85–91.

to create an artificial "double dip" claim in bankruptcy for the Super HoldCo Lenders.  Am. Compl. ¶ 103.  No independent lender would have extended nearly $1 billion in credit on these terms while collateral was being simultaneously stripped.  Am. Compl. ¶ 104.  Luxco SPV was not in the business of making loans and had never lent money to any entity before.  Am. Compl. ¶ 107.

### C.      The 2025 LME

30.      By the end of 2024, the Debtors' financial condition had worsened further, with negative book equity, negative $77.5 million in free cash flow, and debt still trading well below par.   Am. Compl. ¶ 108. The Debtors carried out a second LME with the Super HoldCo Lenders (the "2025 LME"), which further shifted value from the OpCo Credit Group: it designated additional subsidiaries as unrestricted, upsized the Intercompany Loans by $494.5 million, replaced the existing revolver with a "super-priority" $300 million RCF, eliminated the $340 million Foreign Guaranty cap, and forced Deutsche Bank—using Luxco SPV's invalid votes—to enter into the off-market OpCo ICA.  Am. Compl.  ¶¶ 111–24.

31.      The OpCo ICA, meant to address issues between OpCo creditors, gave the right to purchase the "senior" RCF not to the "junior" 2028 OpCo Term Loan lenders, but rather to creditors of an entirely different entity with no claims on the OpCo collateral, the Super HoldCo Lenders.  Am. Compl. ¶¶ 123–23. This purchase right for the RCF and the uptier of the RCF were both express conditions of the Super HoldCo Lenders' new lending.  This ensured they could buy the RCF and control the restructuring.  Am. Compl. ¶ 123. The OpCo ICA also bars the Plaintiffs from proposing or participating in any DIP financing unless the RCF lenders first decline, allowing the RCF holders to dictate DIP terms.  Am. Compl. ¶ 124.

32.      The 2025 Amendment required approval by Required Lenders.  But the Debtors knew that the third-party lenders would never approve such a transaction.  Accordingly, the Debtors mustered the vote of Required Lenders only by counting Luxco SPV's votes as "lender"

on the Intercompany Loans.  Am. Compl. ¶ 126.  But because the 2023 Amendment was void, Luxco SPV was never a valid Lender—and independently, because the 2023 Intercompany Loan should be recharacterized in substance, Luxco SPV was not a lender and could not vote.  *Id*. Without those invalid votes, the 2025 Amendment and ICA are void *ab initio*.  Am. Compl. ¶ 127–28.

33.      Like the 2023 Intercompany Loan, the 2025 Intercompany Loan was approved by the same conflicted fiduciaries, was not negotiated at arm's length, and was made on terms no independent lender would have accepted.  Am. Compl. ¶¶ 129–30.

**D.      Defendants Continue to Prejudice Plaintiffs**

34.      As bankruptcy approached, the Super HoldCo Lenders cemented their control. After being ██████████████████████████████████ they purchased substantially all of the RCF loans at par.   Am. Compl. ¶ 137.  Internal communications confirm the purpose.  An Apollo managing director stated in a February 2026 email that ████████████████████

████████████████████████████████████████████

████████████████████████████████████████

████████████████      *Id*.  Angelo Gordon echoed that the      ████████████████

████████████████████████████████████████████

████████████      *Id.*

35.      The Super HoldCo Lenders then caused the Debtors to draw down the RCF (secured by the OpCo Credit Group) and funnel the proceeds to the Super HoldCo entities.  Am. Compl. ¶ 138.  In a January 2026 forecast, ████████████████████████

████████████████████████████████████████████

████████████████████████      *Id.*  Later forecasts ████████████

████████████████████████████████████████████

12

██████████████████████ *Id.*  But the reality was that ██████████

███████████████████████████████████████████

███████████████████████████████████████████

████████████████ around the same time the Debtors were defaulting on interest payments to non-insider creditors, including the OpCo Term Lenders.  Am. Compl. ¶ 139.  The OpCo Credit Group received nothing in return.  Am. Compl. ¶ 141.

36.     The Debtors also forced OpCo to █████████████████████

████████████████████████████████████ while failing to maintain consistent accounting between the OpCo and Super HoldCo credit groups.  Am. Compl. ¶ 142.

37.     The Super HoldCo Lenders then further insulated themselves from any consequences of their control over the Debtors.  In an April 10, 2026, amendment to the 2025 RCF credit agreement, the Super HoldCo Lenders conditioned new lending on an agreement that the Debtors would conclude the "independent" investigation by the independent managers of the OpCo and Super HoldCo borrowers (the "OpCo Investigation") into the Intercompany Loans in a mere fourteen days—thereby protecting the Super HoldCo Lenders' claim to the Intercompany Loans and further solidifying their control over the bankruptcy by preventing any meaningful investigation into their actions.  Am. Compl. ¶ 145.  The truncation of the Independent Investigation was imposed as a condition of additional RCF lending, ensuring the Debtors had no practical choice but to comply.  *Id.*

**E.     Procedural History**

38.     Plaintiffs commenced this action by filing the Complaint on May 26, 2026.  After filing answers (and one counterclaim) on June 4, 2026,[4] Defendants filed the motions for judgment on the pleadings on June 9, 2026.  Plaintiffs informed Defendants that Plaintiffs would be filing an amended complaint in response to these motions.  Defendants chose not to withdraw their motions and instructed Plaintiffs to treat those motions as directed against the Amended Complaint.

## ARGUMENT

39.     "The restrictive standard of review applicable to a Rule 12(c) motion is well-established: a motion for judgment on the pleadings, like a motion for summary judgment, should be granted only if there is no issue of material fact, and if the pleadings show that the moving party is entitled to prevail as a matter of law." *Sea-Land Servs., Inc. v. D.I.C., Inc.*, 102 F.R.D. 252, 254 (S.D. Tex. 1984) (denying motion for judgment on the pleadings when resolution of the motion would "raise material issues of fact contested by the Plaintiff which should be reserved for trial"). Thus, "a moving party must demonstrate no facts are in dispute for judgment." *Autoconnect Holdings LLC v. Toyota Motor Corp.*, Case No. 2:24-cv-00802-JRG-RSP, 2026 WL 873225, at *3 (E.D. Tex. Mar. 11, 2026); *Herbert Abstract Co., Inc. v. Touchstone Props., Ltd.*, 914 F.2d 74, 76 (5th Cir. 1990) ("A motion brought pursuant to Fed. R. Civ. P. 12(c) is designed to dispose of cases where the material facts are not in dispute and a judgment on the merits can be rendered by looking to the substance of the pleadings and any judicially noticed facts.").

---

[4]     The Super HoldCo Lenders served their answer and counterclaim on June 4, 2026, but did not immediately file as the parties worked on a stipulation regarding the parties to be named.

40.     "Moreover, when construing a motion for judgment on the pleadings, the Court is required to assume that the allegations of fact presented by the opposing party are true and must further view the facts presented in the pleadings and the inferences to be drawn therefrom in the light most favorable to the nonmoving party." *Sea-Land*, 102 F.R.D. at 253 (cleaned up); *see Hoang v. Microsemi Corp.*, No. 4:19-CV-01971, 2025 WL 933720, at *3 (S.D. Tex. Mar. 26, 2025) (quoting *Hughes v. Tobacco Inst.*, 278 F.3d 417, 420 (5th Cir. 2001)) (on a motion for judgment on the pleadings, the court "is confined to the pleadings").

41.     To the extent the Motions are directed at the Original Complaint, they are moot.  To the extent Defendants ask the Court to treat the Motions as directed at the Amended Complaint, the Motions fail for the reasons set forth below.  Defendants have therefore not satisfied their burden and are not entitled to judgment on the pleadings.

## I.     PLAINTIFFS HAVE STANDING TO BRING THIS ACTION.

### A.     The Amended Complaint Brings Individual, Not Estate, Claims.

42.     Defendants contend the equitable subordination and recharacterization claims are estate causes of action requiring derivative standing that can only be brought by the Debtors, even though those Debtors have already entered into binding stipulations and releases that would preclude such claims.  Debtors' MJP ¶¶ 50–59; SHC Lenders' MJP ¶¶ 49–58; *infra* § I.A.5.  However, it is well-settled that the Debtors have "no right to bring claims that belong solely to the estate's creditors." *In re Seven Seas Petroleum, Inc.*, 522 F.3d 575, 584 (5th Cir. 2008).  A claim alleging "direct injury to the plaintiff"—as determined by the looking to the alleged injury and relief sought for that injury—is a direct claim for which the individual creditor has standing. *Id.* at 584–85.  Plaintiffs have individual standing because the Amended Complaint brings claims based on particularized injury to the Plaintiffs and seeks relief only on behalf of the Plaintiffs, rather than all creditors.

1.      Plaintiffs Have Individual Standing to Assert the Equitable Subordination Claims.

43.      The Amended Complaint contains claims to equitably subordinate (i) Luxco SPV's claims under the Intercompany Loans "below the Plaintiffs' secured claims" (Count III), and (ii) the Super HoldCo Lenders' claims under the RCF "below the Plaintiffs' secured claims" (Count IV).

44.      Section 510(c) allows the Court to, "under principles of equitable subordination, subordinate . . . all or part of an allowed claim." 11 U.S.C. § 510(c). Notably absent from that provision is any requirement that the trustee bring equitable subordination claims. For that reason, courts in this District have held that "[t]he plain language of § 510(c), precedent, and the purposes of the Bankruptcy Code support the contention that an individual creditor may seek to equitably subordinate a claim to its claim." *In re Andrews*, No. 94-21308, 2009 WL 1076831, at *5 (Bankr. S.D. Tex. Apr. 2, 2009).

45.      Moreover, as Defendants recognize, and courts in this Circuit routinely hold, individual standing to bring equitable subordination claims exists where the creditor seeks redress for "particularized injury" rather than an injury to the estate as a whole shared by all creditors. *See id.* at *7; *see also In re Waggoner Cattle, LLC*, No. 18-20126-RLJ-11, 2019 WL 469367, at *8 (Bankr. N.D. Tex. Feb. 6, 2019).[5]

46.      The touchstone for determining whether equitable subordination claims are direct or derivative is the test articulated in *In re Elrod Holdings Corp.*, 392 B.R. 110, 115 (Bankr. D. Del. 2008). There, the court distinguished between a claim "to subordinate a senior secured claim to a junior secured claim" and a claim involving "instances of more egregious misbehavior," where

---

[5] *See also, e.g.*, *In re Hoffinger Indus., Inc.*, 327 B.R. 389, 414 (Bankr. E.D. Ark. 2005) ("It would be absurd to permit the estate alone to seek to reorder priorities among specific creditors on all or part of their debt; that concept alone defines particularized harm to specific creditors.").

"equity may require a court to strip a secured claimant of its secured status altogether." *Id.* It is only in this "latter circumstance" where the claim is derivative: If the claim loses "secured status altogether," then "every creditor benefits from the subordination of the senior claim." *Id.*

47. In "the former instance" – where the claim is "to subordinate a senior secured claim to a junior secured claim"—"only the junior secured creditor benefits from a court's employment of § 510(c) as it alone surpasses the senior secured creditor in priority." *Id.* As the court concluded in *Elrod*:

> The difference in these results indicates that a secured creditor is capable of having suffered a particularized injury and that a court may fashion a remedy in response to that injury that benefits only the affected secured creditor and not all general creditors ultimately seeking to recover from a debtor's estate. An injured secured creditor should be permitted to pursue its separate interest apart from the trustee.

*Id.*

48. Courts in this Circuit and others have uniformly accepted the rule from *Elrod* that a secured creditor has standing to equitably subordinate the claims of other secured creditors. *See Andrews*, 2009 WL 1076831 at *6 (quoting *Elrod* favorably for the proposition that "an injured secured creditor should be permitted to pursue its separate interest apart from the trustee"); *see also In re Flying Star Cafes, Inc.*, 568 B.R. 129, 135 (Bankr. D.N.M. 2017) (citing *Elrod* for the "majority rule" that creditors have standing when "their goal is to subordinate another creditor's claim to their own"); *In re Magnolia Gas Co., L.L.C.*, 255 B.R. 900, 924 (Bankr. W.D. Okla. 2000) ("A secured creditor has standing to seek equitable subordination of another creditor's claim."); *In re Vitreous Steel Prods. Co.*, 911 F.2d 1223, 1231 (7th Cir. 1990) ("[I]ndividual creditors have an interest in subordination separate and apart from the interests of the estate as a whole. The individual creditor should have an opportunity to pursue its separate interest.").

49.     Plaintiffs have standing under *Elrod* because their equitable subordination claims are squarely of the first variety—claims "to subordinate a senior secured claim to a junior secured claim." Am. Compl. ¶¶ 157–71. The Amended Complaint is replete with allegations of the specific harm suffered by Plaintiffs as a result of Defendants' conduct. The Amended Complaint alleges the effective down-tiering of Plaintiffs' claims when Defendants gave the RCF a "super-priority" interest, dilution of Plaintiffs' claims when Defendants' incurred the Intercompany Loans, and dilution of Plaintiffs' claims through Defendants' pre-petition draws on the RCF to fund the Super HoldCo entities. Am. Compl. ¶¶ 72, 115–16, 138–42. Aside from those injuries, the Amended Complaint alleges a litany of direct injuries as confirmed by Defendants' own documents. As a result of the Super HoldCo Lenders' inequitable conduct, they obtained the exclusive ability to provide debtor-in-possession financing, the ability to control the Plan at OpCo, the ability to dictate a 2:1 rollup of the RCF, and the ability to dictate the timing of the Special Committee investigation, which, according to the Debtors, compromised Plaintiffs' litigation rights. Am. Compl. ¶¶ 121–24, 136–45.

50.     If Plaintiffs' equitable subordination claims are successful, then only the Plaintiffs (as holders of the 2028 OpCo Term Loans) will surpass those subordinated claims in order of priority. The debtor's estate has no interest in the relative priority of secured claims. *See, e.g.*, *In re Hoffinger Indus., Inc.*, 327 B.R. 389, 414 (Bankr. E.D. Ark. 2005) ("It would be absurd to permit the estate alone to seek to reorder priorities among specific creditors on all or part of their debt."). Accordingly, Plaintiffs' claims are direct, not derivative.

51.     Defendants cite to no authority, and Plaintiffs are aware of none, in which a court has treated any of the claims in the Amended Complaint as estate causes of action in even remotely

similar circumstances.[6] For instance, Defendants rely on *In re AppliedTheory Corp.*, 493 F.3d 82, 87 (2d Cir. 2007), which denied an unsecured creditors' committee standing to sue for equitable subordination. *See* Debtors' MJP ¶¶ 52, 53. There, the court specifically differentiated the rights of the unsecured creditors' committee to bring claims on behalf of the estate as a whole from the rights of individual creditors that "have an interest in subordination separate and apart from the interests of the estate as a whole" and thus have a right "to assert such a claim against another creditor." *AppliedTheory*, 93 F.3d at 87; s*ee also Andrews*, 2009 WL 1076831 at \*6 (holding that "*AppliedTheory* is inapposite" because in *AppliedTheory*, "the unsecured creditor's committee, rather than an individual creditor, sought to bring the 510(c) adversary").

> ### 2. Plaintiffs Have Individual Standing to Assert the Recharacterization Claims.

52. Plaintiffs similarly have standing to assert the Amended Complaint's claim for recharacterization of the Intercompany Loans (Count II). Like the claim objection for which Defendants do not dispute that Plaintiffs have individual standing, the Fifth Circuit has held that the power to recharacterize debt falls under this Court's disallowance power under Section 502(b). *See In re Lothian Oil Inc.*, 650 F.3d 539, 543 (5th Cir. 2011) ("Taken together, *Butner* and § 502(b) support the bankruptcy courts' authority to recharacterize claims."). Section 502 expressly allows

---

[6] *See Poth v. Russey*, 99 Fed. App'x 446, 457 (4th Cir. 2004) (cited at Debtors' MJP ¶ 52) (dismissing breach of fiduciary duty claim for lack of standing because the fiduciary duty claim was "so similar in object and purpose" to fraudulent conveyance, claims indisputably held by the estate; no equitable subordination or recharacterization claims); *In re Tronox Inc.*, 855 F.3d 84, 106 (2d Cir. 2017) (cited at Debtors' MJP ¶ 54) (dismissing fraudulent transfer actions as "the paradigmatic example of claims general to all creditors"); *Matter of Buccaneer Res., L.L.C.*, 912 F.3d 291, 295 (5th Cir. 2019) (holding creditor had standing to assert tortious interference claim); *In re Seven Seas Petroleum, Inc.*, 522 F.3d 575, 587 (5th Cir. 2008) (cited at Debtors' MJP ¶ 54) (holding that creditors had standing to assert fraud and conspiracy claims because the claims); *Matter of S.I. Acquisition, Inc.*, 817 F.2d 1142, 1152 (5th Cir. 1987) (staying alter ego claims); *In re ATP Oil & Gas Corp.*, 540 B.R. 294, 300 (Bankr. S.D. Tex. 2015) (holding only purchaser under a purchase agreement could bring preference claim under Section 547 when sale contract expressly gave purchaser right to assert preference claims and denying motion to dismiss preference claims because "fact issues remain[ed]"); *Wesco Aircraft Holdings, Inc v. SSD Invs. Ltd*, No. 4:25-CV-202, 2025 WL 3514358, at \*6 (S.D. Tex. Dec. 8, 2025) (dismissing equitable lien and equitable subordination claim that were "disguised" fraudulent transfer and preferential transfer claims from a pre-petition state court lawsuit).

19

"a party in interest" to object to claims.  The Plaintiffs are creditors and thus are parties in interest with the statutory right to challenge claims through recharacterization.  *See* 11 U.S.C. § 1109(b) ("A party in interest, including . . . a creditor, . . . may raise and may appear and be heard on any issue in a case under this chapter.").

53.     Further, like the equitable subordination claims, the recharacterization of the Intercompany Loan alleges an injury specific to the Plaintiffs and a remedy specific to the Plaintiffs.  Defendants cite no authority, and Plaintiffs are aware of none, for the proposition that recharacterization claims belong solely to the estate.  *See, e.g.*, *Waggoner Cattle*, 2019 WL 469367, at *8 (considering recharacterization claim brought by individual creditor).

### 3.     Allegations of Fiduciary Misconduct Do Not Transform the Claims Into Estate Claims.

54.     Lacking any basis to strip Plaintiffs of standing for the claims as pled in the Amended Complaint, Defendants next cite to allegations of "fiduciary breaches," actions that were "contrary to the best interests of the creditors as a whole," and conduct that gave Defendants "an unfair advantage over other creditors" in an attempt to recast these allegations into claims, such as "fiduciary duty claims," that courts typically treat as derivative.  Debtors' MJP ¶¶ 52, 56–58.  This argument fails.

55.     As Defendants own cases recognize, standing does not depend on the nature of the *conduct* alleged; to the contrary, "[w]hatever label is put on [a] claim, what matters is the nature of the injury [the claimant] is seeking compensation for."  *Meridian Cap. CIS Fund v. Burton (In re Buccaneer Res., L.L.C.)*, 912 F.3d 291, 295 (5th Cir. 2019).  As the Fifth Circuit has held, "it is entirely possible for a bankruptcy estate and a creditor to own separate claims against a third party arising out of the same general series of events and broad course of conduct."  *Seven Seas*, 522 F.3d at 585.  To the extent that Plaintiffs have alleged the misconduct of estate fiduciaries, those

allegations establish inequitable conduct supporting the claim of inequitable subordination of the Intercompany Loans.  As set out below, claims for inequitable subordination frequently involve allegations of fiduciary misconduct.  *See infra* § III.  But that does not transform them into derivative claims.  Again, the question remains whether the *injury* is particular to the Plaintiffs, not whether the alleged *conduct* is particular to the Plaintiffs.  *Seven Seas*, 522 F.3d at 585.

56.     For these reasons, Defendants are simply wrong in contending that Plaintiffs' claims would control a later theoretical fiduciary duty action by the estate through "preclusive effect."  For issue preclusion to apply, the two suits must share the same issues and the same parties.  This action could not possibly have preclusive effect on a theoretical fiduciary duty claim against the Debtors' officers and directors because, at a minimum, it does not name any of the fiduciaries against whom such a claim could be brought.  *See, e.g.*, *Dudley v. Smith*, 504 F.2d 979, 982 (5th Cir. 1974) ("Stockholders and officers are not in privity to and are not personally bound by judgments against their corporations."); *Students for Fair Admissions, Inc. v. Univ. of Texas at Austin*, 37 F.4th 1078, 1088 (5th Cir. 2022) (holding earlier judgment against a corporation did not bind its directors, reasoning that "the parties in this case and [the prior case] are not identical or in privity").

4.     The Amended Complaint Does Not Repackage Previously Asserted Estate Claims.

57.     Defendants are left with the argument that Plaintiffs' claims are disguised estate causes of action.  But in each of the cases that Defendants cite for this argument, the court dismissed claims that were simply repackaged derivative claims that the plaintiffs had already asserted unsuccessfully.  For example, Defendants rely heavily on *Wesco Aircraft Holdings, Inc v. SSD Invs. Ltd*, No. 4:25-CV-202, 2025 WL 3514358, at *6 (S.D. Tex. Dec. 8, 2025).  Debtors' MJP ¶ 55; SHC Lenders' MJP ¶ 55.  In *Wesco*, two groups of noteholders sued Wesco in state court for

fraudulent transfer and preferential transfer months before Wesco filed for bankruptcy. *See Wesco Aircraft Holdings, Inc v. SSD Invs. Ltd*, Ad. No. 23-3091, ECF No. 508 (S.D. Tex. Bankr. Jan. 14, 2024). Those actions, by their terms, were derivative—they sought to "avoid the entirety" of the challenged pre-petition transaction and "elimination of the new" notes issued as part of that transaction, resulting in a benefit to all creditors generally. *Id.* at *15. After filing for bankruptcy, Wesco sought to stay the state court actions. *Id.* at *3. In response, the noteholders filed counterclaims in the bankruptcy proceeding, including for an equitable lien and equitable subordination, seeking "fundamentally the same" relief sought in the state court lawsuits. *Id.* at *14–15. The bankruptcy court looked past the label given to those claims in the bankruptcy proceeding and concluded that the claims were merely "repackaged" fraudulent conveyance claims from the earlier state court lawsuits and therefore dismissed the claims. *Id.* at *14.

58.     Similarly, in *In re Blockbuster Inc.*, No. 10-14997 BRL, 2011 WL 1042767, at *1(Bankr. S.D.N.Y. Mar. 17, 2011) (cited at Debtors' MJP ¶ 58), the court dismissed claims by an unsecured creditor that were "virtually identical" to earlier estate complaint for which the creditor sought, and the court rejected, derivative standing. "[S]ix days after" the court rejected derivative standing for those claims, the unsecured creditor brought a new individual complaint, which contained "arguments and allegations that have been re-packaged as a claim for equitable subordination." *Id.* The court rejected those claims because "[a]ny unsecured creditor could assert identical allegations to those in the Complaint." *Id.* at *2.

59.     Unlike those cases, the Plaintiffs do not seek to repackage claims that were previously asserted as derivative claims. The Amended Complaint's claims are, and always have been, direct individual claims seeking redress for injury particular to the Plaintiffs. The Amended

Complaint seeks relief for injury particular to Plaintiffs, and Plaintiffs have individual standing to assert them.[7]

     5.     <u>If The Court Concludes That Any of the Amended Complaint's Claims Are Estate Claims, Plaintiffs Request Derivative Standing.</u>

60.     To the extent the Court concludes that any of these claims are estate claims (they are not), Plaintiffs respectfully request that the Court grant Plaintiffs standing to assert them.

61.     In the Fifth Circuit, a creditor may obtain standing to pursue estate causes of action where (i) colorable claims exist, (ii) the debtor unjustifiably refuses to pursue the claim, and (iii) the Court grants permission to initiate the action on behalf of the debtor's estate. *See In re Louisiana World Exposition, Inc.*, 832 F.2d 1391, 1397 (5th Cir. 1987). Plaintiffs easily meet the colorable claim standard for the reasons discussed below.

62.     As to the second requirement, there is no conceivable world in which the Debtors pursue claims against Luxco SPV or the Super HoldCo Lenders, parties to the RSA and Plan that have provided DIP financing, because the Debtors have tied their hands with respect to such claims. Through the Final DIP Order, the Debtors "irrevocably waived and relinquished" all challenges and claims "with respect to the Prepetition Super HoldCo Liens, the Prepetition Super HoldCo Secured Obligations, or the Prepetition Super HoldCo Debt Documents" and any causes of action against the Super HoldCo Lenders. DIP Order [Dkt. 236] ¶ 29(a)-(b). And the Debtors "absolutely, unconditionally and irrevocably release[d] and forever discharge[d]" the Prepetition

---

[7] Defendants argue that the claims are separately barred because they conflict with the pending Intercompany Settlement. Debtors' MJP ¶¶ 60–63. Because the Amended Complaint contains individual, not estate, claims, those claims are not subject to settlement. *See Seven Seas*, 522 F.3d at 590 ("Since the plan only releases the estate's claims against Chesapeake (as that was all it could release), the bondholders' pursuit of their own claims against Chesapeake cannot be characterized as an attempt to invalidate the release contained in the plan."). Defendants' authority is inapplicable here. *See, e.g.*, Debtors' MJP ¶ 60 (citing *Sec. Inv. Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC*, 429 B.R. 423, 430 (Bankr. S.D.N.Y. 2010) (holding automatic stay should continue to stay prepetition state court action that attempted to litigate estate causes of action when trustee was "on the brink of settlement")). Plaintiffs intend to object to the Intercompany Settlement and discovery remains ongoing as to the truth of the Debtors' unsupported assertion that the OpCo Investigation was "extensive, independent, and arms' length." Debtors' MJP ¶ 62.

Super HoldCo Secured Parties from all claims, including "any so-called 'lender liability' or equitable subordination claims or defenses" and any claims "seeking reduction, setoff, offset, recoupment, recharacterization, subordination . . . or any other challenge" to those obligations. *Id.* § E(v).

63.     The DIP Credit Agreement further reinforces these constraints.   Under that agreement, it constitutes an Event of Default if the Debtors "challenge or contest the nature, extent, amount, enforceability, validity, priority or perfection" of the Prepetition Super HoldCo Secured Obligations or "assert any claim, defense or cause of action that seeks to avoid, recharacterize, subordinate (whether equitable subordination or otherwise), disgorge, disallow, impair or offset" those obligations.  *Id.* at 211 (§ 8.01(o)(xvii)).  Even investigating or publicly supporting such claims triggers a default. *Id.*

64.     The RSA imposes parallel restrictions.  Under the RSA, it is a termination event if any Debtor "files any motion seeking to avoid, disallow, subordinate, invalidate, limit or recharacterize, in any respect, any Super HoldCo 1L Claim or RCF Claim" or even "supports any application, adversary proceeding, or Cause of Action" brought by a third party seeking such relief—or "consents to the standing of any such third party" to bring it.  RSA § 5(c)(x).

65.     Critically, the Debtors do not claim that the Special Committee considered these claims as part of the OpCo Investigation—nor is there any evidence that they did.  *See* Debtors' MJP ¶ 45.  The OpCo Investigation was conducted on an extremely compressed timeline per the demands of the Super HoldCo Lenders, and neither the Debtors nor the Super HoldCo Lenders can point to any documents evidencing the claims investigated or the factual or legal bases underlying the releases.  This is particularly true with respect to the equitable subordination claim against the Super HoldCo Lenders.  The Intercompany Settlement as described in the Disclosure

Statement is purely between the Debtors, not third parties.  *See* Disclosure Statement, Ch. 11 Dkt. 30 at 24 (describing Intercompany Settlement as covering "all potential claims directly or indirectly related to the OpCo Intercompany Term Loans between the OpCo Company Parties, on one hand, and the OpCo Intercompany Term Lender, on the other hand").  The equitable subordination claim against the Super HoldCo Lenders was thus never investigated, let alone settled by the "Intercompany Settlement."

66.     Where, as here, bringing an action is in the best interests of the estates but the Debtors are prevented from doing so, the requirement that the Debtors' failure to act be "unjustified" is satisfied.  *See Louisiana World Exposition v. Fed. Ins. Co.*, 858 F.2d 233, 252 (5th Cir. 1988) ("While the debtor-in-possession's refusal was understandable given the grave conflict of interest implications, we cannot ignore the fact that the creditors' interests in seeing the property of the estate collected were not protected.").  Moreover, the "unjustifiable refusal" element to award derivative standing to a committee is not necessary in situations where, as here, demand would be futile because the debtor has previously agreed not to bring the claims.  *See, e.g.*, *Official Comm. Unsecured Creditors v. Clark (In re Nat'l Forge Co.)*, 326 B.R. 532, 544–45 (Bankr. W.D. Penn. 2005) (finding formal request of debtor to bring action waived under DIP financing orders would have been futile as debtor could not have "seriously entertained the idea").

**B.      Standing Under the OpCo Credit Agreement Is Not Required.**

67.     Defendants next argue that Plaintiffs lack standing to pursue Count I of the Amended Complaint, which is a claim objection under Section 502(b) that seeks to disallow – on

grounds of unenforceability under OpCo Credit Agreement—the claims of the Intercompany Loans.[8]

68.     Section 502 allows "a party in interest"—which includes creditors—to object to claims. *See* 11 U.S.C. §§ 502, 1109(b) ("A party in interest, including . . . a creditor, . . . may raise and may appear and be heard on any issue in a case under this chapter."); *In re JNS Aviation, LLC*, 334 B.R. 202, 204 (Bankr. N.D. Tex. 2005) ("The Bankruptcy Code provides that 'parties in interest' may object to any claim filed in the bankruptcy.  Section 1109 of the Code defines a party in interest to include . . . 'a creditor, an equity security holder, [and others] . . . .  The Court is satisfied that the Sheltons, as equity security owners of the debtor, have standing to object to Nick Corp.'s proof of claim.'") (cleaned up); *In re Weinstein Co. Holdings, LLC*, 595 B.R. 455, 463 (Bankr. D. Del. 2018) (holding plaintiff is "a creditor and thus a 'party in interest' with standing . . . to object to the claims of other creditors" under Section 502; *Orius Corp. v. Qwest Corp.*, 373 B.R. 555, 574 (N.D. Ill. 2007) ("Creditors are considered parties in interest under Section 502(a) and have standing to object to other creditor's claims."); *In re Charter Co.*, 68 B.R. 225, 228 (Bankr. M.D. Fla. 1986) ("[T]he Court will not disregard the plain language of § 502(a) and limit the right of general creditors to object to the allowance of a proof of claim in a chapter 11 proceeding.").

69.     Among the bases for objection under Section 502 is that a claim "is unenforceable against the debtor and property of the debtor . . . under any agreement or applicable law."  11 U.S.C. § 502(b)(1).  "Courts have uniformly interpreted this to mean that a claim may be disallowed if it is unenforceable under applicable state law," including under the operative

---

[8] The Amended Complaint makes clear that Count I is not a standalone breach of contract claim but a claim objection under Section 502.  *See* Am. Compl. ¶¶ 146–52.

agreement giving rise to the claim.  *In re DePugh*, 409 B.R. 84, 120 (Bankr. S.D. Tex. 2009), *In re LightSquared Inc.*, 511 B.R. 253, 339 (Bankr. S.D.N.Y. 2014) (considering claim objection by individual creditor under Section 502(b)(1) seeking to disallow claim of another creditor on the basis that the claim violated the relevant credit agreement).  Count I of the Amended Complaint seeks disallowance of claims under the 2023 Intercompany Loan, the 2025 Intercompany Loan, the 2025 Amendment, or the OpCo ICA on the basis that those instruments are unenforceable and, as such, cannot form the basis for any claims.

70.      Courts in this Circuit have routinely disallowed claims where the underlying contract that would give rise to that claim is unenforceable.  *See, e.g.*, *In re Northbelt, LLC*, 630 B.R. 228, 267 (Bankr. S.D. Tex. 2020) (sustaining objection to claim under Section 502(b)(1) on the basis that the claimant did not produce evidence "supporting the enforceability of the Property Protection Advances against the Debtor under the Loan Agreement"); *In re DePugh*, 409 B.R. at 121 (sustaining objection to claim under Section 502(b)(1), reasoning that the claimant had "the burden of proving the validity of its underlying claim" including "proof of an enforceable contract between the Debtors and the original creditor"); *In re Gilbreath*, 395 B.R. 356, 368 (Bankr. S.D. Tex. 2008), *as amended* (Nov. 19, 2008) (sustaining objection to claim under Section 502(b)(1) when claimant "failed to establish the existence of a contract under which the Debtors are liable to eCast").[9]  Because Section 502(b)(1) forms the basis for the Claim I, Plaintiffs have standing to assert that claim objection.

---

[9] *See also In re Stone*, 671 B.R. 752, 758 (Bankr. D. Colo. 2025) (denying motion to dismiss claim objection under Section 502(b)(1) when complaint alleged that the claim was "based on a void, invalid contract and therefore should be disallowed"); *In re GMI Grp., Inc.*, 606 B.R. 467, 483 (Bankr. N.D. Ga. 2019) (considering whether to disallow claim brought under guaranty agreement pursuant to Section 502(b)(1) when the debtor alleged that the underlying agreement was invalid); *In re Ciena Cap. LLC*, 440 B.R. 49, 51 (S.D.N.Y. 2010) (considering claim objection under Section 502 to disallow claim on the basis that the "conditions precedent to the operative legal obligations" underlying the claim "never occurred" and thus the claim was invalid).

27

71.     Defendants do not cite Section 502(b)(1), let alone assert that Plaintiffs lack standing to bring objections under Section 502.  Instead, Defendants appear to argue that the OpCo Credit Agreement overrides Plaintiffs statutory authority to bring objections, which they say can only be asserted by the Administrative Agent to that agreement.  Debtors' MJP ¶¶ 64–69; SHC Lenders' MJP ¶¶ 33–47.  Defendants' argument defies the plain text of the Bankruptcy Code and the OpCo Credit Agreement.

72.     Defendants assert that the Administrative Agent has the sole authority to take various actions under the OpCo Credit Agreement, including a "declaration of default," *see* Debtors' MJP ¶ 66, but do not and cannot contend that this exclusive authority extends to claim objections under the Bankruptcy Code.  Defendants rely on *Beal Sav. Bank v. Sommer*, 865 N.E.2d 1210, 1216 (N.Y. 2007), which considered a breach of contract action, not a claim objection under Section 502.  There, the court pointed to various actions reserved for the administrative agent under the relevant agreement, including to "the power to declare the entire amount due and the power to refrain from accelerating" to conclude that the agreement delegated the right to bring claims for damages to the administrative agent.  *Beal*, 865 N.E.2d at 1216.  Unlike in *Beal*, here, Count I is not for breach of contract, does not seek to recover damages owed under that contract, and does not attempt to take any action even impliedly reserved to the Administrative Agent.

73.     Defendants can point to no provision of the OpCo Credit Agreement that gives the Administrative Agent the power to object to claims in bankruptcy.  In fact, the Credit Agreement states the opposite.  In the event of bankruptcy, Section 9.10 gives the Administrative Agent the right "to file and prove a claim for the whole amount of the principal and interest owing and unpaid in respect of the Loans . . . and to file such other documents as may be necessary or advisable in order to have the claims of the Lenders, . . . allowed in such judicial proceeding."  OpCo Credit

Agreement § 9.10.  Filing a claim objection is not among those rights.  And the same section makes clear that "Nothing contained herein shall be deemed to authorize the Administrative Agent to authorize or consent to or accept or adopt on behalf of any Lender any plan of reorganization, arrangement, adjustment or composition affecting the Obligations or the rights of any Lender."  *Id.* There is no support for any argument that the OpCo Credit Agreement can somehow strip Plaintiffs of their statutory rights under the Bankruptcy Code.

### C. Plaintiffs Did Not Waive Their Claims or Ratify Defendants' Conduct.

74.  The Debtors contend that the Plaintiffs "ratified" the 2023 and 2025 Transaction and, thus, should not be permitted to challenge those transactions in Count I.  Debtors' MJP ¶¶ 70–78.  This contention fails as a matter of black letter law.  Count I contends that the 2023 Amendment, 2025 Amendment, and OpCo ICA were not validly entered into and, thus, are void *ab initio*.  A party cannot ratify or otherwise agree to be bound by a void contract, which is not a contract at all.  *See, e.g.*, *Liberto v. D.F. Stauffer Biscuit Co.*, 441 F.3d 318, 325 & n. 15 (5th Cir. 2006) (a void contract cannot be ratified); *Horowitz v. Nat'l Gas & Elec., LLC*, 17-cv-7742 (JPO), 2021 WL 4478622, at *10 (S.D.N.Y. Sept. 30, 2021) (a void contract is a "legal nullity to which [equitable defense of ratification, waiver, and estoppel] do not apply").  For this reason alone, the Court should not consider this argument.

75.  Even if the Court could consider such factual issues, the Debtors have not and cannot establish a ratification defense at the pleading state.  "Ratification occurs when a party accepts the benefits of a contract and fails to act promptly to repudiate it."  *I80 Grp. Lending Opp. Funding Tr. 2018 v. Meritize Fin., Inc.*, 2026 WL 1022670, at *3 (N.Y. Sup. Ct. Apr. 9, 2026). Determining whether ratification has occurred "raise[s] fact-intensive issues that cannot be resolved at the pleading stage," including because ratification "must be performed with full

29

knowledge of the material facts relating to the transaction, and the assent must be clearly established and may not be inferred from doubtful or equivocal acts or language." *Id.*

76.     Here, as an initial matter, Defendants repeatedly conflate CastleKnight, one of the sixteen Plaintiffs, with the entirety of the group.  The Debtors' main contention is that CastleKnight exchanged "Old 2029 Notes for 2L Notes" in the 2025 Transaction, acquired additional 2L Notes after the 2025 Transaction, and received cash interest payments on those 2L Notes, as well as that the 2L Notes Indenture includes a provision that "the Support Agreement Transactions . . . shall be and are permitted under" the Indenture.  Debtors' MJP ¶¶ 71–72, 74–77.  But aside from CastleKnight, the other Plaintiffs do not hold 2L Notes, as shown in the 2019 Statement.  In any event, none of these allegations demonstrate any benefit accepted by CastleKnight from the 2023 and 2025 Amendments to the OpCo Credit Agreement and OpCo ICA challenged in Count I, let alone any benefit accepted with full knowledge of all material facts about the 2023 and 2025 Transactions as required to establish ratification.

77.     As to all the Plaintiffs, the Debtors' sole contention is that certain 2028 OpCo Term Loans were acquired after the 2023 and 2025 Transactions—allegations outside of the pleadings that are not true with respect to all the Plaintiffs—and the 2025 Amendment added a provision to the OpCo Credit Agreement stating the "2025 Transactions . . . shall be and are permitted" under the OpCo Credit Agreement.  Debtors' MJP ¶ 73 (citing 2025 Incremental Amendment to OpCo Credit Agreement § 4(c).  Again, such facts fail to demonstrate any benefit accepted with full knowledge of all material facts about the 2023 and 2025 Transactions as required to establish ratification.  *See In re TPC Grp. Inc.,* No. 22-10493 (CTG), 2022 WL 2498751, at *7 (Bankr. D. Del. July 6, 2022) ("The current dispute [] does not turn at all on whether one or another party might be cast as sympathetic or opportunistic. . . . Indeed, the robust secondary market for

distressed syndicated debt . . . depends on courts respecting the fact that the buyer of such debt acquires the same bundle of legal rights as were held by its predecessor.").[10]

78.     Without using the term "ratification," the Super HoldCo Lenders raise a similar argument in contending the Plaintiffs are "foreclosed from seeking equitable subordination" of the RCF based on language added to the OpCo Credit Agreement as part of the 2025 Amendment providing for Lenders to agree that the "2025 Transactions . . . shall be and are permitted" under the OpCo Credit Agreement.  SHC Lenders' MJP ¶ 63.  Whether the issuance of the RCF on a super-priority basis was permitted under the OpCo Credit Agreement (and it was not) is irrelevant to the issue of whether the RCF Obligations should be equitably subordinated.  Thus, nothing in this provision waives future claims for equitable subordination against the Super HoldCo Lenders—who are not a party to this agreement and have no rights to enforce it.  Moreover, the Amended Complaint challenges the 2025 Amendment as void *ab initio*, meaning such language does not bind the Plaintiffs.

79.     The Debtors fare no better with their passing references to the doctrine of unclean hands and estoppel.  Debtors' MJP ¶ 78.  Unclean hands bars equitable relief when a defendant relied upon and was injured by plaintiff's "immoral, unconscionable conduct directly related to" the claim plaintiff now asserts.  *Merhav Ampal Grp., Ltd. v. Merhav (M.N.F.) Ltd. (In re Ampal-AM. Israel Corp.)*, 545 B.R. 802, 810 (Bankr. S.D.N.Y. 2016).  The Debtors do not explain how any of these factors are met because none are.  Nor have the Debtors identified any false representation made by the Plaintiffs with the intention that the Debtors rely on such false

---

[10] The Debtors cite a number of inapposite cases providing no support for a finding of ratification here.  Debtors' MJP ¶ 77 (citing, for example, *Pavone v. Aetna Cas. & Sur. Co.*, 91 Misc.2d 658, 661-63 (N.Y. Sup. Ct. 1977) (plaintiff who obtained insurance proceeds by contending an accident occurred in a particular way could not prevent subrogation by changing her description of the accident); *German Roman Cath. Orphan Home of Buffalo v. Liberty Nat'l Bank & Tr. Co. (In re Schaefer)*, 18 N.Y.2d 314, 317 (N.Y. 1966) (bank who signed a consent to a court decree containing a clear release was bound by that release)).

statement or that the Debtors prejudicially changed their position in reliance on any such false representation, as required for equitable estoppel.  *See Citibank, N.A. v. Vebeliunas (In re Vebeliunas)*, 332 F.3d 85, 93–94 (2d Cir. 2003) (rejecting equitable estoppel defense absent evidence of any fraudulent conduct or reliance) (cited by the Debtors).

80.     That members of the Plaintiffs acquired debt, without full knowledge of the 2023 and 2025 LMEs which is only now being uncovered in discovery, is simply no grounds to shield the Debtors' misconduct from judicial review.

**D.     The Mutual Release Agreement Does Not Bar the Amended Complaint.**

81.     The Debtors contend that a 2025 Mutual Release Agreement bars the Amended Complaint.  Debtors' MJP ¶ 79; SHC Lenders' MJP ¶ 64.  While acknowledging Plaintiffs never signed this agreement, Defendants contend "on information and belief" that Plaintiffs became bound "as the successors in interest to original releasing parties under that agreement" "to the extent that" they "presumably purchas[ed debt] from one or more Mutual Releasing Party" under the Mutual Release Agreement.  Debtors' MJP ¶ 80–82; SHC Lenders' MJP ¶ 26, 64.

82.     This relies entirely on issues of fact outside of the pleadings that Defendants themselves acknowledge are unproven and are precisely the type of determinations the Court cannot make on a motion under Rule 12(c).  *See generally Nat'l Oilwell Varco, L.P. v. Auto-Dril, Inc.*, 68 F.4th 206, 218 (5th Cir. 2023) (holding district court erred in granting summary judgment when factual issue remained as to whether party was bound by settlement agreement).  Discovery will show these allegations are not supported by the facts.

83.     As an initial matter, Defendants again repeatedly conflate CastleKnight, one of the sixteen Plaintiffs, with the entirety of the group.  Defendants assert that "On information and belief, the CastleKnight Group acquired OpCo 2028 Term Loans and 2L Notes" from parties that signed the Mutual Release in connection with the 2025 LME.  Debtors' MJP ¶ 82.  As noted above, only

CastleKnight owns 2L Notes.  And contrary to Defendants' "information and belief," discovery will show that certain Plaintiffs acquired their OpCo Term Loan positions long before the 2025 LME and thus could not have possibly obtained those notes from parties that signed the Mutual Release in 2025.

84.     Moreover, Defendants have made no attempt to meet their burden of establishing how Plaintiffs meet the definitions of "successors and assigns" of a "Supporting Creditor" such that a court could bind them to the Mutual Release Agreement as non-signatories.  *See, e.g.*, *Bridas S.A.P.I.C. v. Gov't of Turkmenistan*, 345 F.3d 347, 358 (5th Cir. 2003) (holding party attempting to bind non-signatory to a contract has the burden of proving the application of one of the exceptions to the general rule that only signatories are bound); *Texas v. Am. Tobacco Co.*, 441 F. Supp. 3d 397, 458 (E.D. Tex. 2020) (party was not bound by "successors and assigns" clause in settlement agreement, reasoning that "a contract purporting to bind successors and assigns cannot actually bind successors and assigns unless the successor or assign also expressly consents to be bound").  The Super HoldCo Lenders cite no cases and the Debtors' authority stand only for the proposition that a "clear and unambiguous signed release" that is "binding" can be the basis for dismissal.  Debtors' MJP ¶ 83 (citing cases).  That undisputably does not exist here.

85.     Accordingly, the Mutual Release Agreement is no basis for dismissal.

**E.      The Intercreditor Agreements Do Not Bar the Amended Complaint.**

1.      The OpCo ICA Does Not Bar this Action

86.     The Debtors and the Super HoldCo Lenders contend that the OpCo ICA bars claims for equitable subordination and recharacterization.  Debtors' MJP ¶¶ 84–93; SHC Lenders' MJP ¶¶ 59–62.  As an initial matter, the OpCo ICA cannot serve as a basis to dismiss this action because, as alleged in the Amended Complaint, the OpCo ICA is void *ab initio*.  "A void contact produces no legal obligation."  *LaMonica v. CEVA Grp. PLC (In re CIL Ltd.)*, Adv. Proc. No. 14-02442-

33

JLG, 2024 WL 1693626, at *67 (Bankr. S.D.N.Y. Apr. 18, 2024).  The Court must rule on whether the OpCo ICA is void before it can determine whether the OpCo ICA binds the Plaintiffs.[11]  In any event, nothing in the OpCo ICA bars these claims.

87.     *First*, the OpCo ICA does not bar Count IV to equitably subordinate the RCF. Section 2.2(a) of the OpCo ICA contains a waiver of the right to challenge "the validity, priority, enforceability, or perfection of the Liens" of the RCF Lenders.  OpCo ICA § 2.2(a).  Defendants contend this provision bars Count IV to equitably subordinate the RCF.  SHC Lenders' MJP ¶¶ 59–62; Debtors' MJP ¶¶ 87, 89.  However, an intercreditor agreement cannot bar a claim for equitable subordination under Section 510(c) of the Bankruptcy Code.

88.     As the Debtors recognize, Section 510(a) of the Bankruptcy Code provides for "subordination agreements [to be] enforceable in these chapter 11 cases."  Debtors' MJP ¶ 84; 11 U.S.C. § 510(a).  However, Defendants ignore that Section 510(c) of the Bankruptcy Code explicitly permits courts to equitably subordinate claims "[n]otwithstanding subsection[] (a) . . . of this section . . . ."  11 U.S.C. § 510(c).  Accordingly, any "agree[ment] to subordinate does not preclude [plaintiffs] from seeking to equitably subordinate [a defendant's] claim.  To hold otherwise would eviscerate the provisions of section 510(c), which are an express exception to section 510(a)'s enforcement of contractual subordination rights."  *AIG Financial Prods. Corp. v. Arthurs (In re AIG Financial Prods. Corp.)*, 660 B.R. 603, 618 (Bankr. D. Del. 2024); *cf. In re Tribune Co.*, 972 F.3d 228, 232, 237–39 (3d Cir. 2020) (potential violation of an intercreditor agreement is irrelevant to the confirmation of a cramdown plan because the governing statute provides for cramdown "notwithstanding section 510(a)"); *Cisneros v. Alpine Ridge Grp.*, 508 U.S.

---

[11] While The Debtors and Super HoldCo Lenders reference an agreement to be bound by "the relevant intercreditor agreement" under Section 10.22(b) of the OpCo Credit Agreement (Debtors' MJP ¶ 86; *see also* SHC Lenders' MJP ¶ 60), one cannot agree to be bound by a void contract, which is not a contract at all.  *See, e.g.*, *Liberto v. D.F. Stauffer Biscuit Co.*, 441 F.3d 318, 325 & n. 15 (5th Cir. 2006) (a void contract cannot be ratified).

10, 18 (1993) (a "notwithstanding" clause "clearly signals the drafter's intention that the provisions of the 'notwithstanding' section override conflicting provisions").

89.     *Second*, the Debtors contend that "[i]n seeking to recharacterize and invalidate the Intercompany Loans," the Plaintiffs violated Section 2.2(b) of the OpCo ICA, which contains a waiver of the right to challenge "the validity, priority, enforceability, or perfection of the Liens . . . in respect of the Obligations of the same Class."  Debtors' MJP ¶ 87–88.  According to the Debtors, the Intercompany Loans and 2028 OpCo Term Loans are "Obligations of the same Class." *Id.* ¶ 88.  This contention fares no better.

90.     The OpCo ICA also does not bar the claim to recharacterize the Intercompany Loans.  A recharacterization claim asks the court to consider "'whether a debt actually exists,' not the priority of the claim. . . . Whether recharacterization of [a defendant's] claim would have the practical effect of subordinating" that claim "has no bearing on the recharacterization analysis." *AIG Financial Prods. Corp.*, 660 B.R. at 614 (finding a subordination agreement does not bar a claim for recharacterization).  In other words, that the "practical effect" of a successful recharacterization claim is subordination does not transform that claim—which challenges whether the Intercompany Loan is debt or equity—into a challenge of the priority of the Liens of the Intercompany Lender.

91.     *Third*, the express terms of the OpCo ICA demonstrate that this agreement does not form the basis for a defense against equitable subordination or recharacterization by the Debtors or the Super HoldCo Lenders.  Section 3.6 of the OpCo ICA addresses "Actions upon Breach," providing for the OpCo ICA to be raised as a defense specifically in an action "against the Loan Parties or the Collateral"—which aligns with the purpose of the OpCo ICA to address lien

35

priorities. OpCo ICA § 3.6.[12] Plaintiffs' claims are not asserted against either. Moreover, "Loan Parties" may only raise the OpCo ICA as a defense "with the prior written consent of the Controlling Agent." OpCo ICA § 3.6. There is no evidence the Debtors obtained such consent.

92. Accordingly, the OpCo ICA does not bar any claims of the Amended Complaint.

2. The SHC ICA Does Not Prohibit "Any Action Adverse to the Intercompany Loans"

93. The Debtors also contend that CastleKnight, as a 2L Noteholder, "waived the right to take any action adverse to the Intercompany Loans" under Section 3.1(c) of the SHC ICA, which addresses intercreditor issues among lenders to LuxCo SPV—presumably as an argument against claims against LuxCo SPV to equitably subordinate or recharacterize the Intercompany Loans. Debtors' MJP ¶¶ 91–93. CastleKnight's actions as a 2028 OpCo Term Lender—asserting claims for which a 2L Noteholder would not have standing—are not governed by the SHC ICA. Moreover, the Debtors have no right to raise the SHC ICA as a defense to these claims. The SHC ICA expressly provides for "any Senior Lien Representative or any other Senior Lien Secured Party (in its or their own name or in the name of Grantor)" to obtain relief in the event of any breach of the SHC ICA—not Grantor (which, in any event, is defined to include LuxCo SPV in its role as issuer of Super HoldCo debt, not in its role as Intercompany Lender). *See* SHC ICA § 3.03.

94. Regardless, there has been no breach of the SHC ICA because Section 3.1(c) provides no such waiver. Section 3.1(c) precludes "any action that would hinder any exercise of remedies undertaken by" SHC 1L Lenders or their agent "with respect to the Collateral," such as foreclosure, and waiver of the right "to object to the manner in which" such parties "seek to enforce

---

[12] "Loan Parties" is defined as "the Original Superpriority Loan Parties, the Original Opco Facility Loan Parties, the Original Super Holdco Facility Loan Parties, the Original Super Holdco Notes Parties and any Additional Loan Parties; provided that, with respect to the Super Holdco Facility Obligations and the Super Holdco Notes Obligations, 'Loan Parties' shall be limited to Trinseo Europe only."

or collect the Senior Lien Obligations or the Liens granted on any of the Collateral . . . ." SHC ICA 3.1(c).  While the recharacterization and equitable subordination claims may affect the *value* of the "Collateral," that does not transform such claims into claims *against* the Collateral.  For example, the court in *In re MPM Silicones* explained that a similar provision "pertains to objecting to the [party's] enforcement and exercise of remedies in respect of" shared collateral and, thus, did not preclude an objection to a senior creditor's right to recover on a make-whole or similar claims.  *See In re MPM Silicones, LLC*, 518 B.R. 740, 750–51 (Bankr. S.D.N.Y. 2014).  Here, the Plaintiffs are not objecting to any steps taken by the Super HoldCo Lenders to foreclose on or otherwise enforce their liens on the Intercompany Loans and, thus, this provision is not implicated.  Notably, Debtors make no attempt to explain how this provision has any applicability here.  Debtors' MJP ¶¶ 91–93.

## II.   DEFENDANTS ARE NOT ENTITLED TO JUDGMENT ON THE AMENDED COMPLAINT'S CLAIM OBJECTION.

### A.   The Amended Complaint States Numerous Violations of the Credit Agreement.

95.   The Debtors contend that Count I fails to state a claim "that insufficient basket capacity existed to permit the AmSty Transfer and other components of the 2023 [Transaction]," meaning there was no Default at the time of the 2023 Transaction and, thus, the 2023 Intercompany Loans were validly incurred and validly voted for the 2025 Transaction.  Debtors' MJP ¶¶ 94–107.

96.   These arguments simply disagree with the well-pleaded allegations in the Amended Complaint and are not appropriate for resolution on a motion for judgment on the pleadings.  As alleged in the Amended Complaint, the Debtors had, at most, only approximately $375 million in investment capacity for Restricted Payments at the time of the 2023 Transaction and that amount may have been substantially lower.  Am. Compl. ¶ 85.  This is not something that Plaintiffs made up—it was the contemporaneous belief of the parties at the time.  *Id.* (the Debtors' own advisors

stated that "[a] portion of the 50% AmSty Joint Venture stake with a 'fair market value' of *no more than $375M* can be contributed to UnSub*").

97.     Although the Court need not and should not consider the Debtors' arguments, those arguments are meritless in any event.  The Debtors contend their capacity was increased to "not less than $715 million" by amounts available under the definition of "Cumulative Credit" based on IPO proceeds and Consolidated Net Income ("CNI") (Debtors' MJP ¶¶ 21, 95); however, there is no reasonable basis to infer that any Cumulative Credit was available beyond $170 million of IPO proceeds from the sale of shares in Trinseo PLC (Am. Compl. ¶ 82). Combined with approximately $143 of available fixed-dollar capacity, the total still fell short of the $500 million in capacity required to conduct the AmSty Dropdown.  And because prior usage appears to have exceeded 50% of historic CNI during the relevant period, CNI did not increase Cumulative Credit capacity any further.  *Id.* ¶ 83.

98.     The Debtors further raise factual disputes to contend that the $125 million Basket Capacity Equity Contribution did not constitute a "Disqualified Equity Interest."  Debtors' MJP ¶¶ 21, 97–101.  As pleaded in the Amended Complaint, the Basket Capacity Equity Contribution was debt, not equity, and the Debtors' attempt to characterize this contribution as qualifying equity violates the implied covenant of good faith and fair dealing.  Am. Compl. ¶¶ 85–92.

99.     The implied covenant is "[i]mplicit in every contract" and is a "pledge that neither party to the contract shall do anything which will have the effect of destroying or injuring the right of the other party to receive the fruit of the contract, even if the terms of the contract do not explicitly prohibit such conduct." *E. Ramapo Cent. Schs. Dist. v. N.Y. Sch. Ins. Reciprocal*, 158 N.Y.S.3d 173, 177 (2d Dep't 2021) (cleaned up). "Even an explicitly discretionary contract right may not be exercised in bad faith so as to frustrate the other party's right to benefit under an

38

agreement." *LCM XXII Ltd. v. Serta Simmons Bedding, LLC*, No. 21-cv-3987, 2022 WL 953109, at *16 (S.D.N.Y. Mar. 29, 2022) (cleaned up). These principles were recently confirmed by New York's highest court in *111 W. 57th Inv. LLC v. 111 W57 Mezz Inv. LLC*, No. 41, 2026 WL 1502410 (N.Y. May 28, 2026):

> This doctrine is even more important where a contract contemplates the exercise of discretion, or in other words awards one party the freedom to act in ways the contract may not directly foresee. Accordingly, the implied covenant obligates the party with discretion act in good faith, and not arbitrarily or irrationally, when exercising that discretion. A promisor's discretion may not be used to violate a promise that a reasonable person in the position of the promisee would be justified in understanding was included.

100. The Amended Complaint adequately pleads a breach of the implied covenant under these standards. The Debtors had complete discretion in designing the terms of the Basket Capacity Equity Contribution. The Debtors abused that discretion by engineering the Basket Capacity Equity Contribution to avoid the criteria in the OpCo Credit Agreement for a Disqualified Equity Interest, while replicating, in economic substance, the debt that those criteria are meant to include; for example, providing for dividends to accrue daily but only be paid post-Maturity Date. Am. Compl. ¶ 89(c). And the Amended Complaint alleges that these features had no legitimate business. Instead, the sole purpose of these features was to manufacture basket capacity that was otherwise unavailable to conduct the AmSty Dropdown. The Amended Complaint cites contemporaneous documents that admit that ███████████████████████████ ████████████████████████████████████████████████ *Id.* ¶ 85. That is an abuse of contractual discretion to deprive Plaintiffs of the benefit of their bargain.

101. The Debtors also suggest, without expressly stating or explaining, that they had an "unlimited Fixed Charge Coverage Basket" to permit the 2023 Transaction. Debtors' MJP ¶ 95. To the contrary, that basket is only available if "after giving effect to" the relevant Investment

39

(here, AmSty), the Fixed Charge Coverage Ratio (the ratio of Consolidated EBITDA to Fixed Charges, such as interest and dividends for the period) is not lower than immediately prior to such transaction," *and* the OpCo Borrower or its Restricted Subsidiary "receives consideration . . . at least equal to the fair market value . . . of the assets" contributed.  OpCo Credit Agreement § 1.01 (clause (t) of the definition of "Permitted Investment"); Am. Compl. ¶ 84.  Neither of those conditions were met "after giving effect" to the AmSty Transfer, which was transferred for no value (not fair market value) and lowered the Fixed Charge Coverage Ratio.  *Id*.

102.    In addition, the Debtors only address whether they had sufficient investment capacity for the AmSty Transfer, valued at approximately $500 million (Debtors' MJP ¶ 95), which, as explained above, they did not.  However, this ignores additional defaults alleged in the Amended Complaint.

103.    *First*, the Amended Complaint alleges a default that arose when the Debtors attempted to structure the AmSty Dropdown to circumvent Section 6.15 of the OpCo Credit Agreement, which operates to permit the OpCo Borrower to designate a subsidiary as Unrestricted only if the designation would not lower the OpCo Borrower's FCCR.  *See* Am. Compl. ¶¶ 72–75. The Debtors knew that they had no hope of satisfying these conditions if the creation of the AmSty Unsubs and the transfer of AmSty into those subsidiaries were treated as a single transaction.  The Debtors attempted to circumvent the restrictions by making the one, integrated AmSty Dropdown appear as two independent steps: first, designating the empty shell AmSty Unsubs as Unrestricted Subsidiaries, followed by the AmSty Dropdown. This attempt fails.  Section 1.10 of the OpCo Credit Agreement specifically guards against such maneuvers by requiring that the calculation of any FCCR condition occur *after* giving "pro forma" effect to *all* "Specified Transactions" that occur "*simultaneously* with the event for which the calculation of any such ratio is made."

Specified Transactions is defined to include both the designation of an Unrestricted Subsidiary and Restricted Payments—in other words, both components of the AmSty Dropdown.  Because those were pre-planned components of a single integrated transaction—the 2023 LME—consummated over a period of weeks and documented as a unified refinancing, they must be treated as occurring "simultaneously" under Section 1.10, or otherwise collapsed and treated as a single integrated transaction.[13]

104.    Agreements "executed at the same time, by the same parties, and for the same purpose . . . are, in the eyes of the law, one instrument." *Audax Credit Opportunities Offshore Ltd. v. TMK Hawk Parent, Corp.*, 72 Misc. 3d 1218(A), at *8 (N.Y. Sup. Ct. 2021) (internal quotations omitted).[14]  The Amended Complaint pleads each element of the collapsing doctrine.  The amendments to the Indenture were executed by the same parties "with knowledge of each step." Am. Compl. ¶ 77.  They were each executed for the same purpose—to accomplish the AmSty Dropdown.  And they were conditional and interdependent: Absent the UnSub designation, the Debtors could not have completed the AmSty Dropdown, and "none would have been enacted in the absence of the broader transaction." Am. Compl. ¶¶ 75–77.  This adequately pleads a single integrated transaction.  *See Axos Fin., Inc. v. Reception Purchaser, LLC*, 88 Misc. 3d 1203(A), 246 N.Y.S.3d 915 (N.Y. Sup. 2026) ("Plaintiffs sufficiently allege that the SAA, the Dropdown Agreement, and the Intercompany Agreement had the same purpose, were executed at the same time, and are mutually dependent.  Defendants do not dispute their reliance on the Interconnection of three contracts to execute the October Transaction."); *Cheyne European Strategic Value Credit*

---

[13] Courts routinely collapse transactions spanning much longer time periods.  *See, e.g.*, *In re TS Emp., Inc.*, 597 B.R. 494, 526 (Bankr. S.D.N.Y. 2019) (collapsing amendments enacted eight months apart).

[14] This is an inherently fact-intensive inquiry inappropriate for resolution on a motion to dismiss. *Rudman v Cowles Commc'ns, Inc.*, 30 N.Y.2d 1, 13 (1972) ("Whether the parties intended to treat both agreements as mutually dependent contracts . . . is a question of fact.").

*RAIF v. Hunkemoller Intern. BV*, No. 659297/2024, Dkt. No. 196 at *33 (N.Y. Sup. Ct. June 17, 2025) (Transcript) ("[T]he Court also considers the application of the collapsing doctrine and determines that, at this stage, plaintiffs have sufficiently pled that the following factors militate in their favor: The removal of 4.18 and the balance of the transaction involve the same parties with knowledge of each step of the transaction and for the same purpose to effectuate the up-tiering.").

105.    *Second*, the OpCo Credit Group lacked capacity for providing security interests on substantially all of assets of the AmSty UnSubs to secure borrowing at LuxCo SPV.  Am. Compl. ¶¶ 80–84.  In providing such security interest, the OpCo Borrower permitted an indirect Restricted Payment — specifically, a distribution of property (security interests) that would not have occurred but for Trinseo PLC's equity interests in the OpCo Borrower and LuxCo SPV and, thus, was a distribution "with respect to any Equity Interest."  Am. Compl. ¶¶ 93–96; OpCo Credit Agreement §§ 1.01 (definitions of Restricted Payment and Equity Interests), 7.06.  Even if the Debtors had sufficient investment capacity for the AmSty Transfer, the Debtors did not have sufficient investment capacity for the subsequent grant of security interests in the AmSty Unsubs.

106.    In addition to granting security interests, under the agreement governing the Super HoldCo debt, the AmSty Unsubs agreed that "any cash dividend" from the AmSty JV over $5 million in any fiscal year would be used to prepay the Super HoldCo debt.  This agreement resulted in tens of millions of dollars being diverted to the Super HoldCo Lenders—in 2023 and 2024, $65 million and $45 million of dividends were received by the AmSty JV—that otherwise would have been available for distribution to Trinseo LLC—an OpCo Restricted Subsidiary and guarantor of the 2028 OpCo Term Loans—as sole member of Trinseo NA Finance LLC.  These actions were directed by Trinseo LLC, as the sole member of Trinseo NA Finance LLC which, in turn, is the sole member of Trinseo NA Finance SPV LLC.  For example, to help effectuate the 2023

Transasction, Trinseo LLC executed an amendment to Trinseo NA Finance LLC's operating agreement, and Trinseo NA Finance LLC, in turn, amended Trinseo NA Finance SPV LLC's operating agreement.

107.    *Third*, Section 7.04 of the OpCo Credit Agreement restricts any Restricted Subsidiary, including Trinseo LLC, from "Dispos[ing] of (whether in one transaction or in a series of transactions) all or substantially all of its assets" to any person unless an enumerated exception is met.  Here, Trinseo LLC contributed the AmSty JV to the AmSty Unsubs, agreed to the AmSty Unsubs securing the Super HoldCo debt with substantially all of their assets, and diverted the majority of any cash dividends from the AmSty JV to prepay the Super HoldCo debt instead of being distributed to Trinseo LLC.  Through these steps, Trinseo LLC not only engaged in a Restrict Payment, but also disposed of substantially all of its assets in violation of Section 7.04.

108.    Finally, even if Defaults did not occur, the Amended Complaint also challenges the validity of the 2023 Intercompany Loan on recharacterization grounds.  This would make the 2023 Intercompany Loan void "*ab initio*."  *See, e.g.*, *In re GWG Holdings, Inc.*, Adv. Proc. No. 23-3088, 2023 WL 6449208, at *4 (Bankr. S.D. Tex. Oct. 2, 2023) ("Recharacterization is appropriate where the circumstances show that a debt transaction was 'actually an equity contribution *ab initio*.'").  Without a valid loan, the Intercompany Lender could not vote under the OpCo Credit Agreement.  For this independent reason, the 2025 Amendment and OpCo ICA (which was predicated on the vote of the Intercompany Loan) are void.

**B.    The Absence of a Default Is a Precondition to the Effectiveness of the 2023 Amendment.**

109.    The Debtors agree that the 2023 Amendment could not be effective if a "Default shall exist or would result from [the] proposed Credit Extension," but contend that whether a Default exists "is tested '<u>after</u> giving effect to the amendment.'"  Debtors' MJP ¶ 1110 (emphasis

43

in original).  The OpCo Credit Agreement conditioned the effectiveness of the 2023 Amendment on "section 4.02 being satisfied"—requiring "[n]o Default shall exist or would result" from the Credit Extension—"after giving effect to such Incremental [or Refinancing] Commitments." OpCo Credit Agreement §§ 2.16(d), 2.17(d), 4.02.

110.    The Debtors contend that even if insufficient basket capacity existed for the AmSty Transfer prior to the 2023 Amendment, "such capacity clearly existed 'after giving effect' to the amendments implementing those transactions."  Debtors' MJP ¶¶ 108, 110.  No further explanation is provided.  The Court should disregard this unexplained statement.  In any event, the Plaintiffs are not aware of any reason why "giving effect" to the incurrence of additional debt through the 2023 Intercompany Loans (the Incremental and Refinancing Commitments) would prevent the Defaults that arose from the Restricted Payments alleged in the Amended Complaint.

### C.    The Debtors' Remedies Argument is Irrelevant.

111.    Finally, the Debtors contend the appropriate remedy for Count I is an unsecured damages claim, not voiding, rescinding, or unwinding the 2023 and 2025 Transactions, including the OpCo ICA.  Debtors' MJP ¶¶ 111–15.  The Debtors do not contend this argument is a basis for dismissal and, thus, the Court need not consider it.

112.    Regardless, the Debtors' main contention is that the remedies identified in the OpCo Credit Agreement for an Event of Default do not identify voiding or rescinding transactions and recission is not awarded when damages are available.  Debtors' MJP ¶¶ 112–15.  However, the Plaintiffs are not seeking a remedy for an Event of Default or seeking rescission.

113.    Rather, the Plaintiffs contend that a precondition to the effectiveness of the 2023 Amendment—through which the 2023 Intercompany Loans were purportedly issued as "Term Loans" on a pari passu basis with the 2028 OpCo Term Loans—was not met because a Default existed.  *See, e.g.*, OpCo Credit Agreement §§ 2.16(d), 2.17(d) (providing "[t]he effectiveness of

any [Incremental or Refinancing] Amendment, and the [Incremental or Refinancing] Commitments thereunder, shall be subject to the satisfaction" of various conditions, including that no Default exists or would result).  As a result, the 2023 Amendment was never effective, and the Intercompany Lender could not validly vote under the OpCo Credit Agreement.  *See Kortright Capital Partners v. Investcorp Inv. Advisers Ltd.*, 327 F. Supp. 3d 673, 680 (S.D.N.Y. 2018) (absent compliance with a condition precedent to contract formation, "no contract arises").  Independently, the Intercompany Loan should be recharacterized as an equity contribution *ab initio*—meaning the Intercompany Lender (as an equity holder and not a lender) could not validly vote under the OpCo Credit Agreement.

114.    Absent the necessary votes to amend the OpCo Credit Agreement and direct entry into the OpCo ICA, the 2025 Amendment and OpCo ICA are void.  *See, e.g.*, *U.S. Bank Nat'l Ass'n v. Windstream Servs., LLC*, 17-CV-7857(JMF), 2019 WL 948120, at *19–22 (S.D.N.Y. Feb. 15, 2019) (holding the new notes issued in violation of indenture were not valid "Additional Notes" within the meaning of that indenture and third supplemental indenture issued without sufficient valid votes was invalid); *Deutsche Bank AG v. JPMorgan Chase Bank*, No. 04 Civ. 7192(SHS), 2007 WL 2823129, at *23–24 (S.D.N.Y. Sept. 27, 2007) (amendment entered into without lender consent was "null and void").  Because the 2023 and 2025 Amendments and OpCo ICA are null and void, any claims based on those void agreements should be disallowed under Section 502(b).  *See supra* Section I(B) (addressing the disallowance claim).

115.    "Rescission—and, accordingly, rescissory damages, which are a substitute for rescission . . . is not a remedy for a void contract, because irrespective of whether the contract is rescinded, it has no legal effect."  *Horowitz v. Nat'l Gas & Elec.,* 2021 WL 4478622, at *10

(S.D.N.Y. Sept. 30, 2021) (citations omitted).  Disallowance, not damages, is the appropriate remedy here.

### III.     THE AMENDED COMPLAINT STATES CLAIMS FOR EQUITABLE SUBORDINATION.

116.    Section 510 of the Bankruptcy Code allows a court "under principles of equitable subordination, [to] subordinate for purposes of distribution all or part of an allowed claim to all or part of another allowed claim."  11 U.S.C. § 510(c).  Equitable subordination is permitted where (1) the claimant engaged in some type of inequitable conduct; (2) the conduct resulted in injury to the creditors or conferred an unfair advantage on the claimant; and (3) the invocation of equitable subordination is not inconsistent with the provisions of the Bankruptcy Code.  *Matter of U.S. Abatement Corp.*, 39 F.3d 556, 562 (5th Cir. 1994).[15]

117.    Equitable subordination is generally permitted: "(1) when a fiduciary of the debtor misuses his position to the disadvantage of other creditors; (2) when a third party controls the debtor to the disadvantage of other creditors; and (3) when a third party actually defrauds other creditors."  *Id.*   As detailed below, the Amended Complaint adequately pleads equitable subordination under these standards, including by alleging the misuse of a fiduciary's position in approving the Intercompany Loans and the Super HoldCo Lender's use of control over the Debtors to disadvantage the Plaintiffs.

118.    In addition, this claim properly seeks to offset the harm of these inequitable acts (and, thus, is remedial, not penal, Debtors' MJP ¶ 117) by subordinating the Intercompany Loans and RCF to the 2028 OpCo Term Loans.  *Matter of Mobile Steel Co.*, 563 F.2d 692, 701 (5th Cir.

---

[15] Courts find the third prong of the equitable subordination test "of little significance today" and "likely to be moot" because "[t]he Bankruptcy Code, unlike its predecessors, expressly authorizes the remedy of equitable subordination." *In re Verestar, Inc.*, 343 B.R. 444, 461 (Bankr. S.D.N.Y. 2006) (citation omitted).

1977) (claims "should be subordinated only to the extent necessary to offset the harm the bankrupt and its creditors suffered on account of the inequitable conduct").

> **A.** **The Amended Complaint States a Claim for Equitable Subordination with Respect to the Intercompany Loans.**

119. The Amended Complaint adequately pleads conflicted managers for LuxCo and OpCo Borrower breached their fiduciary duties by entering Intercompany Loans to OpCo Borrower's and its creditors' detriment, such that equitable subordination is appropriate. Am. Compl. ¶¶ 97–103, 129–31. The LMEs were approved by the same conflicted individuals who owed fiduciary duties to both Luxco SPV and OpCo Borrower, yet improperly approved LMEs that were not in OpCo Borrower's best interest or the interests of its creditors. *Id.* These allegations suffice to meet Rule 8 pleading standards.

120. The Debtors' argument (which only references the 2023 LME) that the Amended Complaint fails to identify specific acts by which fiduciaries breached their duties or identify which fiduciary duties were breached under which law (Debtors' MJP ¶ 120) is contradicted by the well-pleaded allegations identified above and contrary to applicable law. Plaintiffs are not required to identify a specific fiduciary duty or law. *See Bennett, Trustee for MTE Litig. Trust v. Siffin*, No. 21-CV-00214-DC-RCG, 2022 WL 2762224, at *12 (W.D. Tex. May 24, 2022) (plaintiff adequately pled a breach of fiduciary duty without asserting which specific duty was breached); *Kucel v. Walter E. Heller & Co.*, 813 F.2d 67, 74 (5th Cir. 1987) (plaintiff not required to plead the applicability of a particular law).

121. Next, the Debtors argue the Intercompany Loans "complied with the operative transaction documents, and the exercise of contractual rights cannot form the basis for an equitable subordination claim." Debtors' MJP ¶ 121. This is contrary to the allegations of the Amended Complaint (*see supra* Section II) and raises disputed factual issues outside of the pleadings that

cannot be resolved on a motion for judgment on the pleadings. Moreover, "inequitable conduct encompasses conduct that may be lawful but is nevertheless contrary to equity and good conscience." *In re Verestar, Inc.*, 343 B.R. 444, 461 (S.D.N.Y. 2006). Thus, even if the Intercompany Loans did comply with the OpCo Credit Agreement, that does not excuse LuxCo SPV's inequitable behavior in exploiting the conflicts of interest to obtain approval of these loans.

122. The Debtors also contend the Intercompany Loans were issued after "a competitive, market-based process," under terms "vigorously negotiated, at arm's length, through the same marketing process." Debtors' MJP ¶ 121. These unpled and unproven facts are contrary to the allegations of the Amended Complaint that the Intercompany Loans were approved by conflicted managers who owed fiduciary duties to both Luxco SPV and OpCo Borrower and that there is no evidence that anyone negotiated, deliberated over, or performed due diligence for the Intercompany Loans on behalf of either Luxco SPV or OpCo Borrower. Am. Comp. ¶¶ 98, 129. Thus, they form no basis for dismissal. The Debtors' arguments appear to conflate their process for obtaining external funding with the process for issuing the Intercompany Loans.

123. *Finally*, the Debtors argue the OpCo Debtors' "fundamentally benefitted from the 2023 Refinancing." Debtors' MJP ¶ 121. Once again, this is contrary to the allegations of the Amended Complaint, including that the LMEs, and particularly the Intercompany Loans, provided OpCo Borrower no benefit, but instead extracted collateral from the OpCo Credit Group and saddled OpCo Borrower with far more expensive debt that increased the Debtors' interest burden and only delayed an inevitable bankruptcy. *See* Am. Compl. ¶¶ 100–02, 131.

**B. The Amended Complaint States a Claim for Equitable Subordination of the RCF.**

124. The Amended Complaint adequately pleads equitable subordination claims with respect to the RCF. Among other allegations, the Amended Complaint alleges that the Super

HoldCo Lenders used their insider status to: (a) force entry of an off-market OpCo ICA that stripped junior creditors of their rights, (b) acquire all of the RCF debt once the Debtors' bankruptcy became inevitable, (c) force the Debtors to draw down the RCF and transfer its proceeds to the Super HoldCo entities for the Super HoldCo Lenders' benefit and to the detriment of the OpCo Entities and their creditors, and (d) control the Debtors and the bankruptcy process to the detriment of Plaintiffs, including by controlling the Intercompany Settlement, which had the effect of protecting the Super HoldCo Lenders' claims under the Intercompany Loans.[16]

125.     As an initial matter, Defendants contend the Super HoldCo Lenders are not insiders, such that a higher standard for equitable subordination of conduct "tantamount to fraud, misrepresentation, overreaching or spoilation" applies.  SHC Lenders' MJP ¶ 68; Debtors' MJP ¶ 123.  This is contrary to the allegations of the Amended Complaint and raises dispute factual issues that cannot be resolved at the pleading stage.

126.     "[N]on-statutory insiders need not have control over a debtor; rather, courts will analyze (i) whether there is a close relationship between debtor and creditor, and (ii) whether there is some evidence, other than the relationship, suggesting that any transactions were not conducted at arm's length." *In re Evergreen Energy, Inc.*, 546 B.R. 549, 563 (D. Del. 2016); *In re Smith*, 415 B.R. 222, 232–33 (Bankr. N.D. Tex. 2009) (The "definition of an insider must be flexibly applied on a case-by-case basis.").  Such a relationship is adequately alleged here, where the Super HoldCo Lenders used its borrower's invalid votes to force entry into the off-market OpCo ICA, bought up the RCF loans while negotiating the Debtors' restructuring to gain control over both Super HoldCo and OpCo silos of the Debtors, and used that control to, among other things, dictate DIP financing containing broad waivers and stipulations by the Debtors as to the validity of their claims and the

---

[16] *See* Am. Compl. ¶¶ 120–24, 136–42.

Intercompany Loans, transfer funds from RCF draw-downs to Super HoldCo, and force OpCo to absorb costs that belong to the enterprise as a whole.  Am. Compl.  ¶¶ 120–24, 136–45.

127.    These allegations, at a minimum, raise issues of fact regarding insider status.  *See In re Broadstripe, LLC*, 444 B.R. 51, 80–84 (Bankr. D. Del. 2010) (allegations of creditors' substantial holdings that created a close relationship between debtor and creditor and creditor's control over debtors, suggesting debtor may not have conducted transactions at arm's length, raised issues of material fact as to insider status).  Because the Amended Complaint adequately alleges that the Super HoldCo Lenders were insiders, it need only to allege that the Super HoldCo Lenders were engaged in unfair conduct that harmed Plaintiffs in support of its equitable subordination claim.  The Amended Complaint does just that.  For example, the Amended Complaint makes the following allegations:

- ███████████████████████████████ the Super HoldCo Lenders purchased all or substantially all of the 'superpriority' RCF Loans– a move that gave them control over the senior-most debt at the OpCo Level, in addition to the control they already exercised over the senior-most debt at the Super HoldCo Level."  Am. Compl. ¶ 37.

- "The result of purchasing the RCF loans, as a managing director for the Apollo Funds stated in a February 2026 email, ████████████ ███████████████████████████████████████ ███████████████████████████████████ *Id.*

- "A senior counsel for the Angelo Gordon Funds also described in a March 2026 email that ██████████████████████████████ ████████████████████████████████████████ ████████████████████████████████ *Id.*

128.    Defendants also contend "the Super HoldCo Lenders were just exercising their contractual rights" (Debtors' MJP ¶¶ 124; SHC Lenders' MJP ¶ 70), which is belied by the allegations discussed above and fails to demonstrate that the Super HoldCo Lenders did not engage in inequitable conduct.  *See supra* ¶ 119.  The Debtors further contend "on information and belief,

one or more members of the CastleKnight group themselves sought to acquire or refinancing OpCo RCF Loans when the Debtors' insolvency was apparent." Debtors' MJP ¶ 125. Such statements cannot be considered on a motion for judgment on the pleadings, nor does it demonstrate that Super HoldCo Lenders' course of conduct, encompassing much more than simply buying the RCF loans, was equitable.

## IV. DEFENDANTS ARE NOT ENTITLED TO JUDGMENT ON THE AMENDED COMPLAINT'S RECHARACTERIZATION CLAIMS.

### A. The Debtors Apply the Wrong Test to the Recharacterization Claim.

129. The Fifth Circuit recognizes a bankruptcy court's power to recharacterize debt under Section 502(b) of the Bankruptcy Code. *In re Lothian Oil Inc.*, 650 F.3d 539, 543–44 (5th Cir. 2011). In conducting this analysis, courts in the Fifth Circuit apply the substantive law of the relevant state. *Id.* Here, the parties agree that New York applies. *See* Debtors' MJP ¶ 127. The Debtors, however, misstate New York law concerning recharacterization claims.

130. The Debtors assert that New York law limits the recharacterization inquiry to three factors: "(1) whether there is a reconciliation provision in the agreement; (2) whether the agreement has a finite term; and (3) whether there is any recourse should the merchant declare bankruptcy." Debtors' MJP ¶ 127 (citing *Oakshire Props., LLC v. Argus Cap. Funding, LLC*, 229 A.D.3d 1199, 1201 (N.Y. App. Div. 2024); *Samson MCA LLC v. Joseph A. Russo M.D. P.C./IV Therapeutics PLLC*, 196 N.Y.S.3d 256, 259 (N.Y. App. Div. 2023); *LG Funding, LLC v. United Senior Props. Of Olathe, LLC*, 122 N.Y.S.3d 309, 312 (N.Y. App. Div. 2020); *K9 Bytes, Inc. v. Arch Cap. Funding, LLC*, 57 N.Y.S.3d 625, 625 (Sup. Ct. 2017)). But each of the Debtors' cases considered the narrow question of whether a particular merchant cash advance contract was a loan subject to New York's usury laws. As the Intercompany Loans are not merchant cash advance contracts, this standard does not apply. *See In re GWG Holdings, Inc.*, 2023 WL 6449208, at *5

(applying New York law, holding that the trustee "incorrectly assert[ed] that this Court is limited to three factors to guide its analysis," which "have been applied exclusively to the merchant cash advance setting"). The recharacterization analysis in the Debtors' motion is therefore largely inapplicable.

131. Instead, New York courts evaluate the totality of the circumstances, looking through the labels the parties have attached to a transaction to examine its economic reality. *See Haymount Urgent Care PC v. GoFund Advance, LLC*, 609 F. Supp. 3d 237, 246–47 (S.D.N.Y. 2022) (quoting *Adar Bays, LLC v. GeneSYS ID, Inc.*, 37 N.Y.3d 320, 334 (2021)); *In re Sackman Mortg. Corp.*, 158 B.R. 926, 932 (Bankr. S.D.N.Y. 1993) (recognizing that "a bankruptcy court, as a court of equity, may look through form to substance when determining the true nature of a transaction"). The hallmark of a genuine loan is that the lender is "absolutely entitled to repayment under all circumstances"—the inquiry is "ultimately about whether the transaction represented a real transfer of risk." *Lateral Recovery LLC v. Queen Funding, LLC*, No. 21 Civ. 9607(LGS), 2022 WL 2829913, at *4 (S.D.N.Y. July 20, 2022).

132. The transaction must be judged by its real character, "rather than by name, color, or form which the parties have seen fit to give it." *LG Funding*, 122 N.Y.S.3d at 312 (quoting *Abir v. Malky, Inc.*, 873 N.Y.S.2d 350, 354 (N.Y. App. Div. 2009)). Thus, a court is not confined to the four corners of the loan documents but must also consider the surrounding circumstances of the transaction as a whole. *See id.*; *GWG Holdings*, 2023 WL 6449208, at *6. As set forth below, the Amended Complaint's allegations easily satisfy this standard.

**B.** **The Amended Complaint States a Claim for Recharacterization.**

133. The Amended Complaint states a claim for recharacterization of the Intercompany Loans for at least the following reasons.

134.    *First*, Luxco SPV—the lender under the Intercompany Loans—had no genuine expectation of repayment.  The defining characteristic of a true loan under New York law is that the lender is "absolutely entitled to repayment under all circumstances." *Lateral Recovery, LLV v. Cap. Merchant Servs, LLC*, 632 F. Supp. 3d 402,453 (S.D.N.Y. 2022).  The Amended Complaint alleges that (i) at the time of the Intercompany Loans, the Debtors' consolidated financial statements showed negative book equity, their existing debt was trading far below par value, and they had been cash-flow negative for years (Am. Compl. ¶ 63); (ii) the collateral supporting any repayment was simultaneously diminished through the AmSty Dropdown (removing a $500 million asset) and the issuance of the Foreign Guaranty to the Super HoldCo Lenders (Am. Compl. ¶¶ 72, 105–05); (iii) despite this deteriorating financial picture—by year-end 2024, the Debtors reported negative $77.5 million in free cash flow—the Debtors nonetheless upsized the Intercompany Loans by an additional $494.5 million (Am. Compl. ¶¶ 109, 115); and (iv) S&P immediately downgraded the company after the 2025 LME, which included the 2025 Intercompany Loan, characterizing the transaction as a "selective default" (Am. Compl. ¶ 32).

135.    These allegations plausibly establish that Luxco SPV took on the downside risk of OpCo Borrower's poor financial performance, much like an equityholder, and did so for the purpose of manufacturing a claim in bankruptcy for Luxco SPV's own creditors. That is sufficient to state a claim for recharacterization.  *See In re BH S & B Holdings LLC*, 420 B.R. 112, 159 (Bankr. S.D.N.Y. 2009) ("The Committee has adequately pled that the source of repayments was expected to be Holdings's earnings, and this weighs in favor of recharacterization."); *cf. GWG Holdings*, 2023 WL 6449208, at *7 (denying summary judgment on recharacterization claim where evidence raised similar questions about whether the purported lender had structured the transaction to "capture all the expected returns of the asset").

136. *Second*, the Intercompany Loans were not arm's-length transactions. The Amended Complaint alleges that (i) the Intercompany Loans were approved by the same individuals who, because of their overlapping management positions, owed fiduciary duties to both Luxco SPV and OpCo Borrower (Am. Compl. ¶¶ 97, 129); (ii) there is no evidence that anyone negotiated, deliberated over, or performed due diligence on the Intercompany Loans on behalf of either entity (Am. Compl. ¶ 98, 130); (iii) none of the usual steps that precede a major loan occurred, such as an exchange of term sheets, negotiation of terms, or an underwriting or credit analysis (*id.*); and (iv) there is no indication that Luxco SPV ever evaluated whether OpCo Borrower could repay the loan (*id.*). Further, the Debtors concede that "[t]he lender and borrower share an identity of interest." Debtors' MJP ¶ 130. This is the "paradigmatic situation for recharacterization . . . where the same individuals or entities (or affiliates of such) control both the transferor and the transferee, and inferences can be drawn that funds were put into an enterprise with little or no expectation that they would be paid back along with other creditor claims." *In re Mallett, Inc.*, No. 21-11619 (JLG), 2024 WL 150628, at *13 (Bankr. S.D.N.Y. Jan. 12, 2024).

137. *Third*, no independent lender would have extended credit on these terms. "The fact that no reasonable creditor would have acted in the same manner is strong evidence that the advances were capital contributions rather than loans." *In re Live Primary, LLC*, 626 B.R. 171, 203 (Bankr. S.D.N.Y. 2021). Here, the Amended Complaint alleges that (i) the terms of the Intercompany Loans simply mirror the terms of the NewCo loans and were not independently negotiated as between the intercompany borrower and lender (Am. Compl. ¶¶ 98, 129); (ii) the Intercompany Loans bore an interest rate of SOFR plus 9.656%—far more expensive than the approximately 7.5% and 5.375% debt they replaced—yet this premium coincided with value being stripped from the borrower's collateral pool (Am. Compl. ¶ 101); and (iii) the Intercompany Loans

were made at a time when the Debtors' existing debt was trading far below par value, signaling market skepticism about repayment prospects (Am. Compl. ¶ 104). Moreover, the Debtors themselves concede that the Company "ran a robust third-party financing process but was unable to raise the necessary financing." Debtors' MJP ¶ 130. This concession *supports* recharacterization: if no independent lender would extend credit on these terms, it follows that the transaction is not a bona fide loan but rather an equity-like contribution between affiliated entities. *See Live Primary*, 626 B.R. at 203 (recharacterizing purported loan where "[t]he Debtor could not obtain loans at the time that were remotely similar to those extended by [the intercompany lender].").

138.    *Fourth*, the purpose of the Intercompany Loans was to manufacture a bankruptcy claim, not to lend. New York law requires courts to determine the "objective indicia of the parties' intent" and to "distinguish between intent to borrow and intent to engage in a joint transaction or exchange money for some other reason." *Haymount*, 609 F. Supp. 3d at 247 (quoting *Adar Bays*, 37 N.Y.3d at 334). Several features of the Intercompany Loans and related transactions evidence that their true intent was not to provide genuine financing but to manufacture a bankruptcy claim: (i) the Intercompany Loans were created simultaneously with the extension of new lending to Luxco SPV and would not exist but for the LMEs (Am. Compl. ¶¶ 67–72); (ii) OpCo Borrower did not receive new value because, although the proceeds refinanced existing liabilities, the related LMEs simultaneously resulted in new guarantees issued by numerous OpCo subsidiaries to secure the Super HoldCo debt, stripping equity value from those subsidiaries and burdening OpCo with substantial new obligations (Am. Compl. ¶¶ 100–04); and (iii) Luxco SPV was not in the business of making loans (Am. Compl. ¶ 107). *See Bunch v. J.M. Capital Fin., Ltd. (In re Hoffinger Indus., Inc.)*, 327 B.R. 389, 409–11 (Bankr. E.D. Ark. 2005) (recharacterizing purported loan where the

debtor "funded its own borrowing" through an entity controlled by the same insiders and the "purpose was not to incur debt necessary to the debtor's operations [but] to pay interest on equity and to judgment-proof the debtor").

139.    For these reasons, the Amended Complaint states a claim for recharacterization.[17]

## CONCLUSION

140.    Defendants are not entitled to judgment on the pleadings for any of the claims in the Amended Complaint.

---

[17] Even if the Court were to apply the *AutoStyle* factors, *see Bayer Corp. v. MasoTech, Inc. (In re AutoStyle Plastics, Inc.)*, 269 F.3d 726 (6th Cir. 2001), the result would be the same.  No single *AutoStyle* factor is dispositive; courts apply them "holistically" to discern "whether the parties called an instrument one thing when in fact they intended it as something else."  *In re SubMicron Sys. Corp.*, 432 F.3d 448, 455–56 (3d Cir. 2006); *Mallett, Inc.*, 2024 WL 150628, at *20.  Here, as discussed above, several *AutoStyle* factors favor recharacterization—including identity of interest between creditor, inability to obtain outside financing, inadequacy of capitalization, dependence on earnings for repayment, and absence of a sinking fund.  The remaining factors—the naming of the instrument, the fixed interest rate, the stated maturity date, and the provision of security interests—go to the *form* of the transaction, which is not dispositive.  *See Live Primary, LLC*, 626 B.R. 171, 199; *SubMicron*, 432 F.3d at 455–56.  In any event, courts have recharacterized loans even where nearly all *AutoStyle* factors facially weighed against recharacterization.  *See Mallett*, 2024 WL 150628, at *20.

Respectfully submitted this 23rd day of June 2026.

**GRAY REED**

By:      */s/ Jason S. Brookner*
   Jason S. Brookner
   Texas Bar No. 24033684
   Lydia R. Webb
   Texas Bar No. 24083758
1300 Post Oak Blvd., Suite 2000
Houston, Texas 77056
Telephone: (713) 986-7000
Facsimile: (713) 986-7100
Email:  jbrookner@grayreed.com
     lwebb@grayreed.com

-and-

**PALLAS PARTNERS (US) LLP**

 Duane L. Loft (*pro hac vice* pending)
 Jill L. Forster (*pro hac vice* pending)
 Brianna S. Simopoulos (*pro hac vice* pending)
 75 Rockefeller Plaza
 New York, NY 10019
Telephone: (212) 970-2300
Email:  duane.loft@pallasllp.com
     jill.forster@pallasllp.com
     brianna.simopoulos@pallasllp.com

*Counsel to the Ad Hoc Group of Excluded
OpCo Term Lenders*

## Certificate of Service

The undersigned hereby certifies that on the 23rd day of June 2026, he caused a true and correct copy of the foregoing document to be served via the Court's CM/ECF system.

    */s/ Jason S. Brookner*
    Jason S. Brookner